**HEIGHTS COMMUNITY CONGRESS, et al., Plaintiffs,**

v.

**HILLTOP REALTY, INC., et al., Defendants.**

No. C79–422.

United States District Court, N.D. Ohio, E.D.

Nov. 30, 1983.

Avery S. Friedman, Kathryn Gonser Eloff, and Donald K. Barclay, Cleveland, Ohio, for plaintiffs.

Anthony J. DiVenere, Burke, Haber & Berick, Richard A. Dean, Arter & Hadden and Harvey B. Bruner, Bruner & Shafran, Cleveland, Ohio, for defendants.

### TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | BACKGROUND | 1241 |
| II. | ALLEGED SECTION 3604(a) VIOLATIONS | 1249 |
| III. | ALLEGED SECTIONS 3604(c) AND 3604(e) VIOLATIONS | 1294 |
| IV. | STATUTE OF LIMITATIONS | 1303 |
| V. | LIABILITY OF VINCENT T. AVENI | 1303 |
| VI. | INJURIES AND RELIEF | 1305 |
| VII. | ORDER | 1309 |

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Tried to this court, the action of plaintiffs Heights Community Congress (also HCC or the Congress) and the City of Cleveland Heights (also City or Cleveland Heights) is based on Title VIII of the Civil Rights Act of 1968, otherwise known as the Fair Housing Act, section 801 *et seq.*, 42 U.S.C. § 3601, *et seq.* (1977). Plaintiffs assert claims against Hilltop Realty, Inc. (now known as HGM/Hilltop), its president and certain sales agents.

Plaintiffs allege that Heights Community Congress, a not-for-profit corporation orga-

nized under the laws of the State of Ohio, seeks to promote and maintain Cleveland Heights as an open and integrated community, and has "endeavored to achieve this objective through the processes of education, negotiation, publication, community organization and litigation." Plaintiffs further allege that the City of Cleveland Heights is a municipal corporation organized and existing under the laws of the State of Ohio. Plaintiff City seeks to continue to be a stable, integrated community, without resegregation in any part, for the benefit of its residents and all those who choose to live there. The City has expended substantial monies, primarily through federal grants, on programs designed and implemented to accomplish these objectives.

The case proceeded to trial on Counts II and III of the plaintiffs' complaint.[1]

In their second cause of action, plaintiffs allege:

Plaintiff Heights Community Congress has monitored the activities of the defendants since 1973 and found a pattern and practice of racially discriminatory housing practices by the defendants including locational steering by race, racial remarks, racial disparity in financing, racial differentiation in treatment and racially inconsistent advertising.

In prosecuting this cause of action, plaintiffs charge defendants Hilltop, Vincent T. Aveni, John Mayfield, Evelyn Gardner and Shirley Bernstein with violations of 42 U.S.C. § 3604(a) and (c).

In the third cause of action, plaintiffs assert unlawful discriminatory housing practices against sales agents of the de-

fendant Hilltop Realty, noting among other things that within six months of the filing of the complaint "two (2) of defendant's agents have been convicted in the Cleveland Heights Municipal Court of violations of the City's anti-solicitation ordinance." In prosecuting this cause of action, plaintiffs charge a violation of 42 U.S.C. § 3604(e) against defendants Val Vrana and Bruce Johanns.

The defendants generally deny the allegations of plaintiffs in the second and third causes of action. In addition, defendants continue to assert that neither the City nor Heights Community Congress has established the necessary elements of standing to assert their claims in this action. The defendants further assert that both the City and HCC have failed to establish a causal relationship between alleged conduct of defendants and any alleged injuries.

After a 12-week trial, counsel submitted post-trial briefs and argued the case orally on June 17, 1983. Thereupon, the case was submitted to the court for decision.

## I. BACKGROUND

### A. Cleveland Heights

Plaintiff City of Cleveland Heights is a municipal corporation organized and existing under the laws of the State of Ohio and was chartered in 1921. The City is contiguous to Cleveland on the west, East Cleveland and Cleveland on the north, South Euclid and University Heights on the east, and Shaker Heights on the South. The City's government includes a council, a council-elected mayor and a council-appointed city manager.

---

1. In their first cause of action, plaintiffs alleged that defendant Hilltop Realty was a party to a consent decree in the United States District Court for the Northern District of Ohio which required specific affirmative fair housing activities. It was alleged that notwithstanding this 1973 decree, defendants and their agents "contributed to the erosion, interference and obstruction of integrated housing opportunities by

the defendants' failure to abide by their affirmative fair housing duties." Immediately before the start of trial, the court on January 26, 1983 granted the motion of defendants Hilltop Realty, Inc. and Vincent Aveni to exclude "evidence of alleged violations of the 1973–76 consent decree," the subject of Count I. By stipulations of December 3, 1981 and May 21, 1982, all remain-

Professor Oliver Schroeder[2] testified as to the diversity of the City. He described Cleveland Heights as a "built-up community" of used homes with a wide variety of styles and with house prices ranging from $30,000 to $250,000. Professor Schroeder observed that Cleveland Heights has "unique citizens," e.g., "45 percent of the Cleveland Orchestra live in Cleveland Heights." The City is "heavily professional," and among its residents are employees of the Cleveland Clinic and University Hospitals. The City has a broad religious make-up, including a "strong Jewish population," a "sizeable Catholic population," and "strong Protestant churches."

Professor Schroeder described two home bombings in Cleveland Heights that were related to race. In October 1965, a house near Euclid Heights Boulevard was bombed. It was the home "in which the new director of the Karamu Theater, a black man and his family, had moved in." The mayor and council issued a proclamation. As its author, Professor Schroeder remembers that the proclamation declared that the community was an open community, that any individuals who wished to conduct themselves in an orderly manner could buy in Cleveland Heights, and that all of the forces of police investigation would be used to prohibit "this kind of violation occurring in the community."

While Professor Schroeder was mayor in 1972, a home on Brinkmore in the northeast section of Cleveland Heights, owned by a black family, was bombed. When the bombing occurred, the mayor visited Mrs. Appling's home and viewed the destruction. He reported:

I assured her that just because she was black, this should never have happened, that we wanted her as a citizen and a resident of Cleveland Heights, and we hoped that we could help her get her home restored.

A meeting of residents of the street was organized, which the mayor attended. He recommended that the residents create a street club to "give themselves protection and to build up an esprit de corps for their street and for their neighborhood that would continue to make it a very worthwhile place in which to live."

The change in demographics in Cleveland Heights in the decade 1970–1980 is demonstrated in the evidence. According to the United States census, Cleveland Heights had a population in 1970 of 57,767 and in 1980 a population of 56,438. In 1970, the census percentage of black residents in Cleveland Heights was 2.5 percent. By 1980, the census showed that the percentage of blacks in Cleveland Heights had grown to 24.9 percent (other minorities comprised an additional 2.1 percent).[3]

Census data for the 17 census tracts within the City reveal that in 1970 census tracts 1401 and 1405 each had zero percent black. The remaining 15 tracts ranged from a low of .5 percent black in census tract 1402, to 9.0 percent in census tract 1406. Census data for 1980 show a black population in each of the 17 census tracts. However, as the court noted in its March 17, 1983 memorandum and order, using the average black population for the City "conceals substantially higher non-white percentages in certain areas of the city." Cen-

ing class action claims of Count IV were dismissed.

**2.** Oliver Schroeder, professor of law at Case Western Reserve University Law School, was elected to three four-year council terms after filling a council vacancy in 1965. From 1972 to 1974 he served as mayor and president of council. Since 1980 he has served on the housing board.

**3.** All parties refer to Cleveland Heights as integrated. Social statistician Edward McNeeley of the Cuyahoga Plan was asked if there is "any agreed-upon definition as to what constitutes

integration?" He answered: "Not a numeric definition, no." He attempted to give what he thought he meant in the Cuyahoga Plan reports when the term "integration" was used. His formulation is not applicable here. Instead, for purposes of this lawsuit when the term "integrated" is used or forms a basis of racial composition, comparison of communities, census tracts, or neighborhoods, the term will be understood to mean approximately the 1980 black population of Cleveland Heights, or 24.9 percent.

sus tract 1413 had a black population of 5.8 percent, while census tract 1403 had a black population of 53.7 percent. Breaking the census tracts into two groups, eight range from 5.8 percent black to 15.9 percent black, and nine census tracts range from 24.0 percent black to 53.7 percent black, as the chart in the margin illustrates.[4]

Adjacent to Cleveland Heights, to the north, the city of East Cleveland experienced a dramatic rise in the black population in the late sixties. The 1970 census showed the black population at 58.6 percent. By 1980 the census showed a black population increase to 86.5 percent. This percentage indicates that overall, East Cleveland has become resegregated.[5]

Cleveland Heights census tract 1403 is 53.7 percent black, the highest concentration of blacks in a Cleveland Heights tract.

It rose from .7 percent in 1970. Tract 1403 is adjacent to East Cleveland census tract 1502, which had an increase in its black population from 10.4 percent in 1970 to 65.3 percent in 1980. It is interesting to note that within Cleveland Heights tract 1403 there also is an ascertainable housing pattern. Within tract 1403, census block group 2 is 12 percent black according to 1980 census data. Block group 2 is located in the southeast corner of 1403 and at the point furthest away from East Cleveland. Moving toward East Cleveland, the next census block group is block group 1. Its population is 39.5 percent black. Successively closer to East Cleveland the percentages of blacks in block groups 3, 4, 6 and 5 are 55, 80, 80, and 67, respectively.

Social statistician Edward J. McNeeley of the Cuyahoga Plan of Ohio, Inc.,[6] was

4.

| Census Tract | Percent | Black |
| --- | --- | --- |
| | 1980 | 1970 |
| 1413 | 5.8 | 2.7 |
| 1412 | 8.1 | 2.2 |
| 1411 | 8.5 | 2.0 |
| 1414 | 9.5 | 1.5 |
| 1415 | 9.5 | 1.4 |
| 1405 | 10.3 | 0.0 |
| 1417 | 15.5 | 1.6 |
| 1404 | 15.9 | .6 |
| 1408 | 24.0 | 3.2 |
| 1401 | 29.1 | 0.0 |
| 1416 | 30.9 | 3.3 |
| 1410 | 33.6 | 4.0 |
| 1402 | 34.8 | .5 |
| 1406 | 38.0 | 9.0 |
| 1409 | 42.2 | 4.2 |
| 1407 | 43.1 | 6.5 |
| 1403 | 53.7 | .7 |

Source: U.S. census data

5. "Resegregation" does not have a precise definition. Mr. McNeeley testified that the Cuyahoga Plan uses the term to mean "a process of one racial group replacing another" if the change is "a rapid racial change." This court uses the term in this memorandum to broadly mean a process of one racial group replacing another.

6. Mr. McNeeley has helped coordinate research and planning in the Cuyahoga Plan's "continuous demographic study of the racial composition of [Cuyahoga County] neighborhoods and communities." Three editions of the "Report on Population and Race Estimates of the Racial

Composition of Census Tracts," published in 1979, 1980 and 1981 are in evidence.

Although census data on racial composition of Cleveland Heights by census tract are not available for the years in between 1970 and 1980, the data compiled from Cuyahoga Plan studies give some indication of changes in the non-white population for years 1970, 1973, 1975, 1976, 1977, 1978, 1979 and 1980. The Cuyahoga Plan methodology uses a formula based on birth and death records, which are reported by race and census tract. Mr. McNeeley testified that when estimates made from the Cuyahoga Plan methodology were compared with census data, the Plan estimates were within five per-

asked on cross-examination by counsel for defendants, "Now, again, looking at Cleveland Heights figures as a whole, if we look at the figures from 1970 in your first report, which goes, I believe to '77, and in your last report which takes it to 1980, is it fair to say that the greatest rate of change in the non-white minority population was in the early part of the decade, the first part of the decade, '70—'75?" Mr. McNeeley answered, "I would say until '76 but, yes." Answering a follow-up question as to whether this rate of change "lessened substantially" in the period '76–'80, Mr. McNeeley answered, "in most of the census tracts."

Professor Schroeder described action taken by the Cleveland Heights City Council to meet problems relating to race and housing. The first problem concerned real estate solicitation in the years 1966 and 1967. He recalled that on a particular street, "all of a sudden over a weekend, 19 for sale signs came up on the street, which had about 35 or 40 homes on it." At a street club meeting he learned that "the whole street had been solicited and urged to put their homes up for sale." The solicitation had been by real estate companies. Hilltop was not one of them.

In 1967 City Council adopted an emergency ordinance which addressed "the problems created by racial discriminations in the real estate area," according to Professor Schroeder. This ordinance forbade for sale signs on private residences. This ban became part of the 1970 zoning ordinance.

Professor Schroeder stated that in 1972, while he was mayor, "there was a tremendous influx of telephone solicitations in several areas." One area was the northeast Oxford area where the Brinkmore bombing occurred, and another was east of Lee Road between Mayfield and Cedar Roads. Many of the street club representatives came to Council and demanded that it stop the telephone solicitation. Council responded by passing an emergency anti-telephone solicitation ordinance which put the burden on the citizens: "If you don't want to be called, you sign this card. Your name will go on the no-call list and you will not be solicited." [7] At the six-month expiration of the emergency anti-solicitation ordinance, a voluntary PAL program was instituted. The program provided a listing of "preferred" agents who the City would advertise as "the people to see if you desire to live or buy a home in Cleveland Heights." In return, the agent would take a training course on the benefits of Cleveland Heights and agree not to solicit. The voluntary plan "worked modestly."

City Council in 1976 adopted Resolution No. 26–1976 and Ordinance No. 27–1976. Resolution No. 26–1976 established the components of a comprehensive real estate program. One component was the preferred agent program, and another was expanded community and public relations. The resolution also established a Financial Institution Advisory Committee (FIAC) and provided for cooperation with other municipalities and organizations in the county area "seeking to open up all of the Cuyahoga County to open housing, completely free market."

Ordinance No. 27–1976, still in force, prohibits discrimination in housing, block busting, and real estate steering. Home solicitations are barred if the homeowner has filed a written notice not to be solicited. The ordinance also provides for the establishment of the Cleveland Heights Housing Board to monitor the operation of the ordinance. The ordinance further provides misdemeanor penalties for persons who violate the various prohibitions.

---

cent of the census data over 80 percent of the time for 1970 and 1980 for all census tracts in the County.

7. Black real estate people asserted that other than through solicitations, they had no way of getting listings. They complained that the white

Mrs. Barbara Roderick [8] became housing coordinator for Cleveland Heights in November 1970. Her major responsibility was to assist in organizing street clubs and neighborhood meetings, to receive complaints from residents, and to try to reduce anxiety associated with black families moving into Cleveland Heights. Her office also worked with the real estate brokers who were most active in Cleveland Heights to "create a stable real estate market and not a panicked one."

After the adoption of the resolution and ordinance, Mrs. Roderick, in April 1976, assumed the title of Commissioner of Real Estate Programs. She supervised the Housing Service "to establish ... a Preferred Agents Program, to work with the industry and [to] work with residents around real estate issues." In November 1979 Mrs. Roderick ended her Cleveland Heights employment to engage in private business.

The foregoing summary of evidence demonstrates the City's affirmative efforts to maintain Cleveland Heights as an open, stable, integrated community and to prevent resegregation.

B. Heights Community Congress

In 1972 a group of women members of St. Ann's Roman Catholic Parish in Cleveland Heights became interested in housing patterns in Cleveland Heights and other suburbs. They formed the St. Ann's Social Action Housing Committee. After receiving instruction from Dr. Julia Saltman, see *infra* pp. 19–20, the committee performed an audit of ten real estate firms, including Hilltop Realty, between June and August 1972.

The Housing Committee prepared a written report and made oral reports to the city councils of Cleveland Heights and Shaker Heights. A copy of the report of the audit was sent on September 1, 1972 to Vincent T. Aveni, president, Cleveland Area Board of Realtors (CABOR), indicating that it was a "Real Estate Audit in the eastern suburbs of Cleveland." Subsequently, representatives of the St. Anne's Social Action Housing Committee met with Mr. Aveni.[9]

Formed in the last months of 1972, a group called the Housing Task Force became the Housing Task Force of the Heights Community Congress. The latter organization was formally chartered as an Ohio corporation not for profit on January 4, 1973. As stated in the HCC's code of regulations:

> The Heights Community Congress is a non-partisan coalition of religious, civic, educational, neighborhood and community organizations in the Cleveland Heights, University Heights area and representatives of city government, with a common objective of promoting and

real estate agents and firms were already in place and had the opportunity to get listings.

8. Mrs. Roderick, M.S.S.A., School of Applied Social Sciences of Case Western Reserve University, in 1964 began to work in the field of fair (open) housing. In 1968 the N. Taylor Road office of Isaac Haggins, the first black real estate broker to open an office in Cleveland Heights, was bombed. Six or eight months later, Mrs. Roderick was employed by Mr. Haggins "in his efforts to see if a black broker could become a part of the mainstream of the real estate industry." Her work was primarily to make community contacts to assist the black broker in securing "listings in white neighborhoods in order to increase opportunities for black buyers."

9. On October 2, 1972, Almon R. Smith, executive vice president of the Cleveland Area Board of Realtors, released a "statement on recent St. Ann's report and open housing in general." Among other things, a news release stated:

> A housing group from St. Ann's in the Heights area did an extensive and exhaustive study and made its report known to all of the news media before they even made it known to the people involved. In addition to that, they further complicated the entire matter by refusing to even name the companies which they had used as their test companies.

The St. Ann's audit report has not been received in evidence, and none of the auditors appeared as witnesses in the trial. Although questions concerning its content were not permitted, the court permitted examination of Mrs. Nigro and Mr. Aveni, as president of CABOR, about their discussion of the report. Testimony was taken, not for the content of the discussion, but "for purposes of claiming notice." This notice could only be general since neither Hilltop or other firms were identified.

maintaining an open and integrated community of the highest quality.

Membership in the corporation includes designated classes of membership and neighborhood organizations.[10]

Activities of the Congress are primarily carried on through 13 task forces. Only the activities of the Housing and Open Housing Task Force are of relevance in this case.

By agreement dated May 30, 1974, the City engaged the Congress to provide a "Heights Housing Service" for a period of six months beginning June 1, 1974 for stipulated monthly payments. Pursuant to this agreement, the "Heights Housing Service" was established to escort prospects throughout the entire City before looking at specific homes for purchase, to assist buyers and sellers with their housing needs, and to "promote an open community whereby access to housing will be available to all home seekers in the total city." As part of the comprehensive program established by Resolution No. 26–1976, the City took over the Heights Housing Service in June 1976. Thereafter, the City administered the escort service.[11]

The Open Housing Task Force performed an audit of Hilltop and other firms from approximately July through September 1973 under the direction of Susan Nigro.[12] After the results were compiled and a report was prepared, representatives of HCC met with the City to discuss the results.

Charles H. "Chip" Bromley started to work for HCC in mid-1973 as a community organizer. After Mrs. Nigro shifted her duties from the Open Housing Task Force to organizing and directing the Heights Housing Service, Mr. Bromley became the HCC staff person working with the Open Housing Task Force. Under Mr. Bromley's direction, real estate firms who were members of the exclusive multiple listing exchange and parties to the U.S. District Court consent decree, see *supra* note 1, were audited in the summer of 1975. Based on the results of the audit, Mr. Bromley prepared a report and recommendations which were submitted to the City in late 1975 or early 1976. He noted that some of the written recommendations to the City were embodied in the comprehensive housing program legislation.

Under HCC's May 1976 contract with the City to monitor real estate practices in the City of Cleveland Heights, see *supra* note 11, the Open Housing Task Force conduct-

---

**10.** Each class and each neighborhood organization is entitled to one trustee on the board of trustees. Among the 14 classes are the Government Class, the School Board—Library Board Class, the Catholic Organizations Class, the Jewish Organizations Class, the Protestant Organizations Class, the Independent Religious Organization Class, the Business Class, the Merchants Association Class, the Civic Organizations Class, the School Affiliated Organizations Class, the Youth Representative Class, the Black Citizens Class, the Women's Rights Class, and the Senior Adult Class. Neighborhood organizations serve residents in the ten geographical areas of Cleveland Heights according to original elementary school district boundaries (Boulevard, Caledonia, Canterbury, Coventry, Fairfax, Millikin, Noble, Oxford, Roxboro, and Taylor).

**11.** To further carry out the "comprehensive program," the City and the Congress entered into an agreement on May 1, 1976 by which, among other things, the Congress agreed to continue research into the "mortgage loan practices of financial institutions" for specified years, and the Congress agreed to assist the City "in monitoring the effect of the Preferred Agents program and monitoring such other aspects of the Housing Delivery System as the City Manager may direct from time to time." Effective December 13, 1976, the parties agreed to specified changes in the services to be performed by the Congress and the payments to be made by the City.

**12.** These results were not received in evidence and the checkers were not called as witnesses. However, Mrs. Nigro was permitted to testify that she reported the audit results to Mr. Aveni on April 25, 1974. In part she stated:

The next thing I remember him saying is that, you know, he was really trying to do a good job, and he would take care of whatever things had happened during this audit.

We told him the names of those agents and what we had found, and he said, "I will take care of it."

ed an audit of Hilltop and seven other real estate companies in August 1976.[13]

The Open Housing Task Force completed another audit of fair housing practices in Cleveland Heights in July 1977, as evidenced by letters of September 15, 1977 and February 16, 1978 to checkers from the chairperson of the Open Housing Task Force. Within the limited purpose for which this letter was received in evidence, the letter records that "[n]ineteen real estate companies (31 completed agent checks) were audited between April and December 1977."

Pursuant to Resolution No. 16–1976, which provided for a "study to be conducted by the City of the availability of housing within the community and other aspects of the housing delivery system within the community," the City entered an agreement with HCC on February 24, 1978. For the fee of $9,500 the Congress agreed to "complete a minimum of sixty (60) housing survey checks, said checks to be made by matched pairs of white and black personnel." The Congress further agreed to "work under the direction and supervision of Juliet Saltman, Ph.D., a consultant under contract to the City."

13. In the fall of 1976, the Open Housing Task Force prepared a report of the 1976 audits. The report compared the activities of PAL and non-PAL real estate agents (13 agents in all, seven companies). The report made several recommendations to the Housing Board of the City, including the recommendation that the Board should follow up vigorously with individual agents whom the Housing Task Force felt had violated the fair housing law.

14. As a consultant to the National Audit, Dr. Saltman performed several services. She wrote the manual for checkers and assisted in the design and preparation of the forms for supervisors. During the 1977 National Audit, which ended in June 1977, she served as regional coordinator for the north central region of the country (eight metropolitan areas in Ohio, Tennessee and Kentucky). She was responsible for the training in each of these areas and the preparation all of the materials.

15. Dr. Saltman differentiated audit types. She explained that the purpose of the HUD-type audit is to measure the equality of treatment in the actual real estate market, as to be determined by broker practices rather than individual agent practices.

Dr. Saltman had served as a consultant[14] with the HUD National Audit of Housing Opportunity. Dr. Saltman explained that the HUD audit was "designed to measure the extent of equal housing opportunity in the country as a way of determining the impact of the fair housing law" and not "for litigation, per se." [15]

Dr. Saltman agreed that the "gist or the premise of the methodology used in the HUD audit" is thus correctly stated in the audit executive summary entitled "Measuring Racial Discrimination in American Housing Markets:"

Two individuals of the same sex are matched as closely as possible in terms of age, general appearance, income and family size; that is, in every relative way except skin color. The two individuals request identical housing and carefully record their respective experiences on standardized reporting forms. The quantity and quality of information and service provided to each are then compared and any systematic difference in treatment accorded black auditors and white auditors is presumed to be because of race.

Asked why she believed this to be a fair and accurate method of determining difference in treatment or discrimination as it relates to a broker's office, she answered:

Because that is really the only way you can measure what is occurring in the true market.

Most people, when they are looking for houses, do not go back to the same agent. Most people deal with a company or various companies. If you wish to measure the treatment of companies, you have to measure the companies rather than the individual agents.

In a single-agent audit where both checkers evaluate the same agent, she agreed that the characteristics are the same as in the HUD-type audit. She considered it a fair and accurate method of determining whether discrimination takes place by that particular agent as far as housing practices go.

On cross-examination she was asked:

Now, if there is a difference in treatment by two different agents, that is, where the agent is not identical, then logically couldn't some of those differences in treatment be attributable to the difference in the agent rather than race? Yes or no?

She answered, "If that is what you are testing." She then added, "If you're not testing that, then it is irrelevant."

Asked if the black and white checkers should have similar educational background, Dr. Saltman stated "only commensurate with their occupational status." However, the "size of housing" and "the area preferred" both "had to be the same." However, the checkers were instructed not to use exactly the same words in giving "the area preferred." [16] She agreed that the "price range also had to be identical." The "down-payment" is not to be identical but "had to mean the same things." Dr. Saltman agreed that the purpose of making these factors "identical between the black and the white checker was so that you could determine whether the difference in treatment was then attributable to race."

This court concludes that the HUD-type audit, used nationally in 1977 and employed in the Cleveland Heights 1978 spring audit, is a generally valid method of detecting disparate treatment of prospective home owners based on race. However, as one of its specifications, the audit methodology limits the number of homes shown that the checker must report in the audit form to three, although she may have been offered or shown more by the agent. Three home showings before a purchase is not reflective of the experience of the large majority of actual home buyers called as witnesses by both plaintiffs and the defendants.[17] Hence, in evaluating each audit, the court has taken into account any homes in excess of three that were offered to be shown by an agent to a particular checker.

During the 1978 spring audits, 35 randomly selected real estate companies were audited in 60 office visits by the 14 checkers (seven black, seven white, all female) from Tuesday, April 4 through Saturday, April 8, and from Monday, April 10 through Friday, April 14. Company real estate sales agents showed homes to the checkers by following up on the office visits. Each checker was directed to limit home showings reported in the audit to three. The seven black checkers and the seven white checkers formed seven pairs, with each counterpart checker auditing the same company. After the white checker had visited the real estate company office, the black checker was to complete her separate audit within 24 hours of the white checker's audit.

Each checker completed a multiple choice audit report, a narrative statement, and a supplementary report immediately after the audit. No more than three homes shown to the checker were reported in the audit form. The checkers took the completed forms to the office of the Heights Community Congress where the audit supervisors reviewed the forms. The supervisors made their determinations with reference to the presence or absence of differences of treatment between the black and white checkers.

With respect to the spring 1978 audits, Dr. Saltman "analyzed the summaries, examined some of the individual audits, and went over the evaluation of the supervisors of the audits in reaching conclusions which are contained in [her 70-page report submitted to the City]." On grounds stated by the court, but which need not be repeated here, the court ruled that the report was inadmissible.

In conducting the fall 1978 audits, HCC acted independently of the City. From October 18 through October 21 and from October 24 through October 28, 1978, eight checkers (four black, four white, all female) completed audits of 17 real estate companies, including Hilltop Realty. Later, on November 19, open house audits of particular agents were conducted.

16. Dr. Saltman, who trained the spring audit supervisors, described the nature of the checker training as consisting of the reading of the checker's manual, group training sessions, including the study of forms used, practice in role playing, and two practice audits conducted in the field.

17. Among the three actual home buyers called by the plaintiffs, the number of showings ranged from 10 to at least 45. Among the 22 actual home buyers called as witnesses by the defendants, three purchased a home after three or fewer showings; fourteen were shown six to 16 homes; three saw 17 to 27 homes; one saw 33 homes; and one saw somewhere between 30 and 40 homes.

Except for the inclusion of some individual agent audits, the fall audits followed the methodology of the 1978 spring audit. The spring 1978 auditor's manual was given to the checkers to read, and other training procedures used in the spring were followed in the fall. At the conclusion of each audit, the checker filled out the auditor's report form and turned it in to a supervisor for review and evaluation. It is determined that HCC applied the HUD-style methodology found to be generally valid by this court.

Based on the results of the spring and fall audits, the HCC requested that the City join it in filing a law suit against Hilltop. The city manager and law director made the decision to file the lawsuit after the City had been told by HCC the results of the fall 1978 series of audits.

### C. Hilltop Realty

Hilltop Realty, Incorporated, an Ohio corporation for profit, incorporated in 1953, now carries on its business as "HGM/Hilltop." Its principal office is in the Hilltop building in Lyndhurst, Ohio. The Lyndhurst or Hillcrest office of Hilltop is also located in the same building. At times relevant to the events of this law suit, Hilltop maintained a Cleveland Heights office at Mayfield Road and Warrensville Center Road. This office was closed in 1980. Hilltop has offices in other communities in the eastern suburbs of Cleveland.

## II. ALLEGED SECTION 3604(a) VIOLATIONS

### A. The Law

■ Racial steering, while not specifically mentioned in the Act, is proscribed by that portion of 3604(a) which makes it unlawful to "otherwise make unavailable or deny a dwelling to any person because of race...." *United States v. Mitchell*, 580 F.2d 789 (5th Cir.1978); *Zuch v. Hussey*,

394 F.Supp. 1028 (E.D.Mich.1975), *aff'd and remanded*, 547 F.2d 1168 (6th Cir. 1977).

■ Unlawful racial steering was defined in *Zuch* as follows:

the use of a word or phrase or action by a real estate broker or salesperson which is *intended* to influence the choice of a prospective property buyer on a racial basis. [Emphasis added.]

*Zuch*, 394 F.Supp. at 1047. Under this definition, intent to steer must be shown to prove unlawful racial steering. *United States v. Welles-Bowen Co.*, Equal Opportunity in Housing (P–8), ¶ 15,314, at 15,762 (N.D.Ohio 1979) (citing *Zuch*), *aff'd*, 673 F.2d 1331 (6th Cir.1981).

Courts have held that if there is proof of significant "discriminatory effect," then this may be sufficient to show a violation of the Fair Housing Act, even without direct proof of discriminatory intent. *Mitchell*, 580 F.2d at 791; *United States v. City of Parma, Ohio*, 494 F.Supp. 1049 (N.D. Ohio 1980); *aff'd in relevant part*, 661 F.2d 562 (6th Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). The statistical evidence presented in this case is not sufficient to permit a finding of "significant discriminatory effect." Therefore, in the instant case plaintiffs must show intent to racially steer.[18]

■ It is not necessary for the steering to be successful in order for the act to violate section 3604(a), for attempts to steer are also proscribed. *Zuch*, 394 F.Supp. at 1048. In *Zuch*, the court held:

The fact that the defendants did not succeed in steering the plaintiffs away from the transitional neighborhoods of Detroit is not relevant; the law makes it unlawful even to attempt. *Smith v. Sol D. Adler Realty*, 436 F.2d 344, 349–50 (7th Cir.1971)...; *Brown v. State Realty*

---

18. Similarly, in *Chicago Heights v. Arquilla-DeHaan Realtors, Inc.*, No. 77–C3305 (N.D.Ill. May 21, 1980), *aff'd*, 645 F.2d 76 (7th Cir.1981), the court focused "its attention on evidence of purpose and intent, since the plaintiffs had not shown that any discriminatory impact resulted

from defendants' alleged conduct." See also *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

*Company,* 304 F.Supp. 1236, 1241 (N.D. Ga.1969).... Were it otherwise, the damage to be done by steering would have to be inflicted first before the actions could be challenged. Such a requirement would fail to serve the purpose of the Act.

*Id.* Furthermore, the test used to determine whether a statement constitutes racial steering in violation of section 3604(a) is not the effect of the racial statement on the hearer of the statement, but rather the effect the statement would have if heard by a reasonable person under the circumstances who is seeking housing.

■ A broker may be held liable for the racial steering of its agents. If an individual sales agent engages in an act of racial steering, and if that act or statement is made within the sales agent's course and scope of employment with a real estate broker, it may be imputed to the broker. *Marr v. Rife,* 503 F.2d 735, 740–42 (6th Cir.1974); *Northside Realty Assoc., Inc. v. United States,* 605 F.2d 1348, 1354 (5th Cir.1979).

In their post-trial brief, plaintiffs support their second cause of action, which alleges "a pattern and practice of racially discriminatory housing practices by the defendants, including locational steering by race," by relying on cases which have construed the Attorney General's right under section 3613. This section allows the Attorney General to bring an action for injunctive or other relief when he has reasonable cause to believe that a person or persons are "engaged in a pattern or practice of resistance to rights granted by the Act." No similar language is contained in section 3612, which provides for enforcement by private persons of rights secured by section 3604 and other sections.

However, earlier in plaintiffs' trial brief, and similarly during the trial, they alternatively argued that "the substance of the complaint" is "the concept of the 'continuing violation' " as set out in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). *Havens,* decided during the life of this case, was a private action for damages and injunctive relief brought under section 3612 in which acts of racial steering in violation of section 3604 were charged by a black renter and two "tester plaintiffs," for themselves and a designated class, and by the organization Housing Opportunities Made Equal (HOME). As plaintiffs suggest, the Court's decision on the issue of the 180-day limitations period of section 3612(a) affects this court's treatment of the nature of the claim which the plaintiffs are bringing.[19]

The Court refused to literally read the Act so that alleged violations that occurred prior to 180 days of the filing of the suit were time barred. The Court dismissed so strict a reading by stating that a "wooden application of 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act." *Id.* at 380, 102 S.Ct. at 1125. Finding that the statute of limitations was meant to bar only stale claims, the Court concluded that where

> a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

*Id.*

■ Since the *Havens* holding on the statute of limitations issue is controlling,

---

**19.** The Court's decision on the issue of organizational standing affects the standing of HCC to join the City as a plaintiff in this action. The Court held:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home-seekers, there can be no question that the organization has suffered injury-in-fact. Such

> concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests. [Citations.]

*Havens,* 455 U.S. at 379, 102 S.Ct. at 1124. This court's December 31, 1980 overruling of a motion to dismiss HCC because of lack of standing is consistent with the Court's ruling.

this court need not rule on whether or not a pattern or practice action as defined in section 3613 cases may be brought by the plaintiffs under section 3612, and if so, whether such a claim has been proved. Applying *Havens,* 455 U.S. at 380, 102 S.Ct. at 1125, the court treats plaintiffs' claim as one which charges separate acts of racial steering by Hilltop agents which comprise "an unlawful practice that continues into the limitations period." Accordingly, those alleged violations that occurred prior to 180 days of the filing of this suit will not be time barred if plaintiffs can show that the alleged incidents violated the Fair Housing Act and constituted an unlawful practice which continued into the 180-day limitations period.

The court turns to the audits chronologically beginning with the 1976 audits.

### B. Claimed Steering Incidents

#### (1) Spagnolo-Kuzma

■ Plaintiffs compare the treatment of white checker Edward Kuzma with the treatment of black checker Hattie Spagnolo as a first steering incident. Edward Kuzma and his wife visited an open house on Dorset Road in Lyndhurst on August 15, 1976. As a result of that open house, Mr. Bill Weir of the Hillcrest office of Hilltop showed the Kuzmas four houses in South Euclid, Highland Heights, and Richmond Heights.

Mrs. Spagnolo had been told to go to the open house and learned from an advertisement in the Sunday paper of its location on Dorset Road in Lyndhurst. Instead of attending the same Sunday open house as told, Mrs. Spagnolo called on Monday and made an appointment for Tuesday at 11:00 a.m. That morning she postponed the appointment until 3:00 p.m. At 2:45 p.m. a lady from the office called to say that Mr. Weir was not in the office. Mrs. Spagnolo said that she immediately called back "in a white tone of voice" and asked if Mr. Weir was there. He was. She hung up and immediately called again and identified herself. She asked him when she could see the house on Dorset. He answered, "I don't think you can see it." However, he told her to call him back at 6:00 p.m. At 6 o'clock she called him back, and he told her that it was not possible because the seller's child was ill. When Mr. Weir offered to show her another house in the same area, she told him that she didn't want to go because it was too late. Mr. Weir testified that he did not show Mrs. Spagnolo any homes because she broke their appointment.

Plaintiffs argue:

Spagnolo, the black checker, was denied access to the Dorset house in Lyndhurst through cancellation of her afternoon appointment (and the agent's inartful attempt to pass it off as the checkers doing), and the later excuse about a sick child which prevented a showing of the house that evening, without an accompanying offer by the agent to show the house at a later time.

Plaintiffs contrast the showing of four homes to the Kuzmas. When Mrs. Spagnolo was asked if she told Mr. Weir that she was black, she answered, "I have never told anyone I was black."[20] Moreover, her account of the various conversations with persons at the Hillcrest office of Hilltop and with Mr. Weir offers nothing from which the court may infer that Mr. Weir knew that Mrs. Spagnolo was black. Not finding that plaintiffs have proved that Mr. Weir knew that Mrs. Spagnolo was black, the court cannot and does not reach the question of whether in dealing with Mrs. Spagnolo, Mr. Weir intended to racially steer her from access to the Dorset Road home in Lyndhurst.

It is concluded that plaintiffs have failed to prove by a preponderance of the evidence that Hilltop Realty engaged in racial steering in the circumstances of the Kuzma-Spagnolo audit of Hilltop in August 1976.

---

**20.** While Mr. Weir testified that he thought Mrs. Spagnolo was white, this statement's credibility is greatly weakened by his deposition testimony that he did not recall talking to Mrs. Spagnolo.

### B.(2) Tufts—Pap

██ Black checker Sheryl Porter Tufts and white checker Patricia Pap audited Hilltop sales agent John Mayfield. The audit began on August 22, 1976 when each checker visited an open house at 1688 Maple Road, Cleveland Heights.

The two checkers gave Mr. Mayfield substantially the same specifications. Mrs. Tufts said she was looking for a home in Cleveland Heights or South Euclid while Ms. Pap and Ken Kowaleski requested the eastern suburbs.[21] At the end of her inspection of the home on Maple Road, Mr. Mayfield gave Ms. Tufts his card and mentioned that "we would be getting back together." When Mr. Mayfield did not call Ms. Tufts by August 31, 1976, nine days later, she called him. He told her that he was going on a Labor Day vacation and would get back to her after that. On September 9, Mr. Mayfield called Ms. Tufts. He told her that "he had a house that he would like to show [her] that was on 175th and South Miles." She told him "[she] wouldn't be able to see that one." Asked about the racial composition of that area, she answered, "I believe it was predominantly black in that area."

Mr. Mayfield then invited her to an open house at 2159 Taylor Road attended to by him. When she arrived at the open house, he let her wander around on her own. She testified that Mr. Mayfield stated "he did want to get together with my husband and myself." Ms. Tufts admitted that on at least two occasions Mr. Mayfield asked her to come to the office so he could "run [information on her housing requirements] through the computer, and [she] did not do that." Asked why not, she stated: "Well, I didn't have—he wanted to meet my husband, and I didn't have a husband to take with me."

Defendants argue:

There is simply no viable claim of lack of service to Tufts. Mayfield tried to service her, but she simply was not willing to meet with him.

The evidence bears out this contention. But this argument does not meet plaintiffs' claim of racial steering with reference to Ms. Tufts. Mr. Mayfield on September 9 suggested a home to Ms. Tufts at 175th and Miles, "predominantly black in that area" and also an area in which she had expressed no interest to Mr. Mayfield. The other home he suggested was the home at 2159 Taylor Road, which she stated in her checker's report was "on the edge of Cleveland Heights." The court judicially notes that 2159 Taylor Road (North Taylor Road) is adjacent to East Cleveland, whose population in 1977 was 77 percent black. It is inferred that the home at 2159 Taylor Road was in a neighborhood more integrated than the Cleveland Heights city-wide average level of integration.[22]

In conjunction with Mr. Mayfield's suggestion of the South Miles Road house and the Taylor Road house to Ms. Tufts, statements made by Mr. Mayfield to Ms. Tufts at the Maple Road open house bear on his intent and frame of mind. Ms. Tufts testified that in her discussion with Mayfield,

he started telling [her] that there had been a white lady that had looked at the house, and she decided not to take the house because there were too many black people in the area.

She also stated that he "started pointing out some of the houses where the white people lived and where black people lived." During defendants' examination of Mr. Mayfield, he denied discussing the "racial make up of [the] neighborhood around [the]

---

**21.** Ms. Tufts informed Mr. Mayfield at the open house that she was married and that she was looking for a house in the $20,000—$30,000 price range. Ms. Pap, accompanied by Ken Kowaleski who posed as her husband, told Mr. Mayfield that they were looking for a home in the eastern suburbs in the price range of $25,-000—$30,000.

**22.** "More integrated" is used to mean a percentage of blacks higher than the City's 1980 census black population of 24.9 percent. The census tract map shows that North Taylor Road is on the border between census tracts 1402 and 1403, which had black populations of 34.8 percent and 53.7 percent, respectively.

Maple Road home" with any prospect at anyone of his open houses. This broad denial of the specific quotation attributed to him by Ms. Tufts is not credited. Ms. Tufts' report of Mr. Mayfield's statements at the open house is credited.

These statements of Mr. Mayfield, considered together with the showings, are deemed to have been made by Mr. Mayfield to influence the housing choices of Ms. Tufts. Therefore, it is concluded that in violation of section 3604(a), Mr. Mayfield racially steered Ms. Tufts toward both a predominantly black area outside of Cleveland Heights and to a more integrated area within Cleveland Heights.

 Mr. Mayfield also made racial statements to Ms. Tufts' white counterparts, Patricia Pap and Ken Kowaleski, on August 22, 1976 at the Maple Road open house and later at his office. At the open house he told a story about his brother-in-law buying from a black family a house which he needed to fumigate before moving into it. At the office, while going over house listings, Mr. Mayfield said that they were lucky to be white because they could get a better deal. When asked why, "he said it was just human nature, that owners prefer selling to whites." He added that "they sold to whites 80 percent of the time, and that was the way it should be."

On August 25, 1976, Mr. Mayfield showed homes to Ms. Pap and Mr. Kowaleski on 3730 Monticello Boulevard, 1005 Englewood Road, and 2054 Revere Road in Cleveland Heights. As Mr. Mayfield stated to Ms. Pap after they left the house on Englewood, "The neighborhood wasn't very integrated." Ms. Pap testified that Mr. Mayfield noted:

There was a high demand for white buyers and that all of the agents knew this and showed them the neighborhood first.

Further, on leaving the Revere Road property, Mr. Mayfield stated that:

[H]e preferred the Englewood area. He said that it wasn't as integrated as the area around Revere and never would be.[23]

Mr. Mayfield's comments to Ms. Pap and Mr. Kowaleski relating to Revere and Englewood are weighed in connection with their request to see properties in the eastern suburbs. In other words, they did not specifically ask to see properties in Cleveland Heights, although they did fix a price range of $25,000–$30,000. Ms. Pap's testimony further shows that Mr. Mayfield passed over three homes in their stated price range: 18005 Chagrin Boulevard in the Lomond school district and 3733 Menlo Road in the Moreland school district in Shaker Heights; and 927 Caledonia, Cleveland Heights, in the Caledonia school district. These properties were listed on the computer print-outs obtained by Mr. Mayfield for Ms. Pap and Mr. Kowaleski at his office Sunday afternoon, August 22, 1976. With reference to these three properties, Mr. Mayfield stated that "[you] wouldn't be interested in them." Asked why, Ms. Pap said he answered, "Those neighborhoods weren't integrated anymore, that they were black, and that even blacks were reluctant to buy in the neighborhood."[24]

---

**23.** When asked if he ever told "a white prospect that the Englewood area was not as integrated as the Revere area and never would be," Mr. Mayfield answered (on direct examination), "No. I wouldn't make that type of comment." On cross-examination he modified his position. When asked, "and you didn't say anything to her about Englewood not being as integrated as Revere; is that correct?", he answered, "I don't even remember talking to the person." He was further asked, "You don't remember talking to a young, attractive white female at this open house on Maple?" He answered, "No." Ms. Pap recorded her conversation with Mayfield on the same day on which he showed her and Kowaleski the homes on Monticello Boulevard, Engle-

wood Road, and Revere Road. Her testimony is credited. Mr. Mayfield's denial is not credited.

**24.** With reference to these three homes, Mr. Mayfield was asked if he remembered saying to "Mrs. Pap and the gentleman she was with that all three of these homes were in areas that were integrated and that she wouldn't want to buy there." He answered, "No, because I wouldn't make that kind of comments about any areas." Ms. Pap refreshed her memory directly from her auditor's report made contemporaneously with the audit. Once again her testimony on this matter is credited and Mayfield's testimony is discredited.

Mr. Mayfield's statements, which diverted Ms. Pap and Mr. Kowaleski from consideration of those three properties located inside and outside of Cleveland Heights in "neighborhoods [that] weren't integrated anymore" and his comments relating to Revere and Englewood together constitute actions on his part which "ma[d]e unavailable or den[ied] a dwelling to [a] person because of race" in violation of section 3604(a). It is so concluded. The statements of Mr. Mayfield, made on August 22, 1976 to Ms. Pap at the Maple Road open house and to her and Mr. Kowaleski in his office, corroborate Mr. Mayfield's locational steering with reference to checkers Pap and Kowaleski.

### B.(3) McGee—Butterfield

■ The next audit claimed to involve racial steering was of John Mayfield. This audit, conducted by black checker Sandra McGee and white checker Hester Butterfield, began with an open house in May 1977 at 3395 DeSota Avenue, Cleveland Heights.

Mrs. McGee visited the open house on DeSota about 3:30 in the afternoon. As she viewed the house, Mrs. McGee informed Mr. Mayfield that she presently owned a home on Berkeley, the street next to DeSota, and that she was "looking for a brick or an exceptional frame . . . in the Hillcrest/Heights area." She gave Mr. Mayfield a price range in the "upper $30's and lower $40's." He asked where she was interested, and she told him, "South Euclid, Lyndhurst and Cleveland Heights." He told her that "Lyndhurst would be a little bit on the high side for [her] price." As for South Euclid, he said "that's on the Lyndhurst side." He said that something could be done in Cleveland Heights.

Three days later she called Mr. Mayfield and arranged for him to give her a computer print-out at her home. He brought over a print-out of South Euclid and went over it with her. When she asked where the print-out for Cleveland Heights was, he said he would bring it to her the next day, but did not.

On May 18 she called him and said she was interested in five or six homes on the South Euclid print-out which he had left with her. He told her that the homes were "sold or sales pending." Arrangements to go out and see homes were then discussed. He suggested they meet on Friday at 11:00 a.m., but she told him "that wasn't a good day." She then suggested Saturday, and he responded that he "would call her on Thursday and we could arrange something." However, at no time did he later get in touch with her.

At trial, Mr. Mayfield remembered the open house on DeSota but had no recollection of Sandra McGee. In view of his nonrecollection of Sandra McGee, no evidentiary basis is perceived for defendants' argument that

> there is a substantial likelihood that he would have viewed her simply as a "shopper" since she came from church on a Sunday and lived on the adjacent street.[25]

Although Mrs. McGee no longer has the South Euclid computer print-out, it is determined that Mr. Mayfield delivered it to her as she testified. It is not probable that on May 11 the homes on the South Euclid print-out were apparently available, and on May 18 all five or six properties she inquired about were "sold or sales pending," as Mr. Mayfield told Mrs. McGee. However, in the absence of the print-out it is impossible to determine the accuracy of his report.

Nonetheless, it is found from the evidence that Mr. Mayfield's failure to provide a further South Euclid print-out, his failure to deliver a Cleveland Heights print-out as promised, and his failure to call her back after Thursday, May 18, as promised, or at any other time to arrange a time to show homes to Sandra McGee, combine to "make unavailable or deny a dwelling to" her "because of race." It was, therefore, a violation of section 3604(a).

---

25. Actually, the record does not show that she had not come directly from church, nor does it show that Mr. Mayfield was informed that she had been at church earlier that afternoon.

When Mr. Mayfield's treatment of Sandra McGee is compared with his treatment of white checkers Don McKelvey and his wife Hester Butterfield, Mr. Mayfield's lack of service to Sandra McGee is even more pronounced. Even though Mr. McKelvey did not go to the open house, he was able to arrange a viewing of the same house, and later he and his wife met with Mr. Mayfield at the Hilltop office. There, some ten homes were jointly selected by Mr. Mayfield, Mr. McKelvey and Hester Butterfield. Mr. Mayfield showed them three of those homes, all located in Cleveland Heights.[26]

### B.(4) Embry—Caron

▇▇▇ Black checker Dorothy Embry and white checker Brian Caron each visited the November 13, 1977 open house at 2086 North Taylor, Cleveland Heights, close to the Cleveland Heights—East Cleveland border. The Hilltop agent "sitting" at the open house was William Howard.

Dorothy Embry stated that she arrived at the open house at "4:14." When Mr. Howard asked her what type of house she was looking for, she answered: "a four-bedroom house in the mid $50's to lower $60's." As to location she recalled saying eastern suburbs. She did not recall whether she said Cleveland Heights and eastern suburbs or "merely eastern suburbs." At trial she did not recall at first asking Mr. Howard for the school district, but did recall this when her memory was refreshed from her deposition. The school district is the Caledonia school district of East Cleveland. After Mr. Howard took her around the house, she left.

Two days later, Mr. Howard called to ask her if she was "really interested in purchasing the house on Taylor, because he had another offer, and that he had lined up some other homes for us to see." An appointment was set up for the next Friday at the Hilltop office on Mayfield Road. Mr. and Mrs. Embry and their two sons went to the office where they met Mr. Howard. After answering several of Mr. Howard's financial qualifying questions, they left to see the homes which he had selected.

The first house was on Henley in East Cleveland, the second at 1231 Hereford in Cleveland Heights, and the third was at 2086 North Taylor Road in Cleveland Heights where the open house had been held. After visiting the house at 2086 North Taylor Road, they returned to the Hilltop office. In her comments on her audit report she stated:

> As we returned to the office Mr. Howard said he would line up other houses in some other eastern suburbs. He did not give any specifics.

When Mr. Howard called Mrs. Embry, she told him that she was no longer interested in seeing any other homes. The homes he showed to Mr. and Mrs. Embry were all in the predominantly black Caledonia school district, either in predominantly black East Cleveland or in an adjacent more integrated area of Cleveland Heights. However, any inference of racial steering of Mr. and Mrs. Embry by agent Howard is neutralized by Mrs. Embry's admission that Mr. Howard offered to show them homes in the eastern suburbs, but they rejected this offer.

White checker Brian Caron also spoke to agent Howard at the Taylor Road open house. He had a conversation with Mr. Howard in which the housing characteristics that he gave were generally the same as those Mrs. Embry gave to Mr. Howard. Before leaving the Taylor Road open house, he told Mr. Howard:

> That remark coupled with the failure to show the house, constituted both direct and indirect discouragement of the white checker's seeing that particular house.

While the statement was an attempt to steer Ms. Butterfield and her husband away from a Shaker Heights home, it did not steer them away from Cleveland Heights.

---

**26.** Plaintiffs' counsel refers to a remark of Mr. Mayfield reported by the white checker that "that end of Scottsdale [in Shaker Heights] is over-integrated and I know you folks don't mind living in an integrated section, but that end is over-integrated." Plaintiffs' counsel then contend:

It's probably not exactly what we were looking for, we generally would like to see more houses on the east side, we do like the feature of the land, but we would like to look at more houses, would you please contact us relative to showing us more houses and seeing if we can find something that we like.

When Mr. Caron did not hear from Mr. Howard, he called him on November 16. Mr. Howard returned his call on the 18th and explained that he would "not be able to show [him] houses as he had prior engagements out of town or was planning to be out of town." He then explained that

> there was a realtor available that could show me houses I would be interested in, a Mr. Mayfield, it was a type of a three-way conversation where I was introduced to Mr. Mayfield and told that he would be happy to show me anything I would be interested in.

After several unsuccessful attempts to arrange a mutually convenient appointment time, Mr. Mayfield rescheduled the appointment for December 3. Mr. Caron said that he met Mr. Mayfield at the Hilltop office. Mr. Mayfield then drove him to a home at 374 Belvoir in South Euclid. It was Mr. Caron's understanding that "there was a specific house that [Mr. Mayfield] wished to show [him] and that he thought met [his] needs." Although Mr. Mayfield did not recall Brian Caron by name, he did recall showing Bill Howard's prospect a ranch on Belvoir. Mr. Mayfield also remembered that after Mr. Howard came back to town he "gave [Mr. Howard] the prospect back."

Mr. Caron has lost all recollection as to whether it was Mr. Howard who picked out the house on Belvoir. However, his audit report, shown to him at trial, indicated that "Howard talked about a house in Forest Hills as well as the house in South Euclid," and Mr. Caron said that sounded correct.

Upon returning to the Hilltop office, Mr. Mayfield prepared a computer print-out of additional homes as suggestions to Mr. Caron. The homes on this list were in Cleveland Heights, University Heights and one in Shaker Heights. Most, however, were in Cleveland Heights. Mr. Mayfield gave him a computer print-out, but later Mr. Caron called Mr. Mayfield to say that he had no interest in purchasing a home.

Upon all the relevant evidence, it is concluded that it was Mr. Howard and not Mr. Mayfield who recommended the Belvoir home to Mr. Caron, the white checker. Thus, Mr. Howard was responsible for the showing of a home outside of Cleveland Heights in a predominantly white eastern suburb to Mr. Caron. Nevertheless, any inference that Hilltop, through the combined conduct of Mr. Howard and Mr. Mayfield, steered Mr. Caron into a suburb east of Cleveland Heights is rebutted by Mr. Mayfield's submission of a list of homes to Mr. Caron on December 3, the majority of which were in Cleveland Heights. Hence, it is concluded that the plaintiffs have not established racial steering on the part of either Mr. Howard or Mr. Mayfield with reference to either black checker Dorothy Embry or white checker Brian Caron.

### B.(5) Perry-Blaser (April 4, 1978)

██ Black checker Anita Perry and white checker Linda Blaser conducted an audit of the Hilltop office in Cleveland Heights on April 4, 1978. This audit was part of the 1978 spring audits using the HUD procedures. Anita Perry was interviewed by Phyllis Williams, while Linda Blaser dealt with John Mayfield.

Anita Perry relied on her audit report to refresh her recollection of her meetings and telephone conversations with Mrs. Phyllis Williams, who greeted her when she entered the Hilltop office. She told Mrs. Williams that she was interested in property in the eastern suburbs priced from $55,000 to $60,000. She also stated that she lived in and liked Cleveland Heights. While she had lived in Cleveland Heights on Coleridge, she and her family for five years prior to 1978 had been living in a home on Washington Boulevard in University Heights.

From a multiple listing book, Mrs. Williams suggested certain homes and "urged [her] to pick others." Of the four or five

homes that were suggested, Mrs. Williams showed her homes at 2895 Meadowbrook in Cleveland Heights and 3586 Meadowbrook in University Heights, several homes from the Cleveland Heights—University Heights line.[27] Both homes met Mrs. Perry's space requirements, each having more than four bedrooms.

When Mrs. Perry's deposition testimony was called to her attention, she agreed that Mrs. Williams called her back several times to try to show her additional homes. Mrs. Perry made a list of the homes suggested to her: 3536 Woodridge, 652 Quilliams, and 1496 Middleton, all in Cleveland Heights. However, this list was attached to her audit report, and Mrs. Perry agreed that these homes were suggested to her "during the actual audit ... rather than a phone call that occurred days later."

While Mrs. Perry had requested homes in the eastern suburbs, she singled out Cleveland Heights. Since she said that she liked Cleveland Heights, it was understandable that Mrs. Williams showed her homes in Cleveland Heights and one just over the boundary line of University Heights. Bearing in mind also that Mrs. Williams called her back several times after the audit to show her additional homes, offers which Mrs. Perry declined, it is concluded upon all the evidence that no inference of intentional racial steering may be drawn.

■ On April 4, 1978, Linda Blaser met with John Mayfield at the Heights Hilltop office. She asked to see homes in the Heights-Hillcrest area. Mr. Mayfield obtained a computer print-out and suggested six or more homes from it. At Mrs. Blaser's insistence, Mr. Mayfield "picked" three homes from the six or more, but no others. Of those three, Mr. Mayfield was able to show the inside of a home at 1440 Gordon in Lyndhurst and a home at 4931 Westbourne, Lyndhurst. He drove her by to see the exterior of a home at 1607 Oakmount in South Euclid.

Refreshing her recollection from her audit report, Mrs. Blaser indicated that Mr. Mayfield talked down both of the Lyndhurst homes and also told her that homes in Mayfield Heights were too expensive. Mrs. Blaser agreed, and her audit narrative corroborates, that "Mr. Mayfield encouraged her to look in Cleveland Heights but actually showed some houses in Lyndhurst." Since he showed her no homes in Cleveland Heights, the encouragement to look in Cleveland Heights was only talk. Mrs. Blaser further recorded in her audit report the following statement by Mr. Mayfield:

> You probably won't want your kids to go to East Cleveland schools. They are mostly black but some white home buyers are buying there for the lower prices.

While she did not remember the context in which this statement was uttered, it is nonetheless concluded that she accurately recorded the statement made by Mr. Mayfield. Since a portion of Cleveland Heights is in the Caledonia School District of East Cleveland's school system, the remark, stressing the "mostly black" character of East Cleveland's school system, the remark, stressing the "mostly black" character of East Cleveland's schools, would tend to disparage living in the portion of the City which comprises the Caledonia school district.

As a sales agent in the Heights-Hilltop office, Mr. Mayfield's making of this remark and his showing of houses only outside of Cleveland Heights, even though she had asked for the Heights—Hillcrest area, which includes Cleveland Heights, persuades this court that Mr. Mayfield racially steered Mrs. Blaser away from Cleveland Heights in violation of section 3604(a).

### B.(6) Perry-Blaser (April 10, 1978)

■ Anita Perry and Linda Blaser on April 10, 1978 audited Hilltop's Hillcrest office in Lyndhurst, Ohio. Anita Perry dealt with William Weir, and Linda Blaser dealt with Violet (Vi) Costello.

---

27. The zip code shows that the last home in Cleveland Heights is 3556 Meadowbrook, and the first home in University Heights is 3577 Meadowbrook.

Anita Perry arrived at the Hillcrest office at 3:10 p.m. and departed at 4:50 p.m. She testified as to what occurred during this period only by refreshing her recollection from her audit report. Using the site visitation assignment sheet, Mrs. Perry testified that she had indicated to agent Weir that her price range was $55,000 to $60,000. While Mr. Weir testified that he did not recall her telling him that, her statement is credited.[28] Mrs. Perry also testified that she had told Mr. Weir that she was "looking for a home in the eastern suburbs."

No homes were shown to Mrs. Perry on Monday afternoon, April 10. Two homes in Cleveland Heights, at 2383 Lee Road and 3283 Meadowbrook Boulevard, were shown to Mrs. Perry on the morning of Wednesday, April 12. A critical question is how these two homes were chosen for viewing.

Mrs. Perry's testimony indicates that Mr. Weir suggested the homes shown to her, even though Mr. Weir at one point showed her a multiple listing book "and urged [her] to pick [homes] out." Mr. Weir testified that in going over the multiple listing book, Mrs. Perry selected "a couple of properties." But on cross-examination he stated that "we both picked them out." Given the forceful personality Mr. Weir exhibited throughout his testimony and other testimony which challenged his credibility,[29] it is determined that as Mrs. Perry testified,

Mr. Weir "suggested both the two [houses] he showed me." These houses were on Meadowbrook Boulevard and Lee Road in Cleveland Heights.

On the basis of the relevant evidence in the record, it is inferred and concluded that by selecting two Cleveland Heights homes, each in a more integrated area,[30] and by failing to suggest a home which met Mrs. Perry's specifications in an eastern suburb other than Cleveland Heights, although homes were then available, as later found, Mr. Weir engaged in racial steering by making unavailable or denying a dwelling to Mrs. Perry because of race.

The question arises whether there is other evidence to rebut the finding of locational steering by Mr. Weir. Because Mrs. Perry was not sure whether she told Mr. Weir she would let him know whether she liked either home she saw after she talked to her husband, she never called Mr. Weir back. Mr. Weir, on the other hand, testified that he told Mrs. Perry he would call for another appointment, called at least three times, and was always given "an excuse not to go out again." He said he told her that he had a home available "in the Birchwald-Mackall area of South Euclid."

On cross-examination Mr. Weir was asked if he remembered that Mrs. Perry asked to see the eastern suburbs. He answered, "I tried to show her the eastern

28. He said that either he or Mrs. Perry determined that her price range was up to $50,000. Even if true, the exact price range stated to Mr. Weir is not material.

29. Mrs. Perry's audit report bears on Mr. Weir's credibility. Made immediately after the house visitations on April 12, it contains a note that explains why it was a few days before the two got together on an appointment:

Agent said he didn't have time. Agent said he would call me on Tuesday and would arrange a time to see some houses by Wednesday. He hadn't called, and I called him.
And he said, "Oh, I thought we were supposed to meet at 9:30 this morning?" And I told him no.
He wanted to know why didn't I call him earlier and why didn't [I] keep the appointment that I had.

Mr. Weir's attempt to charge Mrs. Perry with breaking an appointment is similar to his statement to Mrs. Spagnola after she had made several phone calls trying to reach him.
Mr. Weir's credibility is further challenged by other testimony. He stated that "there was a problem with her car, and I said, well, I'd pick her up." Asked where he picked her up, he answered, "I picked her up at her house on Coleridge." Mrs. Perry testified that she had a car available for her use at that time and did not remember why Mr. Weir picked her up. Moreover, her home where he picked her up was not on Coleridge (where she had not lived for five years) but on Washington Boulevard in University Heights.

30. Both the Lee Road and the Meadowbrook Boulevard properties are in Census Tract 1416. According to the 1980 census, that tract had a black population of 30.9 percent.

suburbs." Asked if he considered showing her a home on either Clearview or Westbourne (both homes in Lyndhurst), he answered, "Not that I can recall." As part of the April 10, 1978 audit of the Hillcrest office of Hilltop, Linda Blaser, the white counterpart of Anita Perry, was shown the Westbourne home in Lyndhurst, a four-bedroom house priced at $59,900. This was also within Mrs. Perry's price range.

Thus, there is evidence that the Westbourne four-bedroom property in Lyndhurst was available but not shown to Mrs. Perry on or about April 12, 1978, the time Mr. Weir stated that he was trying to show Mrs. Perry homes in the eastern suburbs. Further, there is no evidence on the record indicating that a home on Birchwald was available and within the specifications of Mrs. Perry. Neither Mr. Weir's claimed offer to show her a home on Birchwald nor a general offer to show her homes in the eastern suburbs is credited. The inference of racial steering on the part of Mr. Weir is not rebutted.

■ The court turns now to the other half of the audit of the Hilltop Hillcrest office, which was performed on April 10, 1978. Linda Blaser walked into the office at 11:00 o'clock and spoke with agent Vi Costello about looking at houses, according to her audit report. Agent Costello testified that Mrs. Blaser could not have come in at 11:00 because she had "floor duty that afternoon." Resolving the conflict, it is concluded that the audit began at 11:00 a.m. on the morning of April 10, as recorded contemporaneously on Mrs. Blaser's audit report.[31]

Mrs. Blaser's testimony of her various conversations with Mrs. Costello was not remembered independently of her written audit report but was given after her recollection was refreshed from it. Upon the agent's request, she gave her telephone number and address on Rolliston Road in Shaker Heights, Ohio. Mrs. Blaser testified that she told the agent that she was seeking housing in the Heights-Hillcrest area. Mrs. Costello recalled that Mrs. Blaser said "she liked the Hillcrest area."

Mrs. Blaser said that the agent showed her a multiple listing book and "suggested some houses and urged [her] to pick others." Mrs. Costello said six houses were picked out from the multiple-listing book, and then computer print-outs were obtained on them. One of the six was a house which Mrs. Costello picked out on Quilliams in Cleveland Heights. Mrs. Costello said the six homes were all Hilltop listings, which she had already seen on Hilltop's weekly tour. When Mrs. Blaser told her that she only had time to see three homes, Mrs. Costello stated that "[I] picked the ones that I thought were the nicest and that she would like." She selected a three-bedroom home on Clearview in Lyndhurst, a four-bedroom home on Westbourne in Lyndhurst, and the four-bedroom home on Quilliams Road in Cleveland Heights. The remaining three were on Avondale in South Euclid, on Gordon in Lyndhurst, and on Ranchland in Mayfield Heights.

Mrs. Costello indicated the she did not group Cleveland Heights in the Hillcrest area. Bearing that in mind and that Mrs. Costello included a home on Quilliams Road in Cleveland Heights among the three homes to show Mrs. Blaser, it is concluded that Mrs. Blaser did designate the Heights-Hillcrest area as the area in which she was seeking housing. Inasmuch as the three homes picked out by Mrs. Costello fell within the Heights-Hillcrest area, the selection of these homes, standing alone, did not constitute racial steering.

However, these showings must be considered in conjunction with certain statements made by Mrs. Costello in the course of the showings. At a point in her audit report, Mrs. Blaser wrote:

> Agent said a lovely black woman was looking at this house a couple of days

---

31. Mrs. Blaser's recorded 11:00 a.m. as the time of entering the Hilltop office is credited rather than Mrs. Costello's uncorroborated recall of "that afternoon" as the time of Mrs. Blaser's arrival at the Hilltop office.

ago. I thought she might buy it but I haven't heard from her.[32]

Mrs. Blaser noted in her audit report two other conversations with Mrs. Costello concerning race. While the Quilliams Road property was being discussed in the office, Mrs. Blaser recorded that Mrs. Costello asked her "if the school my kids go to is integrated and how much," to which she answered, "Yes." Mrs. Costello then stated, "Just about every place is integrated now. I think they ought to be able to live wherever they want." Mrs. Costello denies making these statements. The court finds no basis for discrediting the accuracy of the statement attributed to Mrs. Costello which Mrs. Blaser recorded in her audit report.

With her recollection refreshed, Mrs. Blaser said that at the Quilliams Road property, the "agent said, your kids would go to Cleveland Heights High. Do you want your kids to go there?" Mrs. Blaser believes that she "would have said something vague in response." Denying such a statement, Mrs. Costello said that in the car going back from Quilliams to the office, Mrs. Blaser "said that she lived in Cleveland Heights; if she stayed there her children would be going to Cleveland Heights High." In response, Mrs. Costello stated, "Do you want them to—don't you want them to go to Cleveland Heights?" She does not remember what Mrs. Blaser said after that.

Mrs. Costello's recollection of this car conversation with Mrs. Blaser falters since Mrs. Blaser had told her she lived in Shaker Heights, not that "she lived in Cleveland Heights." On the other hand, having been told by Mrs. Blaser that she lived in Shaker Heights, it was consistent that Mrs. Costello, in showing the Quilliams Road property, would say to Mrs. Blazer, "your kids would go to Cleveland Heights High," as Mrs. Blazer reported. It is found that the statement of Mrs. Costello as recorded by Mrs. Blaser in her audit report is the accurate version of the conversation.

It is concluded that the agent's statement at the Quilliams Road property with her other statements made at her office are not sufficient to influence housing choices and do not prove intent to steer.

### B.(7) Drake-Bartoo

Black checker Adrienne Drake and white checker Ruth Bartoo audited the Heights office of Hilltop Realty on April 14, 1978. Ruth Bartoo met agent Norman Hott, and Mrs. Drake met agent Ann Gilmore.

According to her completed audit report, Mrs. Drake arrived at the Heights office at about 2:15 p.m. Mrs. Drake had specified on her report that she requested a three-bedroom house in the "50's." Mrs. Drake testified that in response to the question on her audit report about whether the agent requested information on "location by neighborhood or jurisdiction," she had circled "yes." In her trial testimony, Mrs. Drake was asked further about this request. She answered:

If she requested and if it says that, I told her what was on the front page.

Q. And what was that?

A. Lyndhurst, Cleveland Heights, Shaker Heights, South Euclid.

On cross-examination Mrs. Gilmore was asked, "Do you remember her saying to

---

32. Asked whether that note referred to the Westbourne property, Mrs. Blaser stated, "I don't know which one it refers to." Stating without support that the statement was made "during the visit to the Westbourne house in Lyndhurst," plaintiff argues that this "unsolicited comment . . . unnecessarily injected race into the situation." Countering, defendants note that the checker "did not view this comment as derogatory" and urged that from it "no intent to steer" can be inferred. Given this country's wide diversity of ethnic and racial stocks and the dividends diversity brings to all of us, a nondiscriminatory reference to race was not derogatory, and it would be unrealistic to try to proscribe any such comment. To say that she thought the lovely black lady "might buy it," exhibits a willingness to sell a home in Lyndhurst to blacks. No intent to steer is inferable. If Mrs. Costello, with reference to either the Clearview or Westbourne property in Lyndhurst, stated that a "lovely white lady was looking at this house a few days ago," there would be a more reasonable basis from which to infer intent to racially steer.

you that she would like to look in Lyndhurst, Cleveland Heights, Shaker Heights and South Euclid area?" She answered, "No, she never said that." Asked if she was sure, she responded:

I'm positive. She didn't seem to know any of these areas. I thought maybe she was from out of town or new, and I suggested that we tour—each time we'd go out we'd tour a new area.

Since Mrs. Drake's assignment was to say that she was seeking homes generally in the eastern suburbs and "if the agent pins you down, then you narrow it," it is concluded that Mrs. Drake did mention the eastern suburbs and then specified Lyndhurst, Cleveland Heights, Shaker Heights and South Euclid.

The testimonies of Mrs. Drake and Mrs. Gilmore indicate that Mrs. Gilmore "volunteered to [Mrs. Drake] as serious possibilities three houses." These were at 3536 Woodridge, 2383 Lee Road and 3583 Blanche, all in Cleveland Heights. They inspected the Woodridge home on the inside. As for the home at 2383 Lee Road, Mrs. Drake told Mrs. Gilmore "to keep moving" when they drove by.

Mrs. Drake stated that on that first day (April 14) she and Mrs. Gilmore just looked in the window of the Blanche Road property "because she didn't have a key." But she said that they met the next day at which time they inspected the insides of both the Blanche Road property and property on Shannon Road. Having a different recollection of the matter, Mrs. Gilmore said that she "showed her two houses on one day, then we went past a third house [Blanche] that was already sold." The question was then asked, "so you were never inside the house on Blanche with Adrienne Drake?" She answered, "We were standing outside on the curb. I thought it was strange that she wanted to go in that house." It seems likely that Mrs. Gilmore is describing their visit to the Blanche Road property the night before when they could not enter the house because she didn't have a key. As Mrs. Gilmore stated, records could have been

checked by Hilltop to confirm or contradict her statement that the "house was sold." However, in the absence of support for Mrs. Gilmore's statement, and since Mrs. Drake answered several questions in her audit report which showed that she had been shown the inside of the Blanche Road property, her statement that she viewed the inside of the property on the next day (April 15) is credited.

Through Hilltop, Mrs. Drake was shown four homes during the audit period, all in Cleveland Heights. Subsequent to returning her audit materials to HCC, she was contacted again by Mrs. Gilmore. Mrs. Drake was then shown a house in Cleveland Heights off Mayfield Road, "a couple of streets over from the real estate office." Given that Mrs. Drake requested to be shown the "Eastern suburbs" and in particular Lyndhurst, Cleveland Heights, Shaker Heights and South Euclid, yet was shown five homes in Cleveland Heights, it may be reasonably inferred that Mrs. Gilmore racially steered Mrs. Drake into viewing homes only in Cleveland Heights. This inference is further supported by the fact that Mrs. Drake's white counterpart Ruth Bartoo gave generally the same qualifications but was shown homes all outside of Cleveland Heights.

The question arises whether other relevant evidence rebuts this inference of racial steering. Mrs. Drake was asked if after she was shown the home off Mayfield, Mrs. Gilmore called her and "again suggested that she wanted to show [her] some other homes." She answered: "I can't say yes, and I can't say no. Probably." On redirect examination, Mrs. Gilmore was specifically asked the question "why didn't you show Mrs. Drake any homes outside of Cleveland Heights?" She answered:

Mrs. Adrienne Drake did not know where she wanted to live. My main purpose at that point was to find out what kind of home she was looking for. Then I was encouraging her to bring her husband so that her husband then would be able to give me more data. Between one house

and another it could be $300, $400 a month on your monthly payment. It's important to find out exact price range. So I had mentioned it to her, the same as I did in the deposition, why don't we just tour each suburb and area and then look over the area and decide what you want. . . .

Mrs. Gilmore's recollection of the details of her contacts with Mrs. Drake was shown to be faulty on a number of different details. Nonetheless, her suggestion to Mrs. Drake that "we just tour each suburb and area and then look over the area and decide what you want" stands unchallenged in the record. .

Mrs. Drake's acknowledgment that it was "probably" true that Mrs. Gilmore called to again suggest that Mrs. Drake see "some other homes," combined with Mrs. Gilmore's unchallenged testimony that she suggested to Mrs. Drake that they "tour each suburb and area" to determine Mrs. Drake's housing preferences, act to rebut any inference that Mrs. Drake was racially steered from seeing homes outside of Cleveland Heights.

 Ruth Bartoo, the white counterpart of Adrienne Drake, audited the Heights office of Hilltop Realty on April 14, 1978. Her characteristics and specifications given in the site assignment form were similar to those of Mrs. Drake. Listed under the heading "Neighborhood" was "Shaker, Cl. Hts, Lyndhurst, May," and the price range was "50–60."

With her recollection refreshed by her audit report, Mrs. Bartoo testified that she arrived at the Heights office of Hilltop at about 10:00 o'clock without first calling for an appointment. Although Mr. Hott testified that Mrs. Bartoo called the office that morning before she came that afternoon, the court credits Mrs. Bartoo's recollection.[33]

Mrs. Bartoo testified that she told Mr. Hott that she "was interested in the Heights area, Mayfield, Lyndhurst." She further said that she knew that she wrote "those three down on a sheet and apparently did not say South Euclid." Asked if she recalled for sure from her own independent recollection, she answered, "Only from what I reviewed on my forms." At trial Mr. Hott testified:

I recall she called in, said that she was looking for a home in the eastern suburbs in the approximately $50,000 range, that her husband was a professor at the University, and that she lived in Cleveland Heights in the Coleridge area.

Given Mr. Hott's confusion as to whether Mrs. Bartoo first called or came into the office, Mr. Hott may also have been confused when he said that she requested the eastern suburbs. While Mrs. Bartoo may first have mentioned the eastern suburbs, it is found that she became more particular and named the Heights area (Shaker and Cleveland Heights), Lyndhurst and Mayfield Heights, the communities listed on her site visit assignment sheet.

Mrs. Bartoo testified that during the time she was at the office that morning, Mr. Hott suggested that they see homes on Westbourne in Lyndhurst, on Avondale in South Euclid, and on Edison in Cleveland Heights. That afternoon, Mr. Hott and she visited two homes in Lyndhurst, the suggested one on Westbourne Road and another on Gordon Road, and the Avondale home in South Euclid.

On cross-examination, Mrs. Bartoo acknowledged that in addition to the three homes suggested in the morning, (Westbourne, Lyndhurst; Avondale, South Euclid; and Edison, Cleveland Heights), there were two other houses suggested as serious possibilities. Counsel asked her "where was the fourth or fifth house that was suggest-

33. Mr. Hott's trial testimony conflicts with his deposition testimony. At the deposition he was asked, "is there anything that particularly made her stand out in your mind?" He answered: That she came into the office, she was in a terrible hurry and she gave me some informa- tion but she wanted to leave quickly. I took some information, she was coming back later because she wanted to go look at some houses.

ed to you as a serious possibility?" She answered, "I only wrote down the first three. I didn't record others suggested to me in the office." Moreover, she had no independent recollection of "where those other homes were" and said she had "no idea what community they were located in." However, when asked "was the Gordon home one of the four or five homes suggested to you in your first meeting," she answered "it may have been." Concerning the Edison Road house in Cleveland Heights, she was asked, "Did Mr. Hott tell you why he did not show you the Edison Road house in Cleveland Heights?" She answered, "I don't remember if he told me or not." Nor did she remember asking him about it.

Mr. Hott was asked on direct examination, "where were the homes that you had selected?" Mr. Hott answered, "Lyndhurst, South Euclid and Cleveland Heights." He testified that they started in the Lyndhurst area with the Westbourne house and then saw the Ardmore house in South Euclid. At this point he said, "We ran out of time and she said that was all the time she had, she had to go some place else and we went back to the office." When Mr. Hott was asked why he did not first show the home in Cleveland Heights, he answered, "Just a matter of going out to Lyndhurst and coming back in, that's all."

It is found that Mr. Hott had planned to show Mrs. Bartoo a home in Cleveland Heights but that they did not see it because Mrs. Bartoo said that she had run out of time. Although there is evidence from Mrs. Drake's audit that there were other homes in Cleveland Heights of comparable requirements, Mrs. Bartoo has no recollection of the location of two other homes that Mr. Hott suggested.[34] Since Mr. Hott had planned to show her a Cleveland Heights home, since Mrs. Bartoo said that she had run out of time, and since Mr. Hott at no time made any mention of race, the totality of the evidence does not permit a finding that any preference which Mr. Hott disclosed in showing homes outside of Cleveland Heights and in not showing homes within Cleveland Heights was because of race.[35]

### B.(8) Newsom—Horrigan

■ Black checker Juanita Newsom and white checker Diana Horrigan audited the Heights office of Hilltop in mid-October 1978. Mrs. Newsom dealt with Leo Lee[36] on the evening of Wednesday, October 18, 1978. The next morning, October 19 at 9:30 a.m., Mrs. Diana Horrigan met with John Mayfield.

As arranged, Mrs. Newsom met with Mr. Lee at the Heights office of Hilltop at about 1:30 p.m., Thursday, October 19, 1978. Mr. Lee asked Mrs. Newsom the area in which she was looking for a house. Mr. Lee testified that she wanted the eastern suburbs, and when he asked her to name communities, she indicated she was not interested in Shaker Heights, but mentioned University Heights, South Euclid, Lyndhurst, Mayfield (Heights), Cleveland Heights and Beachwood. She said she was looking for a home in the low seventies that was 30 years old or less.

Mr. Lee obtained computer print-outs on two homes in Beachwood, two homes in Lyndhurst, one home in Mayfield Village, two homes in South Euclid, three homes in Richmond Heights, and two homes in May-

---

**34.** Asked if he received listings on Shannon Road, Lee Road, Blanche Road and Woodridge Road when he printed out homes in the Cleveland Heights area, to each question Mr. Hott answered "I don't recall."

**35.** Mr. Hott made certain positive comments about Cleveland Heights. Thus, Mrs. Bartoo made a note:

> While looking at houses, mention was made that he thought I had more house for the money on Coleridge Road than anything he

could show me in the mid-50's in the Lyndhurst—South Euclid area.

At another point he said he thought Coleridge was in a great area.

**36.** Mrs. Newsom testified that she was "to try and get to see Mr. Mayfield." While she first met Mr. Mayfield on entering the Heights office, two or three minutes later, Mr. Leo Lee began to service her and thereafter acted as the agent with whom she dealt.

field Heights. Mr. Lee and Mrs. Newsom looked at the listings and deleted some because they did not fit her specifications.[37] Through this process of selection and elimination, six homes remained on the list. Two were on Concord Drive in Beachwood, and one each on Clearview Road in Lyndhurst, SOM Center Road in Mayfield Village, Monticello Boulevard in Richmond Heights, and Birchwold Road in South Euclid. Because Mrs. Newsom was going to be out of the city for the next three days, arrangements were made to meet at 10:00 a.m. on Monday, October 23 to see homes.

The following appears in Mr. Lee's notes:
Monday, 10:00
to see houses
Make appts Sunday

Based on this note he stated, "I was supposed to make those appointments on Sunday to see houses on Monday." It is unclear when he made the appointments. Asked whether he recalled whether he had "three or four days to make those appointments," he answered, "No." He further testified he "couldn't get an appointment for the other numbers," *i.e.*, other than the two properties on Concord and the property on Birchwold. However, two of the remaining three homes for which he says he could not get appointments were Hilltop listings (the home on Clearview in Lyndhurst and the home on SOM Center in Richmond Heights). Mr. Lee did not provide a satisfactory answer for his failure to make appointments to see these two homes.[38] Furthermore, defendants did not offer any other evidence to explain the failure of Mr. Lee to secure appointments for these two Hilltop-listed homes. Thus, it was Mr. Lee who actually picked the homes that he showed to Mrs. Newsom.

Mr. Lee testified that he still does not know today "the specific make up of the [Concord-Beacon] community." Mrs. Newsom saw a black woman across the street from the first home visited on Concord. On the evidence in the record, the court finds that the Concord-Beacon area was substantially integrated in 1978[39] and that despite his professed lack of knowledge of the "specific makeup of that community," Mr. Lee knew black families resided in that area. The court finds that Mr. Lee showed Mrs. Newsom two homes on substantially integrated Concord Drive without making an effort to show her the two Hilltop listed homes on unintegrated Clearview and SOM Center Roads, which also met her specifications.

Moreover, sales agent John Mayfield on October 19 showed to white checker Horrigan the house at 1218 Cordova in Mayfield Heights, a home on Mr. Lee's computer printout which Mr. Lee did not show to Mrs. Newsom. Mr. Mayfield also showed Mrs. Horrigan the home at 1204 Ford in Lyndhurst, a home on Mr. Lee's computer print-out which he did not show to Mrs. Newsom.[40]

---

37. While Mrs. Newsom spoke of "specifications," the court does not believe that her specifications included a minimal dining room width of nine feet as testified to by Mr. Lee. Mrs. Newsom's denial of this purported specification is credited.

38. At one point he testified:
The reason I didn't get appointments for others is the real estate company didn't answer, and I couldn't get in at that time.
Certainly this reason would not apply to the Hilltop listings. With reference to the non-Hilltop listing, he stated that inability to get the key was not the reason for him not getting an appointment. When asked what that reason was, plaintiffs objected on the ground that it would call for hearsay evidence, and the court sustained the objection.

39. When testifying as to the integrated nature of the "Water Tower" area of Beachwood, Barbara Roderick said that in the early 1970's the black population was "somewhere between 25 and 50 percent." Concord and Beacon Drives make up the Water Tower area. Further, in census blocks 519 and 520, blocks which each contain both Concord and Beacon, black populations were 80 percent and 62 percent, respectively, according to the 1980 census. These percentages contrast with an overall 6.9 percent black population in Beachwood, according to the 1980 census.

40. The dimensions of the Cordova home dining room are 8 × 11 and the dimensions of the Ford home dining room are 9 × 12. Mrs. Newsom testified that dimensions of a dining room were not a factor in the selection of

Mrs. Newsom testified about a conversation with Mr. Lee which took place in the office when they were looking at the computer print-out. At that time, she said Mr. Lee stated that "Mayfield Heights was an all-white community and would I be comfortable in an all-white community." She responded "yes" to this question. Asked on cross-examination if he made this statement, Mr. Lee stated:

> I asked her as we were driving down Ridgebury Road in my car, about Iroquois [Mayfield Heights] which is a street, I actually asked her how she felt about living in a mostly white community.

Since Mrs. Newsom's recollection of Mr. Lee's statement that it was made in the office was recorded by her in her auditor's report on the day of the visit to the office, and Mr. Lee's recollection was based solely on his memory of a 1978 event, her recollection is credited.[41] The court concludes that Mr. Lee made the racial statement as reported by Mrs. Newsom.

Thus, Mr. Lee failed to show at least two homes on the list of homes which he and Mrs. Newsom selected; yet those homes were shown by Hilltop sales agent Mayfield to Mrs. Horrigan, Mrs. Newsom's white counterpart checker. Defendants gave no reason why Mr. Lee could not make appointments for these homes or the Hilltop listed homes on Clearview and SOM Center Roads, which also met her specifications. The weight of the foregoing facts are not outweighed by Mr. Lee's showing of the Birchwold house in South Euclid. Based on this conduct of Mr. Lee and his racial statement to Mrs. Newsom, it is con-

cluded that this strong evidence establishes that Mr. Lee racially steered Mrs. Newsom away from homes which were available in less integrated areas of Beachwood and other communities she requested, to the substantially integrated Concord-Beacon area of Beachwood. This conclusion, because of its strong underlying evidence, is not rebutted by Mr. Lee's later offer to show Mrs. Newsom additional homes.

■ Nevertheless, although Mrs. Newsom was steered to a substantially integrated area in Beachwood, there is no evidence which shows she was steered into Cleveland Heights. Because plaintiffs have failed to prove that this racial steering incident was steering into Cleveland Heights, plaintiffs may not rely on this audit to establish their claim of racial steering. However, the court does consider this incident, see *infra* p. 1281.

This court has previously ruled in its memorandum and order of March 17, 1983 that in the audit of the Heights office of Hilltop by white checker Diana Horrigan, the "black statue—white statue" remark of sales agent John Mayfield "does not constitute a violation of section 3604(a) or any other provision of the Fair Housing Act." See *infra* p. 1296. Plaintiffs have again raised the legality of that remark. For the reasons stated in its previous ruling, this court reaffirms its conclusion.

### B.(9) Jones-Radgowski

Black checker Constance Jones and white checker Roseanne Radgowski were counterparts in auditing Evelyn Gardner, sales agent at Hilltop's Hillcrest (Lyndhurst) office. Each checker had no independent rec-

---

homes and that it was Mr. Lee who struck out the Cordova and Ford homes.

**41.** Mr. Lee's testimony that homes were viewed in Mayfield Heights, Lyndhurst and South Euclid before he drove to Concord Drive, is directly disputed by Mrs. Newsom. She testified that Mr. Lee and she drove in his car directly from the Heights office of Hilltop to the properties on Concord, stopping only to pick up keys for the houses at the Guggenheim Realty office near Cedar and Green Roads. She recorded in her audit report that they arrived at the first house at 10:45 a.m., having left the realty office shortly

after 10:00 a.m. Mr. Lee testified that before going to visit the homes on Concord, he toured Mayfield Heights, Lyndhurst and South Euclid pointing out homes to Mrs. Newsom. His estimate of the time consumed varied from an hour and a quarter to two hours. Yet while agreeing that he and Mrs. Newsom did not leave the Heights office until 10:00 a.m. or a little after, he says that he "couldn't say that [Mrs. Newsom] is inaccurate" if she said that they got to Concord at 10:45. Mrs. Newsom's testimony that he did not drive her through Mayfield Heights is credited.

ollection of the audit, and each refreshed her recollection by reading the audit report. The audits by Mrs. Radgowski and Mrs. Jones were conducted in 1978 on October 20 and October 21, respectively. Both checkers completed their audit reports immediately after the conclusion of the audit.

The specifications for housing which each checker asked for, as listed on their site visitation forms, were substantially the same. Each asked for a three-bedroom house with a two-car garage. Mrs. Jones asked also for a TV room while Mrs. Radgowski asked for a family room. Mrs. Jones asked for a newer house, less than 30 years old, while Mrs. Radgowski asked for a house "post-1945."

With respect to the location of the housing sought, the site visitation assignment form indicated that Mrs. Jones was to ask for homes in the eastern suburbs while Mrs. Radgowski was to ask for homes on the east side. As a reason for moving, Mrs. Jones specifications included "new job," employer was "GE." As Mrs. Radgowski's reason for moving, the form stated "want to be in eastern suburbs," and inserted above was a note, "a little south of Mentor." When her recollection was refreshed on cross-examination by deposition testimony, Mrs. Jones agreed that she had told Mrs. Gardner that she and her husband were moving to be close to his new job at GE in Nela Park. In mentioning Nela Park as the location of the GE plant, Mrs. Jones augmented the "reason for moving" specification, yet she acknowledged that she had been instructed not to deviate from that "whatsoever."

■ Connie Jones was shown three homes, one on Grosvenor in South Euclid, another on Bayard in South Euclid, and a home on Quilliams in Cleveland Heights. A computer print-out gives the specifications of each of these homes. The street atlas in evidence shows that Nela Park is approximately one mile from the Quilliams Road home, 1⅞ths miles from Bayard, and 2½ miles from Grosvenor. Mrs. Gardner testified that she showed Mrs. Jones other streets, for example, Merrymound and Freemont. She said that other homes "were within [her] list of appointments," but "[they] just didn't get in all of them."

On the next day, Mrs. Gardner called back. She had given Mrs. Jones the lengthy computer list and suggested that she show it to her husband. As noted on the prospect interview record, Mrs. Jones informed her that they were "not interested, husband decided not to move."

In overruling defendant Evelyn Gardner's Fed.R.Civ.P. 41(b) motion at the end of the plaintiffs' case, this court noted that the admissions of Connie Jones, relating to their reason for moving, "would have a bearing on the sales person's selection of 656 Quilliams as a home for Mrs. Jones to see since it is close to Nela Park." This conclusion is reinforced by testimony of Evelyn Gardner and particularly by the information contained on the "prospect interview record," which she prepared on or about October 23, 1978 relative to her interview of Connie Jones. Under the heading "Location Desired," Mrs. Gardner inserted "C Hts S Euclid Nearer To Noble [Nela Park] GE." In her testimony, Mrs. Gardner testified that she showed the properties in South Euclid to Mrs. Jones because her emphasis "was on the proximity and closeness of a bus line to Nela Park GE." The Warrensville Center—Noble Road bus line was direct while buses from Lyndhurst to the Noble Road GE plant involved two transfers. Mrs. Jones, on deposition, agreed that Mrs. Gardner showed her both the Grosvenor home and the Bayard home because it was "fairly close to GE." [42]

---

42. In the housing suitability questionnaire, in answer to whether the agent mentioned good transportation, Mrs. Jones answered "no" as to both the Grosvenor home and the Bayard home. But at another point, with reference to the Bayard home, Mrs. Jones responded:

> Only that she pointed out some of the good points, such as *transportation,* schools and etc., but that's it. [Emphasis added.]

In balance, Mrs. Jones' testimony does not overcome Mrs. Gardner's testimony that the Grosvenor and Bayard homes were close to a bus line to Nela Park.

Based upon all the evidence, the court concludes that Mrs. Jones indicated to Mrs. Gardner that she and her husband wanted to move to be nearer to his new place of work at GE Nela Park. Under these circumstances, it is concluded that the inference of racial steering that was permissible at the end of plaintiffs' evidence [43] is now fully rebutted. In addition, the unavailability of other homes for inspection on October 21 and Mrs. Jones' unwillingness to see any additional homes beyond the three that were seen further supports the finding that Mrs. Gardner did not racially steer Mrs. Jones. Mrs. Jones at several points in her testimony acknowledged the courteousness of Mrs. Gardner and stated that she was satisfied with the treatment that she received from Mrs. Gardner.

■ . The court turns to the issue of whether Evelyn Gardner steered white checker Roseanne Radgowski by selecting all Lyndhurst homes to show her. On cross-examination, Mrs. Radgowski was confronted with testimony that she gave at her deposition. Recalling that Mrs. Gardner asked her why she was interested in moving, she stated in her deposition, "I think I told her that I wanted to be closer to relatives." At trial, she agreed that she "might have" told Mrs. Gardner that she "wanted to move to be closer to [her] parents or relatives" though she did "not remember for a fact." When asked if that "deviated from the instructions given to you," she answered:

Well, we were also instructed to be plausible home seekers, and I guess I felt at

that time, if I did say that, that that was what I was trying to do.

The court concludes that she did make such a statement to Mrs. Gardner when asked why she was moving from her Mentor home, and this was a material deviation from the specification given her.

Evelyn Gardner described her introductory conversation with Mrs. Radgowski in the Hilltop Lyndhurst office. Mrs. Radgowski explained that she lived in Mentor, that she and her husband were interested in looking at homes, and that "she had just dropped her kids off at her mother's house." Mrs. Gardner said she responded, "Oh. Where does your mother live?" To this, Mrs. Radgowski stated, "Right around here. That's why we'd like to look at homes, because we'd like to live near my mother right around here." At the same time, Roseanne Radgowski indicated a circle with her hands. Asked why she did not show homes in Cleveland Heights to Mrs. Radgowski, Mrs. Gardner answered, "Because it was indicated that she wanted Lyndhurst, and that's all I showed her." [44]

Weighing the testimony of Roseanne Radgowski and Evelyn Gardner as well as other relevant evidence, it is concluded that Evelyn Gardner showed homes to Mrs. Radgowski in Lyndhurst because she reasonably believed Mrs. Radgowski was only interested in buying a home in Lyndhurst. Upon consideration of all the evidence, it is determined that the inference of racial steering which this court drew at the end of the plaintiffs' evidence is fully rebutted. Plaintiffs have failed to establish that Evelyn Gardner engaged in racial steering in

**43.** At the conclusion of the plaintiffs' case, this court concluded that

the locational contrast as to the homes shown Connie Jones and her counterpart Roseanne Radgowski is sufficient to permit an inference of locational steering with reference to both checkers. Therefore, Evelyn Gardner's motion for dismissal with prejudice is overruled.

**44.** Mrs. Radgowski recalls that Mrs. Gardner asked her to look through "the book" and she did. In a conversation that followed, Mrs. Radgowski quotes Mrs. Gardner as saying "she thought Lyndhurst would be my kind of town, with small children and all." Mrs. Gardner said

that she made the statement during a conversation in regard to the home on Marion. She said that Mrs. Radgowski "liked the idea that it was basically a private-type street with a park-like setting." She said that in reaffirmation of the idea that Mrs. Radgowski liked the house

and the extra amenity was a nice playground and thus sort of an extra push, and being a salesman and wanting to sell the property and make some money, I merely said, "this is your kind of town."

Mrs. Gardner's statement was consistent with her belief that Mrs. Radgowski wanted to buy a home in Lyndhurst.

her dealings with black checker Constance Jones and white checker Roseanne Radgowski.

### B.(10) Johnson-Rust

■ On October 26, 1978, black checker Marion Hortense Johnson began an audit of Elayne Liff, an agent of Hilltop's Hillcrest (Lyndhurst) office. On October 25, 1978, Mrs. Johnson's white counterpart, Susan Rust, began her audit of Mary Booher (formerly Hasselbach), also an agent of Hilltop's Hillcrest office.

Mrs. Johnson refreshed her recollection from her audit report before testifying.[45] Asked if she remembered the conversation about her housing needs with Mrs. Liff without looking at the documents, she answered:

> Maybe I can remember some of them. I wanted to look at houses in the price range of $70,000 to $75,000. I needed three to four bedrooms and maybe a den; a two-car garage. Normally I would ask for a fireplace if it was possible.

As to the location she sought, she answered, "Well, I was seeking a house in the eastern suburbs, near Richmond Mall, not too far out, but maybe in the Heights area." She stated that she told all of this to Mrs. Liff.

Hilltop counsel asked Mrs. Liff whether Mrs. Johnson indicated "what area she was interested in." Mrs. Liff responded: "I don't think so. I don't think she did at the time. I can't just remember that." However, on cross-examination, City's counsel asked Mrs. Liff if Mrs. Johnson's statement that she was "looking for the Heights and Hillcrest area and particularly around the Richmond Mall area" would refresh her

recollection, Mrs. Liff answered, "If you say that she asked me, sir, it's very possible. I cannot remember specifically." [46] Since Mrs. Johnson contemporaneously recorded what she told Mrs. Liff about the area in which she wanted to look and Mrs. Liff did not deny that Mrs. Johnson made the statement, it is concluded that Mrs. Johnson told Mrs. Liff that she was looking for a house "near Richmond Mall, not too far out, but maybe in the Heights area."

Mrs. Johnson's mention of a house "near Richmond Mall" was broad enough to include Richmond Heights in which the mall is located and Lyndhurst and South Euclid. These municipalities are adjacent to Richmond Heights and "not too far out." Mrs. Johnson's mention of the "Heights area" was also broad enough to embrace Cleveland Heights. Hence, Mrs. Johnson's area specifications permitted Mrs. Liff to attempt to show her the home on Langton Road in Cleveland Heights owned by a black family, broker Isaac Haggins and his wife. Both Mrs. Johnson and Elayne Liff agreed that Mrs. Liff attempted to locate Mr. Haggins in the Hilltop offices to arrange for a showing of the Langton Road home.[47] Mrs. Liff returned to Mrs. Johnson with the report that the Haggins' house had been taken off the market.

Because Mrs. Liff attempted to show the Haggins' home to Mrs. Johnson on October 26, it was contradictory for Mrs. Liff to testify that she did not make arrangements to show Mrs. Johnson homes

> because [Mrs. Johnson] was in a hurry. She—I hope I remember correctly, that she was to pick up a child somewhere. I thought that's what she told me.

---

45. Mrs. Johnson's credibility is suspect due to seven false answers to questions on her March 1978 auditor application to Heights Community Congress and her nine false answers to questions on her fall 1978 auditor application to Heights Community Congress. Hence, her statements are accepted as credible only where they are corroborated by her audit report or are against her interest or the interest of the Heights Community congress. Mrs. Liff has a poor memory of her meeting with Mrs. Johnson, and her statements are accepted only where corroborated and not self-contradictory.

46. While her memory about her meeting with Mrs. Johnson was limited, Mrs. Liff did recall that Mrs. Johnson told her "she wanted three or four bedrooms, and a fireplace, specifically a fireplace."

47. Mrs. Liff had been showing the Haggins home. She knew it had several fireplaces, an amenity requested by Mrs. Johnson. This was an additional reason for attempting to show her the Haggins' home.

This statement is also contradicted by Mrs. Liff's testimony that she probably asked Mrs. Johnson "how many there were in her family, if she had children," but she didn't "recall whether she said she had children or not." Upon consideration of all the relevant evidence, it is concluded that Mrs. Johnson did not tell Elayne Liff that she was in a hurry, nor did she tell her that she had to pick up a child. Thus, there was no basis for Mrs. Liff to say, "I don't think she actually wanted to see houses that particular day." [48]

Agent Liff stated that she was suspicious of Mrs. Johnson, and gave this explanation:

> [S]he kept insisting that her husband had gotten my name at a party the night before. And, of course, that made me suspicious, because I don't think my name is thrown around at parties. And I just was suspicious of the lady. [49]

Mrs. Johnson's "story" reasonably warranted Mrs. Liff in being "suspicious" of Mrs. Johnson. Despite her suspicion, Mrs. Liff stated that she "still went about [her] business in the usual manner." The court concludes that there was no basis for Mrs. Liff to not show homes to Mrs. Johnson on the afternoon of October 26, and had Mrs. Liff gone about her business "in the usual manner" she would have obtained listings to suit Mrs. Johnson's specifications.

To determine whether this variance in Mrs. Liff's usual course of business can be construed as a section 3604(a) violation, the treatment of Mrs. Johnson must be compared with the treatment of her white counterpart, Susan Rust, who had generally the same housing requirements. On October 25, Susan Rust requested that agent Mary Booher of the Lyndhurst office of Hilltop show her homes in the low $70,000 price range. Mrs. Johnson asked Mrs. Liff of the same office to see houses in the price range of $70,000–$75,000. Each asked for a three or four-bedroom house, a two-car garage, and either an extra room or a den. Mrs. Johnson added a fireplace "if it was possible." Agent Booher testified that there were approximately 30 houses in the computer fitting the specifications of Mrs. Rust that were available for sale on October 25. Mrs. Liff agreed that had she gone to the computer and "punched in the Heights area and the Hillcrest area in October, 1978," she "probably would have found at least 30 homes" which fit the specifications of Mrs. Johnson. [50]

Defendants argue that the "Rust audit of Booher-Gardner simply cannot be compared with the Johnson audit of Liff" because

> Ms. Booher had almost seven hours of lead time to arrange showings for Ms. Rust, whereas Ms. Liff had none prior to Ms. Johnson's arrival that afternoon.

However, agent Booher said she used no more than three and a quarter hours to obtain the computer listings used to select those homes for which appointments were arranged to show to Mrs. Rust. [51] While it

---

**48.** At best, her conclusion was merely a supposition. Mrs. Liff was asked, "But she didn't tell you that she wouldn't look at houses, did she?" She answered, "No, but her actions indicated that she wasn't interested."

This cross-examination contradicted Mrs. Liff's answer on direct examination that Mrs. Johnson had given an excuse as to why she did not want to see houses that day:

> She wasn't interested in seeing houses that particular day ... she used some kind of excuse, I think she had to pick up a child, if I remember correctly.

**49.** Mrs. Johnson had been given a story to tell as to why she had picked Mrs. Liff. She stated:

> If she was going to ask me how I chose her as the person, I was going to tell her that I had met some friends at a party who had purchased a home from her, and that was my interest in her being my agent.

While Mrs. Johnson did not recall telling Mrs. Liff why she had picked her, the story that she was told to give Mrs. Liff, if she was asked, was similar to Mrs. Liff's positive recollection of Mrs. Johnson's explanation for choosing her. This makes it convincing that Mrs. Johnson told Mrs. Liff what Mrs. Liff recalls.

**50.** The computer print-outs furnished to Susan Rust by agent Booher included homes with a fireplace, an amenity added by Mrs. Johnson to her own specifications.

**51.** Mrs. Rust called the Lyndhurst office about 9:10 a.m. at which time she gave her housing specifications. After accomplishing everything

seems likely that Mrs. Liff could have successfully obtained appointments for some houses to be shown to Mrs. Johnson on the afternoon of Thursday, October 26, had she done nothing more than display the multiple listing book she would have taken some steps towards showing her available housing. Mrs. Liff said this would be her "normal procedure." Mrs. Johnson testified that Mrs. Liff did neither. Further, Mrs. Liff does not remember even showing her a multiple listing book.

Instead, on Thursday, October 26, Mrs. Liff told Mrs. Johnson, according to her audit report, "she would check my needs and get back with me." Having received no call "in the [four] interim days," Mrs. Johnson called Mrs. Liff at her office on Monday, October 30. Mrs. Johnson reported that whoever answered the phone said "hold on for a minute." The person then said to her that Mrs. Liff was not in—"do you want to leave a message?" Mrs. Johnson responded "yes, to return my call." Late on the next afternoon (Tuesday) Mrs. Liff called Mrs. Johnson. Mrs. Johnson reported:

> That day she was very busy preparing herself for a trip to Hawaii and was telling me about that, and she really hadn't had time to check over her computer print-out or her listings for me, but as soon as she returned she would get back with me.

After acknowledging the existence of "the buddy system," Mrs. Liff testified that she thought "most of [her] buddies went on the trip with [her]." She was then interrogated:

Q. So if you had asked someone to take care of this lady while you were away—Hortense Johnson—they would of done it, wouldn't they?

A. I would have under normal procedures, sir, but I don't remember.

Q. You don't remember whether you asked anyone or not?

A. I don't believe I did.

In contrast, agent Booher arranged for agent Evelyn Gardner to meet Sue Rust should she not return to the office at the appointed hour. When agent Booher did not return, agent Gardner showed Mrs. Rust the homes that had been selected and arranged another appointment for her with agent Booher.[52]

Agent Liff mentioned only one home for possible showing to Mrs. Johnson and that was owned by a black family on Langton Road in the Oxford School district of Cleveland Heights. Further, by Tuesday afternoon, October 31, five days after Mrs. Johnson first met with Mrs. Liff, no other homes were suggested to Mrs. Johnson for possible showing. In addition, agent Liff did not arrange for another agent to show homes to Mrs. Johnson when Mrs. Liff departed for a week's vacation, contrary to Hilltop's "buddy system" policy. It is determined, therefore, that agent Liff denied showing available homes [53] to Mrs. Johnson on the basis of race, a violation of section 3604(a).

■ A question has been raised as to whether a statement made by Evelyn Gardner while showing Sue Rust a home in

necessary to make up the list of houses to be shown, agent Hasselbach left the office for a meeting with her lawyer scheduled for 12:30—1:00. However, she fixed 3:30 as the time for Susan Rust to meet her at the office, apparently to allow time for her to conclude her business before returning to the office.

**52.** In another audit, Hilltop agent William Howard had to leave town while servicing white checker Caron. Before leaving, he referred Mr. Caron to Hilltop agent John Mayfield who showed him a home while Mr. Howard was away on vacation. The actions of agents Booher and Howard imply a policy on the part of

Hilltop agents to assure that prospective buyers are not inconvenienced by the unavailability of their agents.

**53.** As a partner of agent Booher, agent Evelyn Gardner showed four homes to Mrs. Rust in University Heights, South Euclid, Cleveland Heights and Lyndhurst. On either October 30 or October 31, additional homes, including one near Fairmount and Taylor in Cleveland Heights and one on Anderson Road in South Euclid were shown by agent Booher to Mrs. Rust.

Forest Hills at 2065 Lee Boulevard[51] violates section 3604(a). Mrs. Rust asked the owner what schools the children would go to, and the owner answered, "Well, this is a private school area, and the agent told me to say that." The owner was referring to the listing agent (a broker other than Hilltop). In the car, after leaving the Forest Hills home, Mrs. Rust said that she asked agent Gardner about the schools that the children would be attending in East Cleveland, and "Evelyn said that the East Cleveland schools were not as well rated." Mrs. Gardner recalls that when they got back in the car, Mrs. Rust made some reference to the owner's remark that "this was a private school area." Mrs. Gardner said that she responded:

> East Cleveland schools were not rated as highly as Cleveland Heights or South Euclid—Lyndhurst schools. Those were the two areas she was looking at also. And I said that's based on the SAT scores and academic scores and things like that.

On cross-examination Mrs. Gardner stated that

> I told her what I had read [in a newspaper article]; it was not my opinion.

She was later asked on cross-examination "the only reason you are stating that this might not, that this wouldn't be considered steering, is because race wasn't mentioned?" She answered:

> Here again, it is a response, not—I want to say this just right. It is a response to a question rather than information put out with the intent to change the situation.[55]

Answering inquiries of a home seeker in a responsive and helpful manner would seem to be essential to selling or brokering real estate. If the home seeker receives an accurate response, it aids the person in making a housing choice. Moreover, an answer or other statement not made to deny housing based on race is not violative of section 3604(a).

The statement of Evelyn Gardner would be violative of section 3604(a) only if it might reasonably influence a housing choice on the basis of race, color or national origin. In this case, race was not expressly mentioned ·or implied in Evelyn Gardner's answer. Therefore, plaintiffs have failed to prove that Evelyn Gardner's answer to Susan Rust's query violated section 3604(a). Moreover, plaintiffs have not shown that in providing service to Susan Rust, either agent Gardner or agent Booher racially steered Mrs. Rust or otherwise violated the Fair Housing Act.

### B.(11) Riggs-Butterfield

■ Hilltop Realty sales agent Sandra Goldberg conducted an open house on Sunday afternoon, November 19, 1978 at 3258 Berkeley Road, Cleveland Heights. Her mother, Shirley Bernstein, also a Hilltop sales agent, sat in at the open house for her. Mrs. Patty Riggs, a black checker, and Mrs. Hester Butterfield, a white checker, visited the open house to audit Mrs. Bernstein.

Mrs. Butterfield arrived at the open house at 4:45 p.m. and left the open house at 5:30, according to her audit report. Before Mrs. Butterfield left, she and Mrs. Bernstein made an appointment for Mrs. Butterfield to come to the Hilltop office to go through the multiple listing book.

---

**54.** While this home is in East Cleveland close to the Cleveland Heights city limits, it printed out from the computer when programmed for the northerly part of Cleveland Heights. Mrs. Booher did not know that the home was actually located in East Cleveland.

**55.** Hilltop's instruction to its agents, incorporated in president Aveni's civil rights lecture during Hilltop's central training program, is to refer to city hall or other knowledgeable government agencies any question about racial composition of a neighborhood or of a school district.

A salesperson's compliance with this instruction would not violate section 3604(a)'s prohibition against making "unavailable or deny[ing] a dwelling to any person because of race, color ... or national origin."

Evelyn Gardner might have followed president Aveni's instruction in responding to the question of Susan Rust, prompted by the owner's comment at 2065 Lee Boulevard. Her failure to follow this procedure does not resolve the legality of her statement.

Mrs. Butterfield and Mrs. Bernstein agree that they met at the Hillcrest (Lyndhurst) office on Monday evening at which time selection of houses occurred.[56] Mrs. Butterfield remembers saying "... that we were looking ... in areas that would allow us access to the recreation programs in those three cities [Cleveland Heights High, Shaker High and Brush High]." It is concluded that she told this to Mrs. Bernstein on Sunday afternoon at the open house. Mrs. Butterfield said that

> when I got to her office, she had already picked the homes, she had marked them in the book for us to look at, preliminarily, and we looked through them and commented on them.

She said that Mrs. Bernstein would have "volunteered me many more. We ended up with three." One of these homes was on Eastway in South Euclid. When an appointment could not be arranged for that home, Mrs. Bernstein arranged to show a home on Elmwood in South Euclid. On the next night, Tuesday, Mrs. Bernstein showed Mrs. Butterfield the Elmwood home and homes on Powell Road and Cedar Road in Cleveland Heights.

Bearing in mind that two out of the three houses which Mrs. Bernstein showed to Mrs. Butterfield were in Cleveland Heights, it is concluded that any claim that Mrs. Butterfield was steered away from Cleveland Heights is not supported.[57]

▮ Turning to the audit by Patty Riggs, according to her audit report from which she refreshed her recollection while testifying, she stated she arrived at the Berkeley Road open house at "4:00 o'clock" and left the open house at "4:50." Mrs. Riggs testified that she and a white lady arrived at the open house at the same time, and the agent asked both of them into the house and took their names. She said that once the white lady left, the agent asked her what she was looking for, and she told her "homes in Lyndhurst, South Euclid or Cleveland Heights." However, she admitted she told the agent that she might want to rent her "old house" which was on Oak Road in Cleveland Heights. Mrs. Riggs agreed that the agent said it would be nice if she could be close by to watch over the property that she would be renting. The record does not show that Mrs. Riggs rejected this suggestion. Thus, she left the impression that she was primarily interested in Cleveland Heights.

Four homes were selected to be seen. One was on Elmwood in South Euclid while three were in Cleveland Heights on Radnor, Brunswick, and Englewood. On direct examination Mrs. Riggs stated that the agent asked her if she would like to pick out any homes to see, and "eventually, I ended up picking out one house." Her audit report stated, "Four houses were suggested. One I chose and the others she did." [58] The home Mrs. Riggs chose was on Radnor.

Hilltop sales agent Sandra Goldberg, Mrs. Bernstein's daughter, showed the homes to Patty Riggs. Sandra Goldberg stated that on Sunday evening, November 19, her mother gave her a sheet of paper that "gave me the name, address, phone

---

56. Mrs. Butterfield first testified that they met on Tuesday night. But she later determined the house selection occurred on Monday evening, and the home visitation took place on Tuesday evening.

57. Mrs. Butterfield recalls Mrs. Bernstein saying:
> I don't want to steer you, but you get a lot more house for your money in the Heights area because those are old, well maintained, solid homes that professional people in the past have been living in and finishing, putting paneled rooms in, so forth.

In view of the conclusion that Mrs. Butterfield was not steered, it is unnecessary to review the

details of the selection process, which the evidence revealed was a joint affair.

58. Mrs. Riggs stated that the reason she "deviated from [her] instructions [not to pick out houses] was because the agent was so persistent in asking that [she] pick out a house." The Radnor home Mrs. Riggs picked out was the first house chosen as a possible house for her to see. She was then asked:
> You are not sure whether any other houses were selected as possibilities for you to see by the agent at the open house, are you?

She answered, "No, I am not."

number and homes that Mrs. Riggs wanted to see." Prior to Tuesday, she made appointments to show the four homes. On Tuesday morning Mrs. Goldberg showed her three of the four homes, the Elmwood home, the Radnor home and the Englewood home. The seller of the Brunswick Road home was not there to let them in, and they did not go inside.

Mrs. Riggs reported in her audit report that at the open house Mrs. Bernstein stated that "there were also homes available in East Cleveland that I could see, and the school district there was Caledonia School." This referred to a conversation at the open house. At trial Mrs. Bernstein was asked by her counsel, "At the open house, was there any suggestion of any homes in East Cleveland by you?" She answered, "No. There was no reason for it, no." She was further asked, "Did you discuss her living in East Cleveland?" She answered, "No, I did not." These denials are unconvincing. It is concluded, therefore, that Mrs. Bernstein made the statement attributed to her by Mrs. Riggs.

However, Mrs. Bernstein's East Cleveland remark must be weighed in connection with the following facts and not as an isolated incident: Mrs. Riggs left the impression that she was primarily interested in Cleveland Heights; Mrs. Riggs herself agrees she picked out the Radnor home in Cleveland Heights; as seen in an earlier audit, Englewood (one of the homes shown) was in a less integrated area of Cleveland Heights; and Mrs. Riggs was shown a home in predominantly white South Euclid. Therefore, it is found that plaintiffs have not carried their burden of producing facts from which racial steering may be inferred.[59]

This conclusion is corroborated by Mrs. Goldberg's offer to show Mrs. Riggs additional homes in South Euclid, Lyndhurst

and Mayfield Heights.[60] Mrs. Riggs refused that offer. This court has found that only infrequently is a home sold to a prospective buyer after seeing only three houses. When, as here, there is an offer to show more than three homes in the requested areas and the offer is rejected by the checker, this rejected offer is a further fact which militates against any inference of racial steering.

Upon consideration of all the evidence, it is concluded that Hilltop agents Bernstein and Goldberg did not violate section 3604(a).

### B.(12) Jerome Emoff

█ Plaintiffs offer the experiences of actual home buyers who sought homes through Hilltop agents as further proof of locational steering on the part of Hilltop. Plaintiffs first call attention to a statement made during the summer of 1978 attributed to agent Delores Russo by home buyer Jerome Emoff. Mr. Emoff testified that while he and Hilltop agent Delores Russo were driving on Monticello Boulevard in the vicinity of Forest Hills, Mrs. Russo asked him whether he was "aware that the Forest Hills area was more than one half black."

Mrs. Russo's records of showings to Mr. Emoff reflect that on September 7 (the third time she showed him homes) she showed him two homes on Bradford, one on Woodridge and one on Boynton, all in Cleveland Heights. When questioned about the route she took to drive from the Bradford home to the Woodridge home, Mrs. Russo first denied being on Monticello, and later stated that she did not remember which way she went or whether she drove through the more integrated Forest Hills area. Mrs. Russo also insisted that the two homes shown on Bradford were east of Taylor Road. However, the court

---

59. In view of this conclusion, it is unnecessary to discuss or decide how Mrs. Bernstein's limited vision may have affected the home selection process.

60. During their meeting on November 21, Mrs. Goldberg said she

offered to show [Mrs. Riggs] homes in South Euclid, Lyndhurst, Mayfield Heights. [Mrs. Goldberg] reiterated the fact that [she] was limited in an hour and twenty minutes on a blizzardy morning and wanted to take her out again.

judicially notes that the homes at 3246 and 3383 Bradford are actually west of Taylor Road, between Lee Road and South Taylor. Thus, it is concluded that it is likely that Mrs. Russo drove the more direct route from 3246 Bradford Road (close to Lee Road) via Lee Road and Monticello to Woodridge and that Mrs. Russo and Mr. Emoff were on Monticello in the Forest Hills area, as Mr. Emoff testified.

It is concluded that Mrs. Russo made the statement attributed to her by Mr. Emoff and that in asking a reasonable home buyer if he was aware that the Forest Hills area of Cleveland Heights was more than half black, she intended to influence the housing choices of this buyer on the basis of race. The statement was, therefore, an act of racial steering in violation of section 3604(a).

Section 3604(a) makes it unlawful "even to attempt" to steer on a racial basis, and success in steering is not relevant. See *supra* p. 1249. Thus, it is immaterial whether or not Jerome Emoff was discouraged from buying in Cleveland Heights as a result of his discussion with Delores Russo and that he purchased a home in a neighborhood not far from Forest Hills.

### B.(13) Mr. and Mrs. Calabrese

 Joseph George Calabrese moved from Rochester, New York in the spring of 1977 to take a position in Cleveland, Ohio. Gallery of Homes, Inc., through whom Mr. Calabrese and his wife Mary were selling their Rochester home, put them in touch with two Cleveland real estate firms, Hilltop and Bishop Realty. Upon contacting Hilltop, the Calabreses dealt with agent Jack Abbott.

The testimony of Mr. and Mrs. Calabrese and agent Abbott indicates that the Calabrese's were interested in looking at a home in the eastern suburbs and particularly Cleveland Heights, although Shaker Heights and University Heights may also have been mentioned. Mrs. Calabrese testified that she was fairly certain that in a telephone conversation with someone in the Hilltop office she told the person that she and her husband wanted Cleveland Heights

and Shaker Heights. Mr. Abbott's notes of the conversation of March 8, 1977 mention as to area only "access to downtown—½ hr." Mr. Abbott disclosed that the form which he received from Hilltop's referral department stated "eastern suburbs/Cleveland Heights." Mr. Abbott further testified that he asked Mr. Calabrese, "are you interested primarily in Cleveland Heights?" He said that Mr. Calabrese replied, "Oh, no, no. I want to see all the eastern suburbs." It is concluded that the Calabreses requested to see the eastern suburbs, including Cleveland Heights.

The Calabreses came to Cleveland on a Saturday at the end of March. Mr. Abbott arranged to show them homes. Mr. Calabrese recalled that they saw seven or eight homes, while his wife said they saw five or six. One home was on Cummings Road in Cleveland Heights, and the rest were in Lyndhurst, Mayfield Heights, and South Euclid. Mr. Calabrese stated that among the reasons he did not like the Cummings Road home was that he has two small children, and there was a ravine close to the back door. Hence, the only home shown to the Calabreses in Cleveland Heights did not meet Mrs. Calabrese's specification that the home have a "decent size" backyard.

After looking at homes, the three returned to the Hilltop office. When Mrs. Calabrese told Mr. Abbott that they did not like any of the homes and that she would like to be shown other homes, he gave her a multiple listing book to examine. She picked out homes, some of which she believed were in Cleveland Heights. She said that when she asked about specific homes, Mr. Abbott would go into another room and would come back and say that the house was sold.

Mr. Calabrese testified that after he observed that "Mr. Abbott would walk back and forth, in and out of the office,"

I got up and met him at the door as he came in, and my wife was still reading the book, going over the book, and I asked him more specifically why he wasn't showing us homes in those three

particular towns [Cleveland Heights, Shaker Heights and University Heights]. He asked, how do you feel about blacks, specifically.

Mr. Calabrese then stated:

I was taken [back] by the question, and I asked him, what did he mean?

He said, did you know that those towns were integrated?

I, at that point, I didn't much listen to him in terms of what other homes he would like to show us.

Asked whether Mr. Abbott said anything derogatory about Cleveland Heights or Shaker Heights, Mrs. Calabrese answered, "not in my hearing." However, she said that her husband told her "about a statement that Mr. Abbott had made that [she] did not hear." Asked what was the statement, she answered, "how do you feel about living near blacks?" Mr. Abbott denied making the statement. When asked if he was certain of that, he answered, "I am positive. I never said that in my life to anyone." For the reasons discussed below, the court concludes that Mr. Abbott did make that statement.

First, no reason is disclosed in the record that would have caused Mr. Calabrese to invent the disputed conversation. While it is believed and found that Mr. Abbott and Mr. Calabrese conversed by telephone on March 8, Mr. Calabrese had never met Mr. Abbott before Saturday, March 26. There is no evidence in the record of any personal animus or hostility towards Mr. Abbott that would have motivated or caused Mr. Calabrese to fabricate the conversation. Asked if Mr. Calabrese said anything that would indicate any ill feeling towards him, Mr. Abbott answered, "He didn't actually say anything, no."

Second, Mr. Abbott testified that he "had an ill feeling toward [Mr. Calabrese]" because he "had taken my time." Mr. Abbott said that on Sunday, March 27, he prepared a list of Cleveland Heights homes to show the Calabreses. He called, he believed, "the Smythe Cramer office and asked to show a home that they had listed on Fenley Road in Cleveland Heights." The court did not permit him to give the content of the conversation; however, as a result of that call, he said he did not make an appointment to show that house to the Calabreses. After the Smythe Cramer call, Mr. Abbott said he called Mr. Calabrese and asked him if they would like to look at any more homes. Mr. Calabrese told him, "Well, I'm not really interested in looking any more at this time." Mr. Abbott testified that he said to Mr. Calabrese, "Joe, how did you like the home that you saw this morning on Fenley Road?" He answered, "As a matter of fact we liked that home very much. We're thinking about putting an offer in on it." At this point Mr. Abbott reminded Mr. Calabrese that they had agreed that Mr. Calabrese "was not going to be looking at homes with anyone else and that I was going to be exclusively his agent in this area." The court does not credit these statements of Mr. Abbott.

Through contacts made by the Gallery of Homes in Rochester, the Calabreses made contact not only with Hilltop Realty but also with Bishop Realty. In view of this, it is improbable that Mr. Calabrese would have entered into an informal, exclusive agreement with Mr. Abbott. Further, other evidence demonstrates that the Calabreses did not believe that they had an exclusive agreement with Mr. Abbott. Mrs. Calabrese testified that on Sunday, March 27, the Bishop Realty agent showed them homes in Cleveland Heights. Further, she testified that they did not see Smythe Cramer until April. It was through Smythe Cramer that they saw five homes in Cleveland Heights, one of which was a home on Fenley that they eventually bought. Thus, Mr. Abbott was mistaken when he testified that on Sunday, March 27 they saw the house on Fenley through Smythe Cramer.

Finally, the reasons given by Mr. and Mrs. Calabrese to Mr. Abbott for the termination of their relationship with Mr. Abbott are consistent with the statement which Mr. Calabrese attributes to Mr. Abbott. Mrs. Calabrese testified that when, at a later time, Mr. Abbott called back to ar-

range a second meeting, she and her husband told Mr. Abbott:

> We were dissatisfied with his services, and that we had seen some homes from another real estate agent that were more of what we had in mind, that we didn't want him to show us anything else.

Asked to say why they were dissatisfied with his services, she answered:

> Because he wasn't showing us houses that were the type that we liked, or he wasn't showing us houses in Cleveland Heights, and we wondered why.

Based upon the findings of this subsection it is concluded that the statements of Mr. Abbott to Mr. Calabrese would influence the housing choices of a reasonable prospective home buyer on the basis of race. Both the nature of his statement and his failure to show the Calabreses homes in Cleveland Heights that met their specifications establish racial steering in violation of section 3604(a). Since an attempt to steer is violative of section 3604(a), see *supra* p. 1249, it is immaterial that the Calabreses purchased a home on Fenley Road in Cleveland Heights.

### B.(14) Mr. and Mrs. Gordon

■ As another "steering incident" the plaintiffs offer statements which allegedly were made by Hilltop agent Steven Paul Francis to prospective home buyers Belita Tisder, a black, and Howard Gordon, a white, when they first met with Mr. Francis in late February 1979. Ms. Tisder of Columbus and Mr. Gordon of the Cleveland area were engaged to be married, and Ms. Tisder had five black children from a previous marriage. They were looking for a home to purchase in the Cleveland area. Hereafter called Mr. and Mrs. Gordon, they contacted sales agent Francis after seeing his name in a Sunday newspaper (Hilltop) ad. On the same day they met him at the Hilltop Heights office.

Mrs. Gordon testified that while in the office she told Mr. Francis that she and Mr. Gordon had driven around several communities. She had looked at houses in Lyndhurst and in "Euclid Heights [*sic*]," and she herself preferred a newer house. In response, Mr. Francis told them about an incident that had occurred in the Lyndhurst area:

> He told us that there was a family that lived there—a black family that had moved in the Lyndhurst area, and their children or something in the high school had been beaten up, and how the family had to sell their house and move, and they had just recently purchased a home.
>
> And he also said that there would be times when something happened at the school where my husband could not go there to represent my kids because of him being white.

Mrs. Gordon said that after he told her about the incident, she "was worried." She then told him:

> We did not want to live in a predominantly black neighborhood. We just wanted to live, period.

Mr. Gordon's testimony corroborated her testimony in all essential respects.[61]

Mr. Francis acknowledged the Sunday meeting with the Gordons in the Heights office of Hilltop. He remembered Mr. Gordon was very interested in living in Cleveland Heights, having grown up there. He recalled Mrs. Gordon "had a desire for Lyndhurst, and she also mentioned Chardon." Mr. Francis was asked whether when they met on the first day he said to them "that the children of a black family that had moved into Lyndhurst were beaten up in the high school and that the family had to move." He answered "no." He also denied that he told them that "Mr. Gordon could not go to the high school if they moved into Lyndhurst to represent his kids because he was white."

---

**61.** Differing from his wife, Mr. Gordon mentioned two black families instead of one, but they both agreed that they were told the child of one family was beaten, and the family left the community. Mr. Gordon said that the conversation with Mr. Francis occurred in the car while they were being shown homes, while Mrs. Gordon stated they were in the office. Despite these differences in the Gordon's testimony, they both agreed that the conversation occurred on the same day.

On the day of their first meeting, Mr. Francis also showed them several homes in Cleveland Heights. Mr. Francis continued to show homes to the Gordons until April 22, 1979, when they entered into a contract through Mr. Francis to purchase a home at 2112 Miramar Boulevard in South Euclid. During the intervening period, agent Francis had shown the Gordons a total of 45 to 60 homes. Approximately 25 to 30 of these were shown only to Mr. Gordon.

Agent Francis testified that the subject of a black child being beaten up at Brush High School (South Euclid—Lyndhurst school district) first came up when Mr. Gordon called him to ask his assistance in getting out of his contract to purchase the South Euclid home. After discussing several financial reasons which Mr. Gordon offered for withdrawing from the contract, he said he asked Mr. Gordon "isn't there some other reason?" Mr. Gordon told him

> he had been informed by a co-worker of violence to a student in Brush High School, and that since his kids would be going there if he concluded the sale of that house, that he did not want to be responsible for the safety of his children going to Brush High School.

He stated he was aware "that had happened" because the newspapers had reported "that a student had been beaten in a washroom at Brush High School."

Some time after April 22, 1979 when he and his wife signed an agreement to purchase the South Euclid home, Mr. Gordon stated he had a "phone conversation with Mr. Francis about the fact [they] wanted to get out of this offer." The reasons given by Mr. Gordon for not wanting to live in the house were "that it went beyond [their] income, and [they] were afraid for the kids." About this time he learned some other information about Brush High School:

> A woman that [he] had casually known at work told [him] that she lived in South Euclid, and the kids would have a rough time in that school system.

He then said "I added [that] to what Mr. Francis had told me earlier," and passed this information along to his wife. Although they had increased their offer on the South Euclid house, as encouraged by Mr. Francis, "a mutual decision" was made by him and his wife to withdraw the offer.[62]

As seen above, Mr. Francis testified that he had told Mr. Gordon he was aware of the Brush High School incident because it had been in the newspapers. Having learned from the newspapers about the Brush High School incident, presumably at the time it happened, it is concluded that Mr. Francis knew about the incident in late February when he first met the Gordons. Mr. Francis also knew that the Gordons were a biracial couple, and in connection with their housing needs he would have known about Mrs. Gordon's children. It is likely and it is determined that Mr. Francis brought up the Brush High School incident at the first meeting when Mrs. Gordon indicated her interest in seeing homes in Lyndhurst. Further, though they were shown 45 to 60 homes, neither on that first day of home visitation nor on any other time did Mr. Francis show them any homes in Lyndhurst even though Mrs. Gordon wanted to see homes in Lyndhurst. The only reasonable explanation supported by the evidence is that Mr. Francis' story of physical violence to a black student and an inability of Mr. Gordon to represent his children at Brush High School in Lyndhurst deterred the Gordons from pressing Mrs. Gordon's request to see homes in Lyndhurst.[63]

---

**62.** When Mr. Francis refused to be a party to breaking the contract, Mr. Francis and the Gordons terminated their relationship.

**63.** Mrs. Gordon's report of Mr. Francis' statement is consistent with her further statement:

> Well, after he told us that story, you know, I guess we really didn't want to look then, because he said—after he told us that story, he told us not to say anything about him telling us that, because it would be called steering. So we didn't really have any desire to look in Lyndhurst after the story.

It is concluded that the statement of Mr. Francis made to Mr. and Mrs. Gordon, as Mrs. Gordon reported it, would tend to influence, based on race, the housing choices of a reasonable prospective home buyer seeking housing in Lyndhurst. Volunteering such information in that context would be likely to discourage a reasonable home buyer from pursuing housing in Lyndhurst. Moreover, its intentional nature was expressly acknowledged by Mr. Francis, who told the Gordons "not to say anything about him telling us that, because it would be called steering." Hence, it constitutes racial steering away from Lyndhurst, but the matter does not end there.

 Plaintiffs condensed their claim involving the Gordons as follows:

The testimony of both Belita Gordon and her husband, Howard Gordon, was that the remark about the Lyndhurst family frightened them.... The Gordons subsequently purchased a home on Bendemeer in Cleveland Heights. In this action, the influence and effect of racial information by the Hilltop agent had a concrete effect on these homeseekers and constituted a violation of section 804(a).

Plaintiffs seem to be saying that by the statement and acts of agent Francis, the Gordons were not only steered away from Lyndhurst but that they were steered into Cleveland Heights. However, there is nothing about the statement of agent Francis or acts that said or suggested that he was seeking to steer the Gordons into Cleveland Heights. In addition, showing the Gordons 45 to 60 homes in several communities, including South Euclid, the location of the Miramar home which they contracted to buy, refutes any claim that he attempted to steer the Gordons into Cleveland Heights. Because the plaintiffs have failed to prove that this racial steering incident was steering into or away from Cleveland Heights, the plaintiffs may not

rely on the incident to support their claim of racial steering.

 In sum, in eight separate incidents, Hilltop's agent violated section 3604(a), and these violations were found to have impacted on Cleveland Heights. Each of these violations were committed within the agent's course and scope of employment with defendant Hilltop Realty, Inc. Applying *Marr v. Rife*, 503 F.2d 735, 742, the acts or statements of these agents are imputed to Hilltop.

## C. Financial Qualifications

Plaintiffs allege that defendant Hilltop violated the Fair Housing Act by unequally applying its financial qualification procedures based on race. To support their allegations, they present evidence of five HCC sponsored audits and one Cuyahoga Plan audit,[64] all performed in 1978. Plaintiffs assert that these audits are designed to "ascertain whether real estate agents qualified persons equally."

Defendant Hilltop asserts that it did not engage in disparate treatment based on race through its financial qualification procedures. Defendant contends that "differences in the way a set of checkers were treated by two different agents could very easily be attributable to differences in the practices of the real estate agents."

While the court finds that there were differences in the timing and the method of financial qualification by various agents, these differences do not relieve the court of the duty of examining plaintiffs' several claims of unequal application of Hilltop's financial qualification procedures.

Section 3604(a) provides that it shall be unlawful to "... otherwise make unavailable or deny, a dwelling to any person because of race...." The language of this section is broad in scope and prohibits all practices which make dwellings unavailable due to race. Accordingly, it prohibits "the imposition of more burdensome applications procedures, of delaying tactics, and of

---

**64.** At trial the court ruled that the Cuyahoga Plan audit can only be used to ascertain Hill-

top's intent to discriminate. See *infra* note 67.

various forms of discouragement." *Zuch v. Hussey,* 366 F.Supp. 553, at 557 (E.D. Mich.1973). *Accord, Williams v. Matthews,* 499 F.2d 819, 826 (8th Cir.1974); *U.S. v. Youritan,* 370 F.Supp. 643, 648 (N.D.Cal.1973), *aff'd in relevant part,* 509 F.2d 623 (9th Cir.1975).

■ However, the mere requirement process of financially qualifying a buyer can hardly be considered to be either a form of discouragement or an unwarranted imposition. All prospective home buyers should expect to be asked questions pertaining to their financial capability. It is only when those questions or comments are racially motivated and used in a disparate fashion that the financial qualifying process would become the "more burdensome application procedures" or "form of discouragement" that the statute disallows.

■ On April 4, 1978, black checker Anita Perry and white checker Linda Blaser audited the Hilltop office at 3950 Mayfield Road. Mrs. Perry was qualified by agent Phyllis Williams while Mrs. Blaser was qualified by agent John Mayfield.

Checker Perry testified that agent Williams asked about her husband's income and employment and whether they owned a home. Though it is not clear from Mrs. Perry's testimony who initiated it, there was "a discussion about the down payment [they] would be required to make or that [they] had available to make." Checker Perry further testified that Mrs. Williams "said we would go into the financing after we had found the house."

The white checker Blaser testified that the only financial qualifying question John Mayfield asked her was about her husband's employment. Mr. Mayfield also offered his assistance in obtaining financing. Although the black checker was asked more qualifying questions than was the white checker, these questions were race neutral and were ones which the agent might reasonably believe would help him determine the prospect's financial ability to buy a house.

■ In their April 10, 1978 audit of Hilltop's Lyndhurst office, checkers Perry and Blaser saw agents Bill Weir and Vi Costello. Checker Perry testified that agent Weir asked her about her occupation, her and her husband's income, their debts and obligations, and whether they owned and planned to sell their present home. Though she did not indicate who initiated it, Mrs. Perry testified that she and agent Weir discussed the amount of down payment available. She also said that Weir offered to assist in obtaining financing. Agent Weir similarly testified that he asked Mrs. Perry about her and her husband's income, but recalled asking no other questions pertaining to their financial capabilities.

Checker Blaser testified that Vi Costello only asked her about her and her husband's employment. She also said that agent Costello offered to help them obtain financing. Agent Costello testified that

> I was discussing price ranges, her husband's job, how much money she was going to devote to buying a home. She said that she had already been qualified by [John Mayfield] in our Heights office, and she told me she qualified for the upper 50's and low 60's.

Linda Blaser was not called on rebuttal to dispute this testimony. Therefore, the court finds that checker Blaser told agent Costello that she had already been qualified by agent Mayfield for homes in "the upper 50's and low 60's." Hence, agent Costello was justified in asking fewer question than agent Weir asked black counterpart Perry.

■ On April 14, 1978 black checker Adrienne Drake met Hilltop agent Ann Gilmore while white checker Ruth Bartoo met agent Norman Hott.

Checker Drake testified that agent Gilmore asked her about her husband's income, her and her husband's employment, their debts and other obligations, and whether they had a house to sell. Mrs. Drake further testified that agent Gilmore said mortgage financing may be difficult to obtain, and she would help them obtain

financing. Agent Gilmore testified that she asked Mrs. Drake where her husband worked, his income and their price range.

Mrs. Drake's white counterpart, Ruth Bartoo, testified that agent Hott asked her whether her present house was to be sold. There was also a discussion about down payments, but checker Bartoo's testimony gave no clear indication as to who initiated it.

In October 1978 black checker Juanita Newsom and white checker Diana Horrigan performed an audit of agents Mayfield and Leo Lee at the Hilltop office at Mayfield and Warrensville Roads in Cleveland Heights.

When checker Newsom first arrived at the office she was asked a few questions by both agent Mayfield and agent Leo Lee. Mrs. Newsom testified that at her initial visit she was asked about a down payment and whether they owned a home. She further testified that Mr. Lee said that a "legal" [65] would have to be run on her home. At her next visit, and still before seeing homes, Mr. Lee asked Mrs. Newsom about family debts and other obligations and her husband's employment. She further testified that Mr. Lee said he would assist them in obtaining financing. Agent Mayfield asked white checker Horrigan where her husband worked and whether they owned and planned to sell their home.

Also in October 1978, black checker M. Hortense Johnson met Hilltop agent Elaine Liff, and white auditor Susan Rust met agents Evelyn Gardner and Mary Hasselbach. Mrs. Johnson was asked for information on her husband's occupation and income, and the couple's debts and other obligations. Mrs. Johnson testified that agent Liff told her that she did not anticipate any problems with financing given the size of the down payment Mrs. Johnson indicated was available. Checker Johnson further testified that agent Liff offered to take her and her husband to the bank "to work out the financial procedures." Susan Rust testified that she was asked her husband's income and whether she was employed.

The evidence reveals that in the Drake-Bartoo, Newsom-Horrigan and Johnson-Rust 1978 audits, black checkers were asked more financial qualifying questions than white checkers. [66] The black checkers were asked more questions on income and occupation than white checkers. In the April 1978 Drake-Bartoo audit and the October 1978 Newsom-Horrigan audit, the black checker was asked about debts and other obligations. No white checkers were asked those questions. Nevertheless, there are several factors which weigh against finding disparate treatment.

First, it must be noted that there was lack of uniformity in the qualifying methods of the various agents who testified, and in each case the black checker audited a different agent than the white checker. Further, even where more questions were asked by one agent than the other in the same audit, the questions were those that all prospects should expect to encounter when buying a home. A real estate agent is not prohibited from asking race-neutral questions which he or she reasonably believes will help determine the prospect's financial ability to buy a house. In summary, the court finds that Hilltop's financial qualification procedures as applied did not violate section 3604(a). Furthermore, Hilltop agents frequently offered to assist the black checkers with financing. This is clearly not discouragement based on race that is prohibited by section 3604(a).

---

**65.** Mrs. Newsom testified that Mr. Lee described a "legal" as "a procedure used to check to make sure that your deed was in order or mortgage was in order."

**66.** In October 1978, black checker Constance Jones and white checker Roseanne Radgowski audited agent Evelyn Gardner. Checker Jones was asked about her husband's occupation and income while both Jones and Radgowski were asked about down payments. Agent Gardner testified that she never qualified buyers until both the husband and wife met with her. Because agent Gardner had not yet undertaken to qualify either checker, the court makes no finding as to her comparative qualification treatment.

## D. Corporate Intent

■ Violations of section 3604(a) that occurred prior to 180 days before the filing of this action are not time barred if these incidents represented an unlawful practice which continued into the 180-day period. See *supra* pp. 1250–1251. To make such a determination, it is essential to find that Hilltop had a corporate intent to continue to "make unavailable or deny a dwelling to any person because of race...."

Considered together, the eight 3604(a) violations previously found, each of which is imputed to defendant Hilltop, reflect such a corporate intent. The court now considers additional pieces of evidence which also bear on Hilltop's corporate intent.

### D.(1.) Racial Steering Incidents

First to be considered are four incidents of racial steering which this court imputes to Hilltop. These acts are not ones on which the plaintiffs may base their claims of racial steering because in each incident the checker or home seeker was neither steered to nor away from Cleveland Heights. However, taken together, these incidents of racial steering support a corporate intent to continue to engage in racial steering.

Chronologically, the first of these racial steering incidents is a statement made by agent John Mayfield to white checker Hester Butterfield and her husband in May 1977. See *supra* note 26. Agent John Mayfield by his statement attempted to steer them away from a home on Scottsdale near the Cleveland—Shaker Heights border because that "end of Scottsdale is over integrated." In the next incident of racial steering, see *supra* p. 1263, agent Leo Lee racially steered black checker Juanita Newsom away from homes which were available in less integrated areas of Beach-

wood and other communities which she requested, to the substantially integrated Concord-Beacon area of Beachwood. The third incident, see *supra* p. 1276, is a conversation including Howard and Belita Gordon and Hilltop agent Francis, where agent Francis related a story to them about a black youth from a Lyndhurst family who was beaten in school. He also said that Mr. Gordon, a white, would have trouble representing his black children in the Lyndhurst—South Euclid schools. The court concluded that this statement racially steered the Gordons away from Lyndhurst.

Finally, in the Cuyahoga Plan's June 1978 "HUD-style" audit of the Euclid office of Hilltop,[67] white checker Judith Wayman audited agent Frances Fee on June 14, 1978. Black checker Lucille Davis audited agent Angela Stritof of the same office on the afternoon of June 16, 1978.

When Mrs. Wayman called the Euclid office, sales agent Fee agreed to an immediate appointment, and Mrs. Wayman arrived at the office ten minutes later. Mrs. Wayman indicated to agent Fee that she wanted a three-bedroom house in the "low 60's" in Euclid or surrounding areas. That afternoon agent Fee showed her three homes, all located in the city of Auclid. One was on East 211th Street, the second on Champ, and the third on Upper Valley. Within a week after their first appointment, the sales agent called Mrs. Wayman and asked if she would like to see some more houses. Mrs. Wayman replied that they were having company that weekend, and she would not be able to look for a while.

Black checker Lucille Davis, and agent Angela Stritof agreed that their first contact was in a telephone call from Mrs. Davis to the Hilltop office. The court determines the call occurred on June 15.[68]

---

**67.** Before the first checker took the witness stand, the court ruled on defendants' objection to the evidence of this audit which involved a showing of homes in Euclid and Warrensville Heights and which "in no way impacted on Cleveland Heights." The evidence of this audit was only received as it might show Hilltop's "intent, plan, design, lack of accident" to violate the Fair Housing Act. This ruling was confirmed several times later during the trial. See, *e.g.,* Tx. 8139–40.

**68.** Lucille Davis, relying on her audit report, stated that she called the Euclid office on June 14 and made an appointment for June 16.

Over the phone, Mrs. Davis asked for a three-bedroom house between $55,000 and $65,000 in Euclid and surrounding areas. Mrs. Stritof testified and it is not disputed by Mrs. Davis that she did not tell Mrs. Stritof that she was black. Mrs. Stritof made appointments for the Upper Valley Road and the Chatworth Road homes, both in Euclid, and the Lawrence Road house in Clarkwood Estates, Warrensville Heights. On the afternoon of June 16, she showed the three homes to Mrs. Davis.

Plaintiffs do not claim that there is any disparate treatment of the two checkers with reference to the homes shown in Euclid. Indeed, as seen, one of those, the home on Upper Valley Road, was shown to both Mrs. Davis and Mrs. Wayman. Plaintiff's claim of disparate treatment involves the home on Lawrence Road in Warrensville Heights.

Undisputed evidence indicates and it is found that the brick ranch on Lawrence Road in Clarkwood Estates was first listed on June 15, 1978. Mrs. Stritof testified that she took the listing off the company telecopier on the morning of June 16.

Agent Strithof said that she took Mrs. Davis to Warrensville Heights because she, Mrs. Stritof, wanted to see the house, not because Mrs. Davis "had shown any interest in Warrensville Heights." Further, Mrs. Stritof said that she concluded that the Lawrence Road property was a good home to show Mrs. Davis

> because [she, Mrs. Stritof] thought it was a good buy at $56,900 when most of the homes in that area—all of Clarkwood Estates were selling for—asking upper $60's.

Mrs. Stritof stated that her first contact with Clarkwood Estates was a couple of weeks earlier when she showed and sold a brick ranch there to Juana Clark and her husband, a black couple:

> Two weeks previous I had sold a home there and I thought it was a lovely area, for one thing. I think I sold it for $61 or $62,500, or something right in that area, and here was a home in an identical area for $56,900. I'm a bargain hunter. I want to see it ... I don't care who it had been, they would of gotten down to Warrensville Heights.

After viewing the two homes in Euclid, Mrs. Davis testified that she was driven "for a long time through the metropolitan park system." In talking to Mrs. Davis about the home she was going to be shown, Mrs. Stritof told her that it "was really a steal that was just listed that day." Mrs. Davis said that when they arrived she found the house was on a street that she was familiar with because she "had friends living on the street." Before they got to the house, Mrs. Stritof had told her that "it was a growing neighborhood and that it was 90 percent white, but everyone got along well." Mrs. Davis said it was a very nice house and that Mrs. Stritof "gassed over it—'oh, look at this. This is so beautiful.'" She observed that "it was different than the way she had talked to [her] about the other houses."

According to Mrs. Davis, on their way back to Euclid, Mrs. Stritof told Mrs. Davis that she wanted her "to put a bid in right away." She said that "she wasn't going to let anybody else know about it so that I could grab it the next day if I could bring my husband to see it." Mrs. Davis further quoted her as saying that the Lawrence Road house would "sell for $89,900 if it were in Euclid, and she said people would be fighting for it." In her audit report, Mrs. Davis noted that "90 percent of the people were, mostly children, that I saw

---

Angela Stritof, Hilltop sales agent, agreed that she received a phone call but said the call was received on June 15 as recorded in her notes. She said that a "no show" on her telephone call memo meant that Mrs. Davis did not keep the appointment on the 15th. But Mrs. Stritof said that on the 16th she received another call at which time she set an appointment for that afternoon. Because it seems more likely that Mrs. Davis would have made an appointment for either the same day or the next day rather than two days later and because she gave no explanation for a two-day delay in the appointment to meet Mrs. Stritof, Mrs. Stritof's June 15 date for the telephone conversation is credited.

were black." Mrs. Davis' quotations of Mrs. Stritof's remarks are credited. Mrs. Stritof's denials of these attributed remarks and her statement that she had not seen any blacks in the area either then or when she had shown a home to Juana Clark on Springdale Road are not accepted.[69]

Mrs. Stritof learned that Mrs. Davis was black when they met at the Hilltop office in Euclid. It is found that she knew that the Clarkwood Estates area was predominantly black. Mrs. Stritof drove Mrs. Davis 16 miles to see a home in an area Mrs. Davis had not asked to visit. She used the pretext that she, Mrs. Stritof, wanted to see the property. Under all these circumstances, it is concluded that Mrs. Stritof's showing of the Lawrence Road property to Mrs. Davis was an act of racial steering.

Plaintiffs claim that Mrs. Stritof's sale of the Springdale property in Warrensville Heights' Clarkwood Estates to Juana Clark and her husband is another racial steering incident. Over the objection of the defendants, the court permitted Mrs. Clark to be called by the plaintiffs to rebut Mrs. Stritof's statement that it was Mrs. Clark who had led Mrs. Stritof to the Clarkwood Estates area of Warrensville Heights. Plaintiffs made no motion at trial for a reopening of their evidence to introduce the testimony of Mrs. Clark as part of their evidence in chief. Hence, it will be considered solely as rebuttal evidence to impeach the testimony of Mrs. Stritof.

Mrs. Stritof testified that Juana Clark had called the Euclid office and made an appointment with her. She stated that at that time, Mrs. Clark told her that she wanted "a brick, either like a split or a ranch, or something very modern." Asked if she had sold a home in Warrensville Heights to a black, Mrs. Stritof answered "yes." Mrs. Stritof further testified, "she

actually led me there" and that "she wanted that area." Mrs. Clark testified that:

> I told her that if I deposited "x" amount, could I get a house within $50,000 or $60,000; that it had to be a brick ranch. And we described, you know, three-bedrooms, finished rec room, attached garage, things to that effect.

However, Mrs. Clark testified that she did not at any time tell Mrs. Stritof the areas in which she was looking at properties and that her words were:

> It didn't matter where in Cleveland, as long as it was a brick ranch and something that we wanted. The specific location was not mentioned.

She said they went to Bedford Heights and to Warrensville Heights but that she did not ask to see either place.

With the testimony of Mrs. Stritof and Mrs. Clark in conflict as to which one initiated the visit to Clarkwood Estates in Warrensville Heights, the statement of Mrs. Clark is credited on several grounds. First, when asked if Mrs. Stritof asked her where she was interested in looking, she answered, "No, because I was only five years in Cleveland, you know."[70] Because of her short stay in Cleveland, it is plausible that given the size of the metropolitan area, she would not have known enough about the area to ask specifically about either Bedford Heights or Warrensville Heights.

Second, Mrs. Stritof said that it was Mrs. Clark who mentioned the area of Bedford or Warrensville Heights and that she, Mrs. Stritof, "had never been there before." Yet, Mrs. Stritof showed her knowledge of the housing in those cities when she said "what [Mrs. Clark] wanted was a brick, preferably a ranch. You have to go where they are." Third, there was implicit conflict in her testimony about Euclid. Asked

---

**69.** According to the 1980 census, Warrensville Heights had a black population of 75 percent.

**70.** She testified that she came to Cleveland in 1973. The showing of homes in Bedford Heights and Warrensville Heights was in late May or early June 1978.

Mrs. Clark brought out her lack of familiarity with the Clarkwood Estates area in this testimony:

> I cannot say I drove down Lawrence. At the time I did not know the area. We drove around Clarkwood to get to Springdale.

if she showed Juana Clark homes in Euclid, Mrs. Stritof answered, "I'm sure I did. I just don't recall." Later, when asked if there were ranches in Euclid, she answered, "Not in the price range she wanted."

Finally, Mrs. Stritof's testimony and her demeanor revealed that she made statements to protect her self-interest as a Hilltop agent. Mrs. Clark, subpoened as a witness and showing a reluctance to testify, had no interest in the law suit and lacked any motive to misstate her conversations with Mrs. Stritof.

Weighing the testimony of Mrs. Stritof and Mrs. Clark, it is concluded that it was Mrs. Stritof who led Mrs. Clark to Bedford Heights and Clarkwood Estates. Since Juana Clark's testimony throughout her appearance as a witness was treated solely as rebuttal testimony, it may not be used as proof of another steering incident. Nevertheless, it further impeaches the testimony of Mrs. Stritof and reinforces the court's findings with reference to her steering Lucille Davis to Warrensville Heights.

### D.(2) Stephanie Nicholes

Stephanie Nicholes, a Hilltop agent in the Heights office during four months in 1974, was called as a witness to describe her transactions with Heights office manager Dominic Sabatino and Hilltop agent Julian Vanni. Defendants objected to her testimony on the ground that her experience with Hilltop was "far removed in time from the claims" in this action. Plaintiffs stated that they offered the testimony to show "admissions made by Hilltop officers in terms of racial conduct of the Heights office." Overruling the objection, this court in part stated that "intent can be shown for any period of time."

Based on the testimony of Stephanie Nicholes (formerly Stephanie Muenger), the contradictory testimony of Julian Vanni and Dominic Sabatino, and the record, the court makes the following findings.

Julian Vanni, agent in the Lyndhurst office of Hilltop Realty, was the listing agent of a home at East 152 Street and Lake Shore Boulevard. An attorney was handling an estate's sale of the property. Hilltop agent Nicholes called Hilltop agent Vanni to report that she had an offer on the house and that she wanted to make an appointment to present the offer. According to agent Nicholes, Mr. Vanni's first question was, "Are the buyers black or white?" She responded, "You're not allowed to ask me that." She stated that Mr. Vanni also told her that the people were not going to sell to blacks and that "if my buyers were blacks, we may as well forget it." Her buyers were white, and the house was sold to them. Concerning this conversation, Ms. Nicholes stated that she "asked Dominic [Sabatino] if Julian had been allowed to ask me that, and he said no" and that "he would take care of it."

Mr. Vanni testified that he recalls a phone conversation in which Ms. Nicholes told him that she had an offer on the property. He said he explained to her that an attorney represented 16 or 17 heirs. He told her that if she would bring a written offer to his office, he would present the offer to the attorney, "and after the attorney either said yes or no, [he] would get back to her." Mr. Vanni denied that in the phone conversation with Ms. Nicholes he asked Ms. Nicholes "what the race of the buyers were."

When Mr. Sabatino was asked if he had discussed with Stephanie Nicholes her conversation with Julian Vanni while she was working at the Cleveland Heights office in 1974, he answered "No sir." He further denied that Ms. Nicholes had told him that "Mr. Vanni had asked the race of buyers" whom Stephanie Nicholes was representing in making an offer on a home. The court does not credit Mr. Sabatino's denial and instead finds that Ms. Nicholes told Mr. Sabatino about Mr. Vanni's statement.

Taking into account the unswerving nature of Stephanie Nicholes' assertions,[71]

**71.** While the occurrences about which she testified occurred five years before the filing of the lawsuit, she believed that in 1976, after she first moved to Kirkwood Road in Cleveland Heights, she had been called by phone about "steering," apparently in connection with the HCC new

her follow-up conversation with Mr. Sabatino, Mr. Vanni's and Mr. Sabatino's unconvincing denial of the conversations attributed to them, and the lack of proof of any reasons that might have prompted Ms. Nicholes to falsify the several conversations, it is found and determined that Julian Vanni made the statement attributed to him by Ms. Nicholes and that Dominic Sabatino failed to take any action.

Defendant Hilltop presented considerable evidence to show that it instructs its agents in fair housing law and urges them to act accordingly. Yet despite Hilltop's professed efforts to train agents to protect clients against any denials of housing opportunities based on race, Mr. Sabatino as the manager of Hilltop's Heights office failed to impose any type of sanction on Mr. Vanni for his statement to Stephanie Nicholes. Manager Sabatino's failure offers proof of corporate intent to not obey the Fair Housing Act.

Stephanie Nicholes stated that at a later time she was driving with Mr. Sabatino to make an offer on a home on Sheffield Road in South Euclid. Mr. Sabatino told her that if she showed a house in South Euclid to a black, her house would be bombed. Mr. Sabatino recalled a listing on Sheffield that was his listing but denied that she ever accompanied him to that home. Asked if he made the statement attributed to him, he answered "No, sir. I never would say that to her or anybody else." The court finds that the statement was made.

Mr. Sabatino's own statement, which may have influenced agent Nicholes to not make properties in South Euclid available to prospective black home buyers, appears to show a corporate intent to not show available homes to black prospective home

owners. However, Mr. Aveni's undisputed testimony contradicts such a conclusion. In late 1974, just a few months after Mr. Sabatino made the statement to Stephanie Nicholes, Hilltop was involved in the sale of a home in South Euclid which was vandalized after it became known in the neighborhood that Hilltop had sold the home to a black couple. Mr. Aveni then took steps to preserve the sale to the black couple by contacting the FBI and the South Euclid police. He also arranged for and held a meeting with owners in the area "to explain to them the fair housing laws" and to assure them that "blacks were able to buy anywhere." He tried "to allay fears" that a black's entry into the area would cause "price reductions," noting that the black buyer was "a well-qualified individual." Finally, Mr. Aveni met with the black buyers and reassured them when they were getting ready "to back out of the transaction."

Hilltop's sale of a house to a black couple in South Euclid and Hilltop and Mr. Aveni's affirmative acts to preserve the sale after the home was vandalized shows that in this instance in late 1974, Hilltop acted to protect the Fair Housing Act rights of this client.

### D.(3) Mayfield's Activities

It is important to ascertain the extent of defendant Hilltop's knowledge of the activities of agent John Mayfield and what action, if any, it took concerning those activities.[72] The Cleveland Heights Housing Board met with Hilltop agent John Mayfield and his Heights office manager, Grace DiDonato, on January 19, 1977. Commissioner of Real Estate Programs Barbara Roderick and Law Director Donald Barclay

homeowner questionnaire. She said "at that time" she knows that she "told someone" that she knew "about some practices."

**72.** Agent Mayfield was dismissed as an individual defendant at the end of plaintiff's evidence pursuant to this court's March 17, 1983 memorandum and order. The court recognized that "considerable evidence in the record ... involved Mr. Mayfield, [but] only the full audit of him by white auditor Diana Horrigan occurred

within the time limitation of Title VIII (42 U.S.C. § 3612), i.e., 180 days before plaintiffs filed their complaint on March 7, 1979." Since this incident occurring within the 180 days was found not to "constitute a violation of section 3604(a) or any other provision of the Fair Housing Act," the action against him was dismissed. However, this does not affect Hilltop's liability for his violations which were committed prior to the 180 days.

were also present. Barbara Roderick testified that the housing board members presented their concerns about an audit of Mr. Mayfield in connection with 1688 Maple Road, Cleveland Heights. She reviewed some of the racial statements which the checkers attributed to Mr. Mayfield in their audit reports. She stated that the Board gave Mr. Mayfield an opportunity to respond to the Board's concerns over "racial comments made to the white checker." It was her recollection that Mr. Mayfield did not deny the statements.

At trial, after a series of the reported racial remarks had been recited to Mr. Mayfield, he was asked whether he recalled them being discussed at the January 1977 meeting. He answered "no." To the best of his recollection, Mr. Mayfield recounted that the Board

had some complaints about racial remarks and other complaints, and [they] wouldn't go into detail to say what they were. They were all confidential.

Manager DiDonato remembered that at the meeting it was stated that John Mayfield had been audited. She also testified that

. John, of course, was trying to explain his position based on what they were saying about him and he just kept asking them and asking them questions about who's making these statements and where were they made, and they just wouldn't tell him. They just kept saying that the information was confidential.

When specific remarks of Mr. Mayfield, as reported by the checkers, were separately read to Mrs. DiDonato, she said she did not remember "specifically what was said regarding the audit at all."

Mr. John J. Boyle, Housing Board member, stated that at the January 19 meeting, as it related to Mr. Mayfield, the Board reviewed "the audit and the New Homeowner complaints with Mr. Mayfield and with Ms. DiDonato." He said that the Board discussed with them "the unsolicited racial comments." At several points in his testimony, Mr. Boyle stated that Mr. Mayfield "said nothing." It is concluded that

those comments and probably other racial comments attributed to Mr. Mayfield by white checker Pap and black checker Tufts, as set forth in the discussion of the August 1976 audit of Mr. Mayfield, see *supra* pp. 1251–54, were divulged to Mr. Mayfield and manager DiDonato. While the names of the checkers were not disclosed to Mr. Mayfield and Mrs. DiDonato, the Board members had met with the checkers at some previous time to verify their reports of Mr. Mayfield's racial comments. Corroboration that the Board brought the checker reports to his attention is contained in a letter of January 31, 1977, which Mr. John Mayfield received at Hilltop's Heights office from City Manager Robert A. Edwards. In part, the letter stated:

Members of the Heights Housing Board have written to me of their meeting with you in relation to several complaints about your real estate practices, which they discussed with you on January 19, 1977.

\* \* \* \* \* \*

The Board found that the audit specifically indicated that black and white checkers did not receive equal treatment, that racial remarks were frequently introduced by you, and that you failed to promote Cleveland Heights in a positive manner.

The letter further informed him that the Board recommended and Mr. Edwards concurred that Mr. Mayfield was to be placed on probation as a "Preferred Agent" until they were satisfied that he was meeting the "Preferred Agent Agreement."

Manager DiDonato called Mr. Aveni after the meeting on January 19 and told him what had happened. While her recollection of what she told Mr. Aveni is very general, it is concluded that she undoubtedly reported to him the racial remarks attributed to Mr. Mayfield at the January 19 meeting of the Housing Board. With regard to the January 31 letter to Mr. Mayfield, Mr. Aveni states that he was informed of the letter a few weeks after Mr. Mayfield received it.

Barbara Roderick and City Manager Edwards met with Mr. Aveni and Dominic Sabatino, who was then a vice president of Hilltop Realty. She stated that she expressed her concerns "about Mr. Mayfield's —about the audit and our request for the sales information." In the January 31 letter, City Manager Edwards had requested that Mr. Mayfield produce a written record of his 1976 sales inside and outside of Cleveland Heights, by address and race of buyer. She recalled that Mr. Aveni "again stated that they felt that that would be a violation of confidentiality."[73] Mrs. Roderick further stated that Mr. Aveni "indicated that Mr. Mayfield was a problem agent."

When he was called by the plaintiffs as an adverse witness, Mr. Aveni recalled the meeting with Barbara Roderick, City Manager Edwards and Dominic Sabatino. However, he said that the findings of the Housing Board were not discussed at the meeting and that "the only thing Mr. Edwards and Mrs. Roderick addressed was the fact the Board had asked for this customer list." Later, during his direct testimony as part of Hilltop's case, he denied that "any audits of Mr. Mayfield specifically [were] discussed at this meeting that [he] attended." On the same point, he contradicted himself during cross-examination.[74] Showing lack of recall on other points, Mr. Aveni testified that he did not recall that Mrs. DiDonato had told him "about the racial remarks [Mr. Mayfield] was supposed to have made in that audit," and he further denied that he indicated to Mr. Edwards that John Mayfield as an agent was a problem to him.

Considering the foregoing evidence, other relevant evidence in the record, and all reasonable inferences therefrom, it is found and determined that Mr. Aveni was told by Mrs. DiDonato about the racial remarks attributed to Mr. Mayfield in the audit that was discussed at the housing board meeting. Further, Mr. Aveni learned first hand in his meeting with Mr. Edwards and Mrs. Roderick about the audit of Mr. Mayfield and the racial remarks attributed to Mr. Mayfield by the checkers who conducted that audit.

When he testified as an adverse witness, Mr. Aveni was not sure whether or not he had talked with John Mayfield after the receipt of the January 31 letter. But later, during his direct examination in Hilltop's case, Mr. Aveni stated that "he talked with Mr. Mayfield concerning his supplying the records and he did not want to supply those records." It is believed that Mr. Aveni did talk with Mr. Mayfield. It is further believed that although he knew that racial remarks were attributed to Mr. Mayfield, Mr. Aveni did not take up this matter with Mr. Mayfield or in any way reprimand him. Even if Mr. Mayfield denied making the racial remarks, Mr. Aveni should have made it clear that such remarks would not be tolerated from a Hilltop agent.

Mr. Mayfield continued to be a Hilltop agent until early 1979. When asked, "In all the time that you worked for Hilltop, were you ever told by any management person, including your office manager, your sales manager, any Hilltop administrative personnel, that you had to stop

---

**73.** By letter of February 23, 1977 Mr. Aveni informed City Manager Edwards that it was "the policy of Hilltop Realty, Inc., that our client list is confidential and that to give you the addresses of the properties that John Mayfield has sold, would be a violation of a client confidentiality." Because Mr. Mayfield never agreed to disclose names of clients in sales outside Cleveland Heights, the Housing Board and the Cleveland Heights city manager refused at a Board meeting in October 1977 to grant Mr. Mayfield's application for reinstatement to the preferred agent program.

**74.** Following is the colloquy:

Q: So there was no mention made to you that Mr. Mayfield had been before the housing board primarily for his use of racial remarks in showing property to individuals?
(Objection overruled.)
A: I'm not sure.

 \* \* \* \* \* \*

Q: Did you know that Mr. Mayfield had been audited in 1976 at the time of your meeting?
A: With Mr. Edwards?
Q: Yes.
A: Yes. They informed me.
Q: They told you he had been audited; is that correct?
A: Yes.

making racial remarks to prospective purchasers," he answered "no." Even though Hilltop trained its agents to comply with the law, in the face of full notice of Mr. Mayfield's history of making racial remarks to prospective customers, brought to the attention of Hilltop on different occasions, Hilltop management failed to even discuss the matter with him, let alone give him an appropriate reprimand or termination warning.

As in *Marr v. Rife*, 503 F.2d at 742, Hilltop and president and chief operating officer Aveni had "the power to control the acts" of Hilltop's sales agents. Therefore, the failure of Hilltop and Mr. Aveni, as chief executive officer, to take action against Mr. Mayfield is direct evidence of a corporate intent to not obey the Fair Housing Act.

### D.(4) Mary Hudson

Further bearing on corporate intent are the reactions of Hilltop Realty to an experience of its black sales agent Mary Hudson.

In April or May 1978, agent Hudson made an appointment to take her client, Mr. Riley, a black male, to an open house on Cato Street in Maple Heights. When they arrived at the Cato home, she was met at the door by a white person whom she believed to be the listing agent. The agent told her to wait outside, entered the house and later returned. He told Mrs. Hudson that the owner did not want them to come into the house. Even though Mrs. Hudson told the listing agent that she had an appointment to show the house to her client, the white male would not allow them to enter.

Mrs. Hudson informed her manager, Grace DiDonato, Heights office manager, of the Cato Street incident. Mrs. Hudson stated that she "found out" that Mr. Riley was not interested in making any problems, that "he wanted to leave it alone." She remembers that "within the next day" Mrs. DiDonato told her she was "trying to reach ... the broker or the manager of the office." She believes on one other occasion Mrs. DiDonato said something to her about the incident, but she could not specifically remember what it was.

Subsequently, Mrs. Hudson attempted to show a home to Mr. Riley on Maple Heights Boulevard in Maple Heights. When she set up the appointment to see the house she was told to pick up the key from another real estate company (it was not a Hilltop listing). At their office she was told they did not have a key and that another agent must have forgotten to bring it back. Mrs. Hudson left the office, called her manager, and was told to wait for a return call. Eight or ten minutes later, Mrs. DiDonato called her and told her to go back to the listing office, "there is a key there." When she returned to the office, she was given a key, but by the time she arrived at the house where Mr. Riley was waiting, he had gone. While office manager DiDonato sought to protect the right of Mrs. Hudson's client to be shown the home, nonetheless, Mr. Riley's fair housing rights were impaired.

Because of the interference with the Fair Housing Act rights of a Hilltop client to be shown available properties on two separate occasions, and because Hilltop agent Hudson had promptly brought these experiences to the attention of her manager Mr. DiDonato, and given Hilltop's professed policy of compliance with the Fair Housing Act, it is reasonable to presume and the court finds that these incidents were reported by office manager DiDonato to chief executive officer Aveni or others in management.[75]

The failure of management to follow up on the Cato incident involving agent Hudson and to report back to her what it had found and done about it, reflected a corporate intent to not protect the Fair Housing Act rights of a client of Hilltop agent Hudson.

---

75. The likelihood of these experiences being thus reported is increased by a further incident experienced by Hilltop agent Hudson soon thereafter and reported by her to manager DiDonato. Agent Hudson showed a black couple a home on South Perkins in Bedford Heights. When they walked to the home from their automobile, neighbors yelled racial slurs at them.

### E. Defendants' Homeowner Witnesses

Among the witnesses called by the defendants were 22 persons who purchased homes in Cleveland Heights through Hilltop Realty. Six were black, one was Hispanic, and fifteen were white. Twelve of the 22 homeowner witnesses dealt with Hilltop agents John Mayfield,[76] Steven Paul Francis, Evelyn Gardner, Delores Russo, and Leo Lee, the conduct of whom was the subject of testimony by plaintiffs' witnesses. The remaining ten homeowner witnesses called by the defendants dealt with ten other Hilltop sales agents.

Defendants argue that the "testimony of the actual home buyers demonstrates that Hilltop engaged in no pattern practice of violating the Fair Housing Act." The court is treating plaintiffs' claims of racial steering not as a pattern or practice claim, but rather as a claim that the incidents represented a continuing violation of section 3604(a) which continued into the 180–day limitations period. Therefore, the experiences of 22 home buyers called as witnesses will be considered for possible rebuttal of this latter claim. First, the court will consider the experiences of 12 home buyers shown homes by Hilltop agents whose conduct is challenged in plaintiffs' evidence.

 Ruth M. Raitz bought a home at 4038 Monticello Blvd., Cleveland Heights through Hilltop agent Delores Russo. In addition to the home's physical requirements and amenities which she requested, she said "[she] would like the home sort of in Lyndhurst, Richmond Heights or South Euclid just from driving up through that area." In August 1978, on three different days covering several weeks' time, Mrs. Russo showed her some 22 homes in Mayfield Heights, South Euclid, and Lyndhurst. After her third visit, she "was getting disgusted." Mrs. Russo then told her "some things about Cleveland Heights, the school district, the price range." She suggested Cleveland Heights to Ms. Raitz and picked out two homes in Cleveland Heights, one of which Ms. Raitz purchased.

Ms. Raitz said that Mrs. Russo did not say anything that discouraged her about Cleveland Heights. Indeed, it was Mrs. Russo who suggested Cleveland Heights and said that Cleveland Heights might have property that Ms. Raitz "would be able to better afford ... and might have more of the things [she] wanted." This act of not steering a white home buyer away from Cleveland Heights is relevant in determining whether Hilltop Realty has rebutted plaintiffs' proof of a continuing violation of section 3604(a).

 Black homeowner Wade N. Young told Hilltop agent Norman Hott that he was interested in "Cleveland Heights and University Heights" and he bought property on Meadowbrook Boulevard in University Heights. However, agent Hott showed the Youngs two houses that were in South Euclid or Lyndhurst. One was "a couple houses off Mayfield," east of Richmond in Lyndhurst. The Youngs stated that "the one off of Mayfield, we had considered buying." Mr. Hott's showing of two homes outside of Cleveland Heights, one of which was in Lyndhurst, is not an act of steering a black home buyer into Cleveland Heights.[77] It is immaterial that the

---

**76.** To attack the merits of plaintiffs' evidence showing Mr. Mayfield's conduct violative of section 3604(a), defendants introduced evidence relating to John Mayfield's sales in Cleveland Heights from 1976 to 1979. Defendants argue that this evidence demonstrates that Mr. Mayfield "had no practice of steering, of selling [to] anybody of any race in any particular area." Although this evidence shows that Mr. Mayfield sold homes to both blacks and whites in many different census tracts within Cleveland Heights, this does not prove that Mr. Mayfield had no practice of steering. The evidence does not show what areas these 34 home buyers asked to see. In the absence of the circumstances surrounding the selection of the location of each of the homes Mr. Mayfield sold, no inference may be drawn from the locations where Mr. Mayfield sold homes.

**77.** Mr. Joseph Sterling, a black home buyer, wanted a split-level home in Cleveland Heights. Eventually, agent John Mayfield found such a house for Mr. Sterling in Cleveland Heights, which Mr. Sterling purchased. Mr. Mayfield suggested a split-level home in Lyndhurst, but Mr. Sterling told him he "didn't want to go there." Since no homes were shown to Mr.

Youngs eventually decided to buy in University Heights. Agent Hott's act is relevant in determining whether Hilltop has rebutted plaintiffs' proof of a continuing section 3604(a) violation.

The experiences of the following homeowners are determined not to be relevant to rebut plaintiffs' claim because each expressly or impliedly asked for the area in which she or he purchased. In dealing with agent Leo Lee, Mr. Gerald Artl specifically "asked for Cleveland Heights" as well as "South Euclid or University Heights or Euclid." The showing of homes to Mr. and Mrs. Artl in Cleveland Heights and outside of Cleveland Heights complied with their area requests and were not done at the suggestion of agent Lee.

Black homeowner Harry Mays, serviced by agent John Mayfield, told him that he "wanted to get a home in Cleveland Heights." He did not request any other area. Hubert Von Sehrwald, a white homeowner, met Mr. Mayfield at an open house of a home at 3399 DeSota in Cleveland Heights; he told Mr. Mayfield he was interested in buying the house if it could be financed. A loan was arranged, and he bought the house.

White homeowner Dorothy Landis bought a home in Cleveland Heights through agent Delores Russo. The Landises moved because her employer moved its plant to Mayfield Village from Parma, where she and her husband had been living. Mr. Landis worked at the Veterans Administration. In dealing with agent Russo, Mrs. Landis stated that she "wanted between Mayfield and Monticello or north, in that relative area." Monticello provided access to the VA Hospital in University Circle and also to her own place of employment. Because she wanted a house with "character," Mrs. Landis knew that they would be looking for a house "in either University Heights, Shaker Heights or Cleveland Heights, and Cleveland Heights was closer [to] what [they] wanted in price."

Three white homeowners who testified as defendants' witnesses used the services of agent Steven Paul Francis. Each bought a home in Cleveland Heights. Douglas Peco bought a home at 922 Roanoke Road, which runs east from Noble Road. He had been driving from a residence on Cleveland's southeast side across the city to his place of employment at East 152 Street and Noble Road in East Cleveland. Mr. Peco told agent Francis that he wanted to "live in a, at least a five-to eight-mile radius from [his] ... job." Mr. Francis showed him homes in Cleveland Heights, Lyndhurst, Mayfield and South Euclid. Once he saw the home on Roanoke Road, within that radius, he decided to buy it.

White homeowner Gregory Hall purchased a home at 3337 Silsby Road in Cleveland Heights. Among the "requirements ... specified to Mr. Francis," Mr. Hall told him that he "wanted to move into Cleveland Heights." [78]

Michael F. Hoffer, a white homeowner, bought a home at 3699 Berkeley Road in Cleveland Heights, after being shown a number of homes by Mr. Francis. The showings began during Mr. Francis' relationship with Elco Realty and continued when he moved to Hilltop Realty. Mr. Hoffer told Mr. Francis that he would like to find something "in the Heights," which he defined as "Shaker, University Heights, Cleveland Heights." Mr. Hoffer also told

Sterling in Lyndhurst, Sterling's experience is not the same as that of Mr. Wade Young, who was shown homes in Lyndhurst, although he had wanted Cleveland Heights or University Heights.

**78.** Not only did Mr. Francis show Mr. Hall homes that were "all over Cleveland Heights", belying racial steering, but when Mrs. Hall asked whether the neighborhood was "racially integrated", Mr. Francis recommended that the Halls meet their neighbors to find what the neighborhood was like. He arranged for the Hall's to meet their immediate neighbors, a biracial couple.

Mr. Francis that he was interested in living in an "integrated, stable neighborhood."[79]

Ellis B. Mascareno, a Hispanic homeowner, asked to be shown homes in South Euclid and Lyndhurst. He was shown both areas and bought a home in 1977 on Anderson Road in South Euclid through agent Evelyn Gardner.[80]

Attention is now directed to the ten Hilltop agents whose conduct was not the subject of testimony offered by the plaintiffs. These agents sold homes to the remaining ten homeowner witnesses called by the defendants.

Plaintiffs challenge the testimony of these ten homeowners because they

> bought homes from Hilltop agents whose conduct was not at issue at trial and, if such conduct were at issue, would not have been probative insofar as unfair housing practices are concerned from 1976 to 1979.

Counsel for the defendants disagree, urging that it was "relevant to have before the court the actions and the patterns of other agents, so that the Court can have a complete picture of how Hilltop has operated during the relevant period."

Eight of these ten "other agents" dealt with homeowners who asked to look at homes in Cleveland Heights.[81] Therefore, the experiences of these eight homeowners are deemed not to be relevant to rebut plaintiffs' claim. However, the experiences of the remaining two homeowners are found to be relevant.

■ Donald Robinson is a Beachwood, Ohio police officer. He and his wife, white homeowners, purchased a home at 3830 Parkdale Road, Cleveland Heights in the summer of 1978. Prior to that, they rented a home in Richmond Heights. In purchasing the Cleveland Heights home, they used the services of Gene and Claire Fallon, agents in the Beachwood office of Hilltop.

The Fallons showed them homes in South Euclid, Lyndhurst, Cleveland Heights and University Heights. Asked how it was that he came to look at houses in Cleveland Heights, Mr. Robinson answered that he believed, "[i]t was suggested by the realtor," Claire Fallon. When this suggestion was made Mr. Robinson said that he "told her [he] really didn't care to, [he] wished to look in the Lyndhurst-South Euclid area." Nevertheless, the Fallons still showed them two homes in Cleveland Heights, as well as homes elsewhere.

Mr. Robinson asked Claire Fallon about the effect on property values of the racial makeup of the area in which he was buying. She responded that "she can't answer because she couldn't give me the answer." In this situation, it is material that agent Claire Fallon refrained from giving any answer that might discourage the Robinsons from buying in Cleveland Heights and suggested that the Robinsons look at property in Cleveland Heights. Since Mr. Robinson told her he did not care to do that, it is evident and it is found that it was Claire Fallon's independent suggestion that caused the Robinsons to buy one of the two homes they were shown in Cleveland Heights. It is concluded that in suggesting to prospective home buyers that they look at Cleveland Heights properties, in showing Cleveland Heights homes, one of

79. Mr. Hoffer asked Mr. Francis about the racial stability of the Berkeley Road neighborhood. In doing so, Mr. Hoffer was seeking information that bore on his decision to buy a home on that street. Mr. Francis' response, as quoted by Mr. Hoffer, described the area as "a stable, integrated area." The answer, to a reasonable home buyer, is relevant information in that it assists a prospective home buyer in making a housing choice. While race was mentioned, the reference was factual and without any intent to discourage purchase of the home. It is not a violation of section 3604(a).

80. Ella Mae Harris, a black homeowner, bought a home in South Euclid through agent Gardner after moving to the Cleveland area in 1981. Because this transaction was subsequent to the filing of the lawsuit, it is not deemed relevant.

81. These eight homeowners either asked for property in Cleveland Heights or laid down requirements as prospective buyers that necessarily led to the showing of homes in Cleveland Heights. The showing of these homes in Cleveland Heights did not involve independent acts carried out at the suggestion or recommendation of the Hilltop sales agent.

which was purchased, and in refraining from saying anything relating to the neighborhood and its racial makeup, Claire Fallon did not racially steer the Robinsons.

George J. Markon and his wife purchased a home at 3943 Orchard Road in Cleveland Heights in 1977. They had inquired about a home in Mayfield Heights advertised by Hilltop Realty. When introduced to agent Charleigh Seith, they told him they were "looking for a house primarily in the Mayfield Heights area," because of the location of her employment. After seeing three or four homes in Mayfield Heights, they expressed disappointment at what was "offer[ed], and for the price." Mr. Seith then recommended that they "take a look at the houses in Cleveland Heights." He stated:

> [T]he houses in Cleveland Heights would be a much better value than those that we saw in Mayfield Heights, and ... would offer us a lot more than we were presently seeing.

They eventually decided to buy the house on Orchard, which they later learned "was an integrated street."

In recommending that the Markons look at Cleveland Heights properties, and in showing them homes in Cleveland Heights, including a home on an integrated street, Hilltop agent Seith did not racially steer the Markons.

Thus, only the experiences of four of the 22 homeowners called as defendants' witnesses are relevant to rebut plaintiffs' claim.

### F. Section 3604(a): Summary and Conclusions

In connection with the cross-examination of their expert Dr. John Kain, plaintiffs stated on the record:

> [T]he Heights Community Congress and the City of Cleveland Heights conducted a total of 22 audits on Hilltop.... Of the 22 audits the Plaintiffs have introduced evidence of 12 audits. Eleven of the twelve audits introduced in evidence

were conducted by the Heights Community Congress and the City of Cleveland Heights. The twelfth audit (Wayman-Davis) was conducted by the Cuyahoga Plan.

These 11 audits conducted by the Heights Community Congress and the City of Cleveland Heights, with two checkers per audit, constitute 22 individual contacts. It has been determined in parts B.(1) through (11) that in six of the 22 individual contacts (also referred to as incidents), Hilltop agents engaged in violations of section 3604(a). It was determined that agent Mayfield racially steered black checkers Tufts and McGee and white checkers Pap and Blaser. It was further determined that agent Mayfield attempted to racially steer white checker Butterfield, but this was not steering away from Cleveland Heights.

It was determined that agent Weir racially steered black checker Perry. It was also determined that although agent Lee racially steered black checker Newsom, she was not steered into Cleveland Heights. It was further determined that agent Liff violated section 3604(a) by failing to show available homes to black checker Johnson on the basis of race.

There were three incidents of alleged racial steering of actual homebuyers. It has been determined that agents Russo and Abbott made statements which constituted racial steering in servicing, respectively, prospective home buyers Emoff and Mr. and Mrs. Calabrese. Additionally, Mr. and Mrs. Gordon were racially steered by agent Francis, although that steering was not into or away from Cleveland Heights.

In sum, of the 25 incidents claimed by the plaintiffs to violate section 3604(a) through acts or statements, it has been found and determined that five agents of Hilltop engaged in eight violations of section 3604(a) that involved Cleveland Heights.[82] Each of the acts or statements

---

**82.** Dr. Kain testified that Hilltop's differences in showings based on race accelerated resegregation in Cleveland Heights. He based his opin-

ion on the number of black checkers shown homes in Cleveland Heights as compared to the number of white checkers shown homes there.

of these agents was made within the agent's course and scope of employment with Hilltop Realty, Inc. and, therefore, are imputed to Hilltop.

The eight incidents of making a dwelling unavailable because of race, committed by Hilltop agents, were not isolated incidents. They occurred in the successive years of 1976, 1977 and 1978 and demonstrate, as found in II.D., a corporate intent to continue to violate section 3604(a). Moreover, that corporate intent is corroborated by other incidents in the years 1974, 1977, 1978 and 1979, as found in II.D., which either show Hilltop did not intend to comply with the Fair Housing Act or that it did not uniformly protect the Fair Housing Act rights of Hilltop's clients. In part, that corporate intent involves the corporation's 1977 knowledge of racial statements which John Mayfield made in 1976 and for which he was neither reprimanded nor warned by management. That corporate knowledge paralleled in time John Mayfield's four acts of racial steering during the years of 1976, 1977 and 1978.

The findings of these eight violations are determined to constitute *prima facie* evidence of Hilltop Realty's continuing practice of making a dwelling unavailable because of race. The 15 incidents in which steering was not found cannot diminish or vitiate either the eight violations, considered individually, or the continuing unlawful practice represented by those eight violations. However, as will be seen, those 15 incidents may affect the nature of the relief to be awarded.

As the court has found in II.E., *supra,* the experiences of 18 of the 22 homeowners who bought homes through Hilltop and were called as witnesses by the defendants are not relevant to a determination of plaintiffs' continuing violation claim because they requested Cleveland Heights or some other specific community and were shown those communities. As to the experiences of the four remaining homeowner witnesses who bought homes through Hilltop, the conduct of the agents showed no violations of section 3604(a). These four instances however, either in number or substance, do not rebut the *prima facie* proof of the eight violations of section 3604(a) constituting a continuing unlawful practice shown by plaintiffs' evidence.

Upon all the evidence, the court finds that defendant Hilltop has engaged in eight violations of section 3604(a). Further, these eight violations constitute a continuing violation of section 3604(a) "manifested in a number of incidents." *Havens,* 455 U.S. at 381, 102 S.Ct. at 1125.

The numbers were given in a hypothetical question posed to him on direct examination. The facts in the hypothetical summarize the showings in seven of the twelve audits introduced into evidence by the plaintiffs. Plaintiffs argue that it is only these seven audits that deal with differences in showing. Showings which occurred in the other five audits introduced into evidence and showings which occurred in the remaining eleven Hilltop audits not introduced into evidence at this trial were not incorporated into the hypothetical.

On cross-examination Dr. Kain was asked: Q. [Y]ou assumed that the other audits not included in the seven pairs that Mr. Friedman referred to, the showings would be equal on both sides; is that correct? A. That is correct, that is correct. Q. And if, in fact, the showings were not in the same ratio as indicated on the board, that would affect your opinion? A. That is correct. That is correct.

The evidence shows that out of the five audits excluded from the hypothetical question but included in the evidence, three included showings of Cleveland Heights homes to the white checkers. In the August 22, 1976 Tufts-Pap audit of agent Mayfield, white checker Pap was shown three homes in Cleveland Heights while black checker Tufts was shown one there. In the May 8, 1977 McGee-Butterfield audit of agent Mayfield, the white checker was shown two homes in Cleveland Heights while the black checker was shown three there.

The omission from the hypothetical question of five of the 12 audits in evidence changed the ratio of showings between white and black checkers. Further, nothing is known about the showings to checkers in the 11 HCC audits of Hilltop which were not introduced into evidence. Since Dr. Kain himself stated, "if you change just one number it is obviously going to have an effect on my opinion," his testimony based on the hypothetical is not given any weight.

## III. ALLEGED SECTIONS 3604(c) AND 3604(e) VIOLATIONS

### A. Section 3604(c) Statements

Plaintiffs assert that Hilltop agents have made "racially preferential statements, whether or not intending to steer." Plaintiffs contend that "the simple making of a statement which expressly or implicitly expresses a preference, limitation or discrimination, violates [section 3604(c) of] the Fair Housing Act." Disagreeing, defendants interpret section 3604(c) as aimed at written advertisements and argue that "the subsection was not intended to cover an oral statement of preference to a person not the subject of the discrimination."

■ Section 3604(c) [83] makes it unlawful "to make, print, publish, or cause to be made, printed or published, any notice, statement or advertisement...." These words do not limit the scope of the statute to advertisements.[84] Nor do the three words "make, print or publish" imply a congressional intent to restrict the statute to written "notices, statements, or advertisements." It is presumed that the three verbs of section 3604(c) are not redundant.

The verb "make," broad enough to cover all forms of communication, has a usual meaning that differs from the verbs "print" and "publish." If Congress had intended to limit the clause to written expressions of preference, limitations or discrimination, "print or publish" would have been sufficient.[85]

■ Turning to the meaning of the prepositional phrase "with reference to the sale or rental of a dwelling," it is essential to first note differences between section 3604(a) and section 3604(c). Clause three of section 3604(a) broadly makes it an unlawful housing practice to "otherwise make unavailable or deny a dwelling to any person because of race...." Clauses one and two on the other hand, are limited to a refusal "to sell or rent" or refusal "to negotiate for the sale or rental of ... a dwelling because of race...." Section 3604(c) is similar to the first and second clauses of section 3604(a) and requires as a predicate of the prohibited housing practice "the sale or rental of a dwelling." Hence, section 3604(c) prohibits only statements by an owner or his agent [86] that pertain to the selling or renting of his dwelling.

**83.** Section 3604(c) states that it is unlawful to make, print, or publish, or cause to be made, printed, or published any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex or national origin, or an intention to make such preference, limitation or discrimination.

**84.** As stated in *Mayers v. Ridley*, 465 F.2d 630, 633 (D.C.Cir.1972):
On its face, the Act prohibits making or publishing any *"notice, statement* or advertisement" indicating a racial preference. Unless the words "notice" and "statement" are to be treated as surplusage, they must mean that the Act prohibits at least some communications which cannot be classified as advertisements. Although the legislative history of this section is sparse, it indicates beyond doubt that as the words themselves suggest, Congress intended to go beyond advertising to reach other sorts of "notices" and "statements" as well. [Emphasis original.]

**85.** The wording of section 3604(c) was originally included in S.1026 which was introduced but not passed by the 90th Congress. In a draft of S.1026 the phrase "oral or written" preceded

"notice, statement, or advertisement" but was later dropped from the text. See *Mayers v. Ridley*, 465 F.2d at 652, n. 23 and 25. Although Congress' reason for dropping the modifiers does not appear in the congressional history, it is presumed that the modifiers "oral or written" were deemed superfluous. Had Congress intended that the three verbs "make, print or publish" applied only to written materials, it would have only dropped the modifier "oral."

**86.** In *United States v. L & H Land Corp., Inc.,* 407 F.Supp. 576 (S.D.Fla.1976), and *U.S. v. Gilman,* 341 F.Supp. 891 (S.D.N.Y.1972), the statements that violated the statute were made by apartment managers and reflected policies which, if exercised, would have denied housing to persons because they were black.

In II.D. this court found that Hilltop agent Julian Vanni told agent Stephanie Nicholes that the people he represented were not going to sell to blacks and that if Mr. Nicholes' "buyers were black, we may as well forget it." By making that statement, agent Vanni indicated a racial preference by the seller of a particular property. Thus, this violation of subsection (c) is illustrative of the circumstances under which an agent may violate section 3604(c).

The logic of distinguishing between an owner and a buyer of a dwelling is apparent. A prospective buyer of a dwelling is free to state a preference for living with persons of a particular "race, color, religion, sex or national origin." To prohibit such an utterance might deprive that person of his First Amendment right of free expression. Although his statement may reflect prejudice, the buyer is not able to impose his prejudice "with reference to the sale or rental of [that] dwelling" on others. But when an owner of a dwelling or his agent makes a statement to another person pertaining to the sale or rental of his property based on a "preference, limitation or discrimination based on race...," he is imposing that "preference based on race" on another person "with reference to the sale or rental of [that] dwelling."

Plaintiffs allege that defendant Hilltop violated section 3604(c) on 16 separate occasions through the racially discriminatory comments of various Hilltop agents. Eleven of those comments are attributed to agent Mayfield, and one each to agents Abbott, Russo, Lee, Bernstein and Francis.[87]

Five of the alleged violations involve statements found to have been made by Mr. Mayfield to checkers Patricia Pap and Ken Kowaleski, or Patricia Pap alone, pursuant to their meeting at an open house at 1688 Maple Road in Cleveland Heights. See *supra* p. 1253.

■■■ The first three statements were made at the August 22, 1976 open house. The first statement is not a violation of section 3604(c). By saying his brother-in-law bought a home that needed fumigating from a black family, Mr. Mayfield demeaned that family. Yet the statement did not indicate a policy of racial preference,

limitation or discrimination "with respect to the sale of a dwelling."

■■■ Mr. Mayfield indicated in his second statement that owners preferred selling to whites rather than blacks. In his third statement he further indicated that Hilltop should sell to whites 80 percent of the time, a policy that limits sales to blacks. Since these statements were general and did not express a preference related to the sale of a specific house, these statements were not made "with respect to the sale of a dwelling." Thus, they do not violate section 3604(c).

■■■ On August 25, 1976, Mr. Mayfield made several comments while showing homes to Ms. Pap and Mr. Kowaleski. After showing a home on Englewood, Mr. Mayfield stated that agents showed whites the Englewood area first because there was a high demand for white buyers. This statement indicates that white sellers or their agents preferred to sell to whites instead of to blacks. Since the statement about the Englewood neighborhood was made while leaving a particular house just shown in the Englewood neighborhood, it was "with respect to the sale ... of a dwelling" and implies that the owner preferred to sell that house to whites. Whether he repeated the preference of the owner to sell to whites or he adopted the preference, the statement is found to violate section 3604(c). However, his expressions of bewilderment as to why a white person would buy a home in the predominantly black Caledonia school district displayed no racial preference with respect to the selling of a home. Further, the statement was not made in connection with the sale of a particular home in the Caledonia school district. Therefore, section 3604(c) was not violated.

---

**87.** In their post-trial brief, plaintiffs have cited 18 separate statements which they allege violate section 3604(c). One of the statements was allegedly made by Hilltop agent Angela Stritof to checker Lucille Davis in an audit sponsored by the Cuyahoga Plan in June 1978. Since this court ruled that evidence of the Cuyahoga Plan audit was admissible only as to establishing Hilltop's intent to violate the Fair Housing Act, statements made during the audit cannot serve to constitute a Fair Housing Act violation. Plaintiffs also allege that agent John Mayfield violated the Act by telling checker Pap that it is "just human nature" that owners prefer selling to whites. The court finds that this was part of another alleged statement and not a separate one. Hence, the court considers 16 alleged violations instead of 18.

Plaintiffs also assert as violations of section 3604(c) statements made by Mr. Mayfield to Sheryl Porter Tufts at the same August 22, 1976 open house attended by Patricia Pap and Ken Kowaleski. Ms. Tufts was told by Mr. Mayfield that there was "a white lady that had looked at the house, and she decided not to take the home because there were too many black people in the area." Mr. Mayfield also "started pointing out some of the houses where the white people lived and where black people lived." These comments did not reflect a preference or limitation of the owner of the home to sell to a member of a particular race. Therefore, statements made to Sheryl Porter Tufts do not constitute violations of section 3604(c).

On October 19, 1978, agent Mayfield told checker Diana Horrigan that the population of Lyndhurst was "Jewish, WASP and a few Italians." Additionally, while showing a Lyndhurst home with a statue of a black boy in the yard, "[h]e made a reference of being glad that he didn't [take] a black family to see this house." In the same conversation he made reference to a black family in Warrensville Heights with a similar white statue in their front yard. These comments do not indicate the preference of an owner of a dwelling to sell to a member of a particular race.

In May 1977 when white checker Hester Butterfield and her husband considered a home on Scottsdale found on a computer printout, Mr. Mayfield stated, "That end of Scottsdale is overintegrated. I know you folks don't mind living in an integrated section but that end is over integrated." While this statement expresses his personal opinion with reference to buying a home on "that end of Scottsdale," the statement does not indicate a preference "with respect to the sale of a dwelling." Therefore, this statement does not violate section 3604(c).[88]

The statement made to white checker Linda Blaser by Mr. Mayfield that she probably would not want her child to go to the predominantly black East Cleveland schools, even though some whites are buying there for the lower prices, was not made with respect to the sale of a particular dwelling. Moreover, while this statement may express Mr. Mayfield's opinions, it did not purport to be the preference of any seller. Therefore, there is no section 3604(c) violation.

Hilltop agent Leo Lee's questioning of black checker Juanita Newsom as to whether she would feel comfortable living in an all white community was not made "with respect to the sale of a particular dwelling" nor does it state the preference of a seller. Therefore, this October 1978 incident does not constitute a subsection (c) violation.

On similar grounds, agent Delores Russo's September 1978 comment to home buyer Jerome Emoff about the Forest Hills area being more than one-half black does not constitute a subsection (c) violation.

In November 1978 checker Hester Butterfield attended an open house given by Hilltop agent Shirley Bernstein. Mrs. Butterfield testified that agent Bernstein said that a particular house "had been well decorated and worked on inside, and taken care of, even though the family that lived there were colored people." Since the house was not for sale, the comment was not made with respect to the sale of a house. It, therefore, does not constitute a violation of section 3604(c).

Plaintiffs assert that Hilltop agent Jack Abbott's statement to home buyer Joseph Calabrese violated section 3604(c). Mr. Calabrese had asked why he and his wife were not shown houses in Cleveland

---

88. On rebuttal, plaintiffs offered evidence that Mr. Mayfield in February 1978 told Linda Mendelson that he felt that the seller would be more receptive to her as a buyer because she was white. The statement indicates that the seller preferred to sell to whites rather than blacks and, therefore, would constitute a violation of section 3604(c). Offered in rebuttal, it challenged Mr. Mayfield's denial of any discriminatory statements but cannot be considered as substantive evidence of a subsection (c) violation.

Heights, Shaker Heights and University Heights, and Mr. Abbott responded by asking Mr. Calabrese how he felt about blacks, and did he know that the towns in which Mr. Calabrese wanted to seek housing were integrated. Agent Abbott's statement did not express a preference on the part of an owner to sell to a certain race. Therefore, this statement does not violate section 3604(c).

■ Plaintiffs assert that agent Paul Francis violated subsection (c) in March 1979 when he told Belita and Howard Gordon that a black family moved away from Lyndhurst after their child was beaten in the high school there. The court finds that the story did not express a seller's preference to sell a dwelling to a certain race and, therefore, does not constitute a violation of subsection (c).

In sum, of the 16 instances in which plaintiffs charge section 3604(c) violations, only one statement is found to be a violation. This is John Mayfield's statement of August 25, 1976 to auditors Pap and Kowaleski involving the Englewood dwelling and neighborhood. The court has previously ruled that the same statement constituted racial steering under section 3604(a). Since the section 3604(c) violation arises out of the same incident found to be a section 3604(a) violation, the former constitutes part of the continuing violation previously determined.

### B. Section 3604(e)

■ In their third cause of action, plaintiffs in part assert that "within the last six (6) months, two (2) of defendants' agents [Val Vrana and Bruce Johanns] have been convicted in the Cleveland Heights Municipal Court of violations of the City's anti-solicitation ordinance." Plaintiffs next allege "defendants continue to engage in various unlawful discriminatory housing practices." These sentences, read together, are

understood to allege that the agents' solicitations violated 42 U.S.C. § 3604(e), which makes it unlawful

for profit to induce or attempt to induce any person to sell ... any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race....

As the case was finally submitted, the third cause of action proceeded only against defendants Bruce Johanns and Hilltop.[89]

To determine whether agent Johanns violated section 3604(e), the court first turns to the issue of whether "representations" were made and if made, the nature of the "representations."

James Ciocia, his wife and his family, reside at 3714 Fenley Road in census tract 1401 of Cleveland Heights. Census tract 1401, in the northeast section of Cleveland Heights, is bounded on the west by East Cleveland, on the north by Cleveland, and on the east by South Euclid. Other streets in census tract 1401 north of Fenley Road are successively Brinkmore Road, Mount Laurel Road, and Runnymede Boulevard. To the south are successively Stoneleigh, Langton, Burbridge and Atherstone Roads.

Mr. Ciocia testified that in August 1978 and again in October of that year he received post cards "signed by Bruce Johanns." He stated that the second was "a virtually identical card ... to the first post card." The card indicated, as he recalled, "that a house either was for sale on [their] street or had just been sold, and inquired as to whether or not [they] might be interested in discussing the sale of [their] house."

Mr. Johanns testified that he prepared a mailing after a house owned by the Traylors at 3659 Fenley was listed with him on July 12. The cards were then given to Hilltop which mailed them to 40 to 60 resi-

---

**89.** Pursuant to this court's March 17, 1983 memorandum and order, defendant Vrana's Fed.R. Civ.P. 41(b) motion was granted, and she was dismissed from the case. Agent Johanns' motion was denied. During trial the court ruled that Mr. Johann's violation of the Cleveland Heights ordinance was inadmissible to show a violation of the Fair Housing Act. However, the facts surrounding that violation were ruled admissible as bearing on the alleged section 3604(e) violation.

dents on Fenley and Stoneleigh Roads. From the Hilltop Realty post card sample manual Mr. Johanns identified a card identical to the one mailed. The card states:

If you have a friend or relative who would like to live near you, please have them give me a call, and I will be pleased to give them all the details and arrange for them to see it. . . .

The card has a line for the agent's signature and phone number. Hilltop's name is printed on the card.

Two cards signed by Mr. Johanns and addressed to Mr. and Mrs. Ciocia at 3714 Fenley were received into evidence. One of these cards has an August postmark, and the second card is postmarked "29 Sep., 1978." Both cards are signed "Bruce Johanns" above a printed line which states "Residential Counsellor" and "Hilltop Realtors." The printed message on each card stated:

We have sold the home at 3659 Fenley [address written in by Mr. Johanns]. In selling this property, we came into contact with other families who wish to buy in your neighborhood. Are you interested in selling your property? We would welcome the opportunity of consulting with you without obligation.

Mr. Johanns' admitted sending to Mr. and Mrs. Ciocia the post card with the August postmark. Also in his testimony he admitted sending a second card and admitted that it was his handwriting on the card postmarked September 29. However, he did not recall mailing anything in the Fenley-Stoneleigh area in September 1978. Weighing this evidence, it is found and determined that Mr. Johanns did fill out and send to Mr. and Mrs. Ciocia these two Hilltop post cards bearing the printed message previously quoted. It is concluded that these post cards made "representations" to "induce the sale" of a dwelling. Moreover, these representations, made by a real estate agent and broker to a prospective customer, are conclusively presumed to have been made for a commission. Thus, Mr. Johanns made representations to

induce the sale of a dwelling for profit through these post cards.

To further determine whether a subsection (e) violation occurred, the court turns to the issue of whether these representations suggested "the entry or prospective entry into the neighborhood" of blacks. In *Zuch*, 394 F.Supp. at 1049, the court held that "the representations prohibited by section 3604(e) include the subtle, as well as the more obvious, forms of racial inducements to sell," and a representation may be "a violation of the section even if race is not explicitly mentioned." With respect to this issue, *Zuch* states that "the solicitations [must] convey to a reasonable man, under the circumstances, the idea that members of a particular race are, or may be, entering the neighborhood." *Id.*

Mr. and Mrs. Ciocia complained about the Hilltop post cards to the Cleveland Heights Office of Real Estate Programs on August 30, 1978 and October 5, 1978. While the office took no action on its own, the office suggested to the Ciocias after their second complaint that they meet with Mr. Johanns. In their meeting with Mr. Johanns, they told him that there was an ordinance in Cleveland Heights that "prohibited that kind of activity." They said they were concerned about the amount of "real estate activity in [their] part of Cleveland Heights."

On direct examination Mr. Johanns testified that he received a telephone call from Mr. Ciocia approximately October 20 and later met with Mr. and Mrs. Ciocia about October 25, 1978. He stated that in their conversation he agreed that he signed a post card shown to him by the Ciocias. When Mr. Johanns' counsel presented the August post card, Mr. Johanns identified that card as the one shown to him by the Ciocias.

Mr. Ciocia testified that when he spoke to Mr. Johanns, he made it clear that he was fearful of the effect of the post cards, in view of the racial composition of the neighborhood. Mr. Ciocia was asked, "Was there any discussion whatsoever about the matters you have outlined as

racial problems in the area in 1978?" He answered:

Well, yes, there was in a general way. I explained to him why we were concerned, that the law was in existence partly because of what we felt was illicit activity, real estate activity in Cleveland Heights. The law was designed to protect us in that respect. We were concerned about the turnover of homes in Cleveland Heights, and I mentioned a couple other things in a general way. I discussed what our concerns had been, why we came out there.[90]

During the interrogation of defendants' witness Charles Russo, a resident of Langton Road in census tract 1401 and a person with experience in the real estate business, defense counsel showed him plaintiffs' exhibit No. 694, the card that Mr. and Mrs. Ciocia received in the mail. Counsel then asked, "If you received a card like that in the mail and you lived on Fenley, would you be concerned that that particular real estate agent was attempting to bring blacks into the neighborhood?" Mr. Russo answered:

As a resident of Cleveland Heights and abiding by the laws that we have set up for ourselves, you are talking to a person who is in real estate, receiving a card of this kind, I would [have] called Aveni up right away, "what's going on, you know."

Counsel asked him why, and he answered:

Because it just isn't done in our area, because of integration. There's nobody else in all of Ohio that is integrated but us, and to get something like this is alarming to residents in the area.[91]

Mr. Johanns had knowledge of the racial composition of the neighborhood. Bruce Johanns worked as a painting contractor beginning in 1974 and continued after he became a real estate salesman for Hilltop in May 1977. He had painted homes on several streets in the Oxford area where he had seen black children and adults.[92] During the years that Mr. Johanns engaged in painting contracting in the area, the percentage of blacks in Census Tract 1401 was increasing. The Cuyahoga Plan estimates, see *supra* note 6, indicate that by 1977 the

90. Mr. Ciocia summarized the concerns that he had in 1978:

We were very concerned about the high level of activity, as I think I have indicated, solicitation techniques that were being employed to generate activity. We were concerned about the sale of homes, and we were deeply concerned if you look at this, and I tend to do that, to look at the whole situation, the whole package of circumstances and compare what was happening in the Oxford School district to surrounding areas, we felt we were under seige. I don't know how else to describe it. We felt we were being raped and pillaged by elements over which we had very little control, aside from, perhaps, the enforcement of the anti-solicitation ordinance. And we were very, very anxious about the situation at that point.

Q. And that situation is the concern you had expressed as being your concerns in 1978?
A. Yes. I might just add to that, being situated as we were, where we lived in close proximity to South Euclid. I think that even magnified our concern. Because we were able, because we were experiencing this turmoil in Cleveland Heights and you could look just virtually across the street and see homes being sold, white families moving out, white families moving in. There was virtually no

real change in the racial make-up of that part of South Euclid until a little bit later on, and yet our side of the street was a completely different situation.

91. In an attempt to circumvent these answers of Mr. Russo, counsel asked him, "If you received a solicitation of that nature, saying that there was a home for sale, and the words on the card, *and also received this solicitation saying that* there was a listing [in] that area, would that indicate to you that that particular agent was bringing blacks into the neighborhood?" Mr. Russo responded, "No." This answer is of limited probative value because counsel omitted the critical existing circumstance of a racially transitional neighborhood of which a reasonable homebuyer, receiving the card, would have been aware. It is this existing circumstance which Mr. Russo described in this explanatory answer.

92. He said "he would see black children coming from their front doors, back doors, etc., and going to school, and also maybe some parents going to work." He characterized the streets where he "actually worked" as "integrated." Mr. Johanns' observations of black school children are substantiated by the Oxford Elementary School figures which showed a black enrollment of 47 percent in 1978. See *infra* note 93.

nonwhite population was 26 percent. It was 22 percent in 1978; 29 percent in 1979; and 37 percent in 1980. The census statistic for 1980 was 30.7 percent nonwhite (29 percent black).[93] The evidence shows the neighborhoods in census tract 1401, in which Mr. Johanns worked and of which he had knowledge, were racially transitional.[94]

Sales agent Johanns and Hilltop Realty represented that they had come "in contact with other persons who wished to buy in your neighborhood." While the race of such interested entrants into the neighborhood was not specified, given the level of integration and the atmosphere as described in the evidence, each of the 40 to 60 addressees of Fenley and Stoneleigh Roads, white or black, were left with the likely prospect that many or all of the "other persons who wished to buy" were black, and the failure to mention race was intended to mask that likelihood.

Based on Mr. Russo's testimony, Mr. Ciocia's testimony, and other relevant evidence, it is concluded that under the circumstances a reasonable homeowner on Fenley Road or Stoneleigh Road would have believed from the mailings that blacks might be entering the ʼneighborhood. Thus, upon all of the evidence, it is found and determined that the last element of section 3604(e), as articulated in *Zuch, supra,* is satisfied.

Related to this finding is a telephone conversation between Patrick Hollis and defendant Johanns. Mr. Johanns stated that he sent out letters to his "past painting customers on Stoneleigh and Fenley, which number approximately 16 people." Patrick Hollis who lived on Stoneleigh was one of Johanns' past painting customers.

On direct examination Mr. Johanns testified that he had "heard from no one in the neighborhood" about the mailings."[95] Then on cross-examination, Mr. Johanns was asked, "Isn't it a fact, Mr. Johanns, that after you had written the letter to your old painting customers, that Mr. Pat Hollis called you on the phone?" Mr. Johanns admitted that was correct. The question was then asked, "And he told you in August or September of 1978 that you shouldn't be soliciting customers in that area; didn't he?" Mr. Johanns answered:

> Mr. Hollis called me after—as a matter of fact, within a day or two after I had spoken with Mr. Ciocia. When I sent out, along with the card that I sent to the residents on Stoneleigh and Fenley, I also sent a letter to my painting customers, which was mentioned. I also sent a letter to my painting customers along with the second card stating that that house had sold.

He added:

> And Mr. Ciocia came to see me on approximately October 25th, and these let-

---

93. The Oxford school district is comprised of all of census tract 1401 and parts of census tracts 1403, 1404 and 1405. Plaintiff's exhibit 1044A, a computer printout of 1980 population figures from census data broken down by census blocks, allows a computation of the percentage of black residents by census block in the census tracts which comprise the Oxford school district. In tracts 1403 and 1404 there are census blocks with black populations substantially higher than the 24.9 percent overall black population in Cleveland Heights. Census tract 1401, 31 percent black, contains Fenley and Stoneleigh Roads, the streets to whose residents Mr. Johanns mailed the cards. Fenley is in census blocks 101 and 108 while Stoneleigh is in blocks 101 and 110. According to 1980 census figures, blocks 101, 108 and 110 had percentages black of 23.3, 24.1, and 16.5 respectively. Nine census blocks in tract 1401 are higher than the overall Cleveland Heights percentage of blacks.

94. The terms "racially transitional neighborhood" and "changing neighborhood" do not appear in either section 3604(e) or Title VIII. However, defining these terms, Judge Keith said, "[T]o the layman, either expression [a "racially transitional neighborhood" or a "changing neighborhood"] is used and understood to mean that blacks are moving into an area." *Zuch,* 394 F.Supp. at 1033.

95. It was Mr. Johanns' statement on direct examination that he had "heard from no one in the neighborhood" about the mailings which laid the foundation for Mr. Barclay's cross-examination of Mr. Johanns about receiving a call from Mr. Pat Hollis. This further supports the court's ruling that Mr. Hollis's rebuttal testimony was permissible.

ters that I sent out to my past painting customers were sent out a few days prior to my meeting with Mr. Ciocia.

In his rebuttal testimony, Mr. Hollis, on the other hand, places his conversation with Mr. Johanns earlier in time. Mr. Hollis testified that he received some "correspondence" from Johanns between May and July 1978. Mr. Johanns agreed that he sent to Mr. Hollis, a former painting customer, a "general introductory letter in April or May of 1978." This April-May 1978 date is credited, although in earlier testimony he fixed this "introductory" communication "when I first got into the business [in 1977]."

Mr. Hollis thus described the purpose of the "correspondence" from Mr. Johanns:

> Number one, to more or less reintroduce himself and explain that he was now graduated from college and working for Hilltop. And secondly, he expressed an interest in handling our house, should we—the sale of our house, that is, should we decide to sell.

Mr. Hollis testified that within 24 hours of the receipt of that correspondence, he called Mr. Johanns. After an exchange of niceties, he went on to say:

> I felt it was my responsibility as an acquaintance and old customer of his to inform him that what he was doing through this correspondence was illegal. And basically what I told him was that my wife and I had signed a non-solicitation card, had filed it with the City, and that solicitation card precluded him from

contacting us to solicit the sale of our house.[96]

Further, he testified, "Bruce, he was extremely surprised ... and he apologized if that caused me any problem." He said he had no further conversation with Mr. Johanns.

Among the letters to his painting customers, Mr. Johanns stated he sent one in conjunction with a card to Fenley and Stoneleigh residents after he obtained the Fenley Road listing of the Traylor Home on July 12. Mr. Johanns said he "also sent a letter to [his] painting customers along with the second card stating that that house had sold [August 13]." Mr. Hollis states that he only received one piece of correspondence, the introductory letter, from Mr. Johanns between May and July 1978. This is corroborated by the similar experience of Eli Follick, another painting customer of Mr. Johanns.[97]

Mr. Pat Hollis' insistence that his telephone complaint to Mr. Johanns was made shortly after he received between May and July 1978 an introductory letter from Mr. Johanns is more credible than Mr. Johanns' timing of the Hollis call in late October. Mr. Johanns' statement is not credited.

Mr. Johanns' testimony that Mr. Hollis did not call him until after Mr. Johanns received the visit from Mr. and Mrs. Ciocia on or about October 25, 1978 is not credited for another reason. Mr. Johanns testified that he sent to Mr. Hollis "a total of five mailings."[98] It is not credible that Mr.

96. In his surrebuttal testimony, Mr. Johanns' description of the content of the introductory letter differs from that of Mr. Hollis. Denying that there was any request for a listing of Mr. Hollis' house for sale, Mr. Johanns stated that he was "a real estate counsellor and offered [his] services if they should be in need." Even if this is what he said in that letter, it was sufficient for Mr. Hollis to treat the letter as a solicitation to sell their home. The fact is that Mr. Hollis did so treat the letter, which explains his prompt follow-up telephone call to Mr. Johanns.

97. Shown the various Hilltop form post cards (one of which was used on two occasions by Mr. Johanns mailing cards to Mr. and Mrs. Ciocia),

Mr. Follick was asked "if any of the forms here are the ones you received from Bruce Johanns?" He answered, "No, I do not recollect any of them."

Mr. Follick further testified that about one year after having the interior of his Fenley Road home painted in 1977, he received a mailing from Mr. Johanns. The substance of the mailing was that Johanns "was associated with Hilltop Realty and in real estate." Like Mr. Hollis, Mr. Follick recalls receiving from Mr. Johanns only the introductory letter and not any other card.

98. These would have included the introductory letter and "four after [he] received the listing." Three mailings would have been sent to him as

Hollis would hold off making an anti-solicitation complaint until he had received from Mr. Johanns five solicitations to sell his home. It is more probable, as Mr. Hollis testified, that he called Mr. Johanns to complain immediately (he said within 24 hours) after receiving Mr. Johanns' introductory Hilltop Realty letter in April or May 1978.

The court finds that Mr. Hollis complained after the first Johanns' mailing rather than after five; this permits the parallel inference that Mr. Hollis notified Mr. Johanns of the perceived violation of the Cleveland Heights Anti-Solicitation Ordinance before Mr. Johanns mailed the August and October post cards to Mr. and Mrs. Ciocia.[99]

To have persisted in mailing solicitation cards after being notified that he should not be soliciting Cleveland Heights residents to sell their homes who had signed anti-solicitation notices, Bruce Johanns demonstrated that his solicitations were not accidental but clearly intentional. To have intentionally solicited in a neighborhood that he knew was racially transitional and, therefore, subject to the fears of panic selling, rendered his acts of solicitation at least reckless.

Previously this court has found that the message on each of the post cards mailed by defendants Johanns and Hilltop to James Ciocia constitute "representations" made "to induce or attempt [persons] to sell" their "dwelling[s]." This requirement of section 3604(e) is articulated in *Zuch*, 394 F.Supp. at 1049, as the second element, *i.e.*, "that the solicitations are intended to induce the sale of a dwelling." Even if this second element is construed to require that the solicitor must intentionally or recklessly induce or attempt to induce the sale of the recipient's dwelling by "representations

regarding the entry or prospective entry into the neighborhood of .. persons of a particular race," this second element has been established in this case.

■ It is determined that Bruce Johanns violated section 3604(e), and his acts as a Hilltop sales agent are also imputed to Hilltop Realty. *Marr v. Rife, supra.* Hilltop Realty printed and supplied to its sales agents the solicitation cards which were used by sales agent Johanns.[100] Hilltop Realty also paid for the metered postage on the cards and mailed the cards to the residents of Fenley and Stoneleigh Roads. Thus, Hilltop expressly participated in Mr. Johanns' unlawful solicitation and is, therefore, directly liable. Further, this constitutes express corporate intent to not obey the Fair Housing Act, and this corroborates the court's previous finding of corporate intent. See *supra* p. 1293.

■ With respect to any injury caused by this solicitation, there is no evidence that any homeowner contacted Bruce Johanns to put up a house for sale. But there was actual injury nonetheless. Mr. and Mrs. James Ciocia and Mr. and Mrs. Pat Hollis had each signed a Cleveland Heights "Notice to Discontinue Real Estate Solicitations," a right granted them by Ordinance 27–1976. Bruce Johanns' mailing of solicitation cards to the Ciocias and Hollises violated the Cleveland Heights policy of controlling real estate solicitation embodied in Ordinance 27–1976. Since the City expended money to enforce the ordinance against him, Bruce Johanns' violation of the ordinance caused a distinct and palpable injury to the City. However, the evidence does not show that the violation caused injury to HCC.

> I felt the whole act of signing and filing a card prevented me from being harrassed by real estate people ... to: No. 1, sell my house; and No. 2, to disrupt the neighborhood.

a painting customer and two as a Stoneleigh resident, who would have received the two Fenley-Stoneleigh mailings.

99. Mr. Hollis testified that he believed that at the time he received the letter in May through July 1978, "any solicitation violated the Anti-Solicitation Ordinance." As the basis for his belief, he stated:

100. Significantly, Hilltop's principal post card manual contained no notice to the sales agents that post cards may be illegal under the Cleveland Heights Anti-Solicitation Ordinance.

In addition, had not Mr. and Mrs. Ciocia and Mr. Hollis contacted Mr. Johanns to put a stop to his violation of the Cleveland Heights ordinance, additional injury in the form of panic selling may have occurred. As Mr. Russo testified with reference to the solicitation card:

> There's nobody else in all of Ohio [that] is integrated but us, and to get something like this is alarming to residents in the area.

Thus, there was both actual and threatened injury to the City that flowed from the mailing of the solicitation cards.

## IV. STATUTE OF LIMITATIONS

Of the eight section 3604(a) violations, one described in II.B.(10), occurred within the 180–day period prior to the filing of plaintiffs' complaint. As in *Havens*, 455 U.S. at 381, 102 S.Ct. at 1125, if "at least one" of the eight incidents "occurred within the 180-day period," then the "unlawful practice ... continue[d] into the limitations period." Therefore, the "complaint is timely," and each of the eight incidents is rendered timely.[101] *Id.* Additionally, the incidents described in II.B.(8) and B.(14) were found to be racial steering but were not counted as part of the continuing unlawful practice because the steering was not into or away from Cleveland Heights. However, since these incidents occurred within the limitations period, they corroborate the finding that Hilltop's section 3604(a) unlawful practice continued into the limitations period.

The court determined in III.B. that defendants Johanns and Hilltop engaged in racial solicitation which violated section 3604(e). Since the last of the card solicitations was received on September 29, 1978, this incident also occurred within the 180-day limitations period.

## V. LIABILITY OF VINCENT T. AVENI

The plaintiffs assert in their post-trial brief that vicarious liability for the acts of Hilltop agents is imputable not only to defendant Hilltop but also to Vincent T. Aveni. Since 1967, Vincent T. Aveni and his brother Joseph have been co-owners of Hilltop Realty, Inc. Vincent T. Aveni is also president and chief operating officer. In 1981 Hilltop Realty, Inc. purchased all the stock of HGM and now does business under the name of HGM Hilltop. Hilltop Realty, Inc. is licensed, as broker, to engage in the real estate business by the Ohio Department of Commerce, Division of Real Estate. Vincent T. Aveni and other associates of Hilltop retain their broker's licenses. These licenses are attached as addenda to Hilltop's broker license. Each sales agent associated with Hilltop is a party to an "independent contract" with Hilltop Realty.

A broker under contract with its agents has a nondelegable duty to obey the Fair Housing Act. *Marr v. Rife*, 503 F.2d at 741. Thus, Hilltop Realty is liable for the imputed acts and statements of those agents who participated in the eight violations of section 3604(a) and the sections 3604(c) and (e) violations found by this court. However, since the sales agents in those violations have a contractual relationship with Hilltop as broker and not with Vincent T. Aveni as broker, their acts and statements may not be imputed to him under *Marr v. Rife*.

Further, vicarious liability may not be imposed on Mr. Aveni because of his other roles at Hilltop Realty, Inc. Since he is not sole owner of the company, his partial stock ownership would not permit a per se piercing of the corporate veil.[102] Moreover,

---

**101.** The section 3604(c) violation arises out of the same incident found to be a section 3604(a) violation and is, therefore, part of the continuing violation. Hence, the unlawful practice is made up of nine Fair Housing Act violations arising from eight incidents.

**102.** Stockholders of a corporation generally are not personally liable for the acts of their corporation unless the record justifies piercing the corporate veil. *Export Credit Corporation v. Diesel Auto Parts Corp.*, 502 F.Supp. 207 (S.D.N.Y.1980). No claim was made in this case that the corporate veil should be pierced, nor was any evidence offered to support such a claim.

his status as president and chief operating officer in and of itself does not render him personally liable for acts of the corporation or its agents or employees. See *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1144–45 (4th Cir.1975); *Lobato v. Pay-less Drug Stores,* 261 F.2d 406, 409 (10th Cir.1958). To impose vicarious liability upon Mr. Aveni as president and chief operating officer for the acts of the Hilltop agents who participated in the continuing violation found by this court, it is essential to show that he participated in their acts or knew of and ratified their acts and statements.[103]

The plaintiffs point to Mr. Aveni's signing of the Voluntary Affirmative Marketing Agreement (VAMA) in March 1977 and his discussion of the agreement at the Quail Hollow breakfast meeting of the company and sales agents on April 20, 1977. There he explained the "meaning and content of the agreement and the importance of adhering to it." In this meeting he also asked associates "to keep track of all their prospects as to race, and houses shown to each prospect." Later, that request was rescinded. Therefore, no effort was made by the company to put into effect the form in the "Affirmative Marketing Handbook", circulated to Hilltop's sales agents, which among other things provided a line on which to record the race of the prospective buyer. Hilltop has not prescribed a uniform prospect interview form, though it does require the use of some standard forms, *e.g.,* standard listing agreements. Nor does Hilltop or Mr. Aveni require agents to record information on race of the buyer.

Plaintiffs argue that if Hilltop and Mr. Aveni had required the use of a form that recorded the race of a prospect, management would have been able to "monitor the performance of associates in carrying out the terms of [the Affirmative Marketing] agreement." Hence, it is contended that since Hilltop and Mr. Aveni did not require the use of either the VAMA form or its equivalent that would have recorded the race of a prospect, Mr. Aveni is chargeable with the failure to learn of and stop any steering activities of its agents. It is said that these failures make him a participant in their steering activities and therefore liable for their actions.

The failure of Hilltop and Mr. Aveni to have required the use of a uniform prospect interview form which recorded the race of a prospect is inconsistent both with Mr. Aveni's act of signing the affirmative marketing agreement and with his instructions to the sales agents at the April 20, 1977 Quail Hollow meeting. However, record keeping of prospects by race, while recommended by the "Affirmative Marketing Handbook," is not mandated by the Fair Housing Act. Hence, the court concludes that it may not find that Mr. Aveni's failure to require the use of such a prospect interview form in effect made him a participant in the acts or statements of the

Hence, the court does not need to determine whether relevant factors set forth in *Bucyrus Erie Co. v. General Products,* 643 F.2d 413, 418 (6th Cir.1981), have been satisfied, nor whether the "alter ego" requirements have been met. See *United States v. Pisani,* 646 F.2d 83, 85 (3d Cir.1981).

**103.** Mr. Aveni lectured on fair housing as part of Hilltop's "central training" of its sales agents. As part of this program, Mr. Aveni instructed them on the Fair Housing Act. Beginning in late 1976 or early 1977, he used a pamphlet supplied by the National Association of Realtors. He said he "would go into primarily the various aspects as the pamphlet describes the Fair Housing Law and particularly would get into the questions concerning the conduct of the agent." He used the book in his discussion of

racial steering. To the best of his recollection he told the agents:

Well, racial steering is the agent's effort to steer a minority into an integrated area, and it is the agent steering a white out of an integrated area into an all-white area, and that any, you know, effort upon the [part of the] agent to do so in essence was a violation of the Fair Housing Law.

Mr. Aveni's instruction on this subject does not exonerate Hilltop's imputed liability for the racial steering incidents previously found to have been committed by Hilltop agents. However, Mr. Aveni's instruction on racial steering does emphasize the necessity of the plaintiffs' producing direct evidence of his participation in those racial steering incidents in order to render him liable for those incidents.

Hilltop agents which comprise the violations of section 3604 found by this court.[104]

For these reasons it is concluded that defendant Aveni may not be found liable for the section 3604 violations previously found by the court and imputed to defendant Hilltop.

## VI. INJURIES AND RELIEF

### A. Injuries

■■■ It is concluded that defendant Hilltop's section 3604(a) continuing violation and its section 3604(e) violation, heretofore

found, have caused distinct and palpable injury and has threatened further injury to the City.[105] It is essential to detail the injuries sustained by the City in order to pass on the City's claims for injunctive relief.

Financing the City's efforts to maintain an open and stable integrated community without resegregation has cost the City money. According to City Manager Richard V. Robinson, the total expenses assigned to fair housing activities was $281,-526 during 1978 and $287,254 during 1979.[106]

---

**104.** In *United States v. Youritan Construction Co.*, 370 F.Supp. 643 (N.D.Ca.1973), *aff'd in relevant part,* 509 F.2d 623 (9th Cir.1975), the court held a defendant construction company and its owner and operator liable for the racially discriminatory preferences of rental agents in violation of the Fair Housing Act. In holding the owner liable, the court concluded that "owners and supervisors are responsible for the conduct of their agents," *id.* at 649, but the court did not discuss the legal theory upon which the owner's liability was based. Nevertheless, the court in *Youritan* noted that:

> Defendants [construction company and its owner] have instructed their apartment managers to seek prospective tenants who fit in with present tenants. Prospective compatibility with other tenants is not an appropriate rental consideration where its application would have a discriminatory racial impact.

*Id.* at 650. Thus, in *Youritan* the owner affirmatively participated in the discriminatory conduct of its agents through the owner's instructions to its managers. In the instant case there is no evidence of similar affirmative participation by Aveni in the racial steering of Hilltop's agents.

**105.** At an earlier stage of this case, the court in its memorandum and order of December 31, 1980 ruled that plaintiffs had alleged sufficient "actual or threatened injury" to satisfy the requirements under Article III for standing. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). Nevertheless, defendants have again raised the issue of standing in their post-trial brief, asserting that in *Bellwood* "the court emphasized that the allegations relating to standing remain to be proven at trial." Defendants refer to the Court's conclusion that:

> [T]he facts alleged in the complaints and revealed by initial discovery are sufficient to provide standing under Art. III. It remains open to petitioners, of course, to contest these facts at trial.[31] The adequacy of proof of

respondent's standing is not before us, and we express no views on it. [Footnote omitted.] *Id.* at 115, 99 S.Ct. at 1615.

In n. 31, the court observed:

> 31. Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial. *Id.* at 115, 99 S.Ct. at 1615.

To make standing an issue that must be proved by the plaintiff at trial would overturn the Court's fundamental concept that by virtue of Article III of the Constitution, standing is a "threshold question." *Linda R.S. v. Richard D.,* 410 U.S. 614, 616, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Even if defendants are correct, however, and the allegations relating to standing need to be reconsidered at trial, it is clear that the record provides facts which are sufficient to support plaintiffs' pretrial allegations of actual and threatened injury.

**106.** The largest component of the total for each year is money spent for public relations and community relations. In 1978 this was $116,-887, and in 1979 the amount was $101,100. Mr. Robinson explained that to better community relations, a full-time and a part-time employee were hired as "liaisons for the various school districts." These community relations workers conduct street meetings and block club meetings, and work with the Heights Community Congress and with the neighborhood associations. They help, he said,

> to keep peace in the community, to kind of smooth over fears that people may have in neighborhood areas when they feel that, in this particular case, when housing is not being maintained, or perhaps when it is being sold in a fashion that they feel is incorrect.

The next largest item is money spent for the "Heights Housing Service". In 1978 this was $106,666, and in 1979 it was $107,863. The Housing Service office conducts the "Escort

Defendants objected to the interrogation of City Manager Robinson about financial information prepared by the City's finance department (plaintiffs' exhibit No. 1069), which underpinned his testimony on injury to the City. In part, defendants' objection was that

> [t]he Supreme Court in *Bellwood* did not provide for these types of expenditures by the city with respect to the type of injuries they envisioned that the city could sue for with respect to the standing issue.

Plaintiffs pointed out that Mr. Robinson's testimony indicated that "these funds are expended to combat the illegal practices of the real estate industry." Plaintiffs further called attention to Dr. John Kain "testifying to the damage which discriminatory housing practices do to the city." The court ruled:

> Here, where the damages are not being offered really as a basis for claiming money, but as a basis really for the relief of injunctive or declaratory nature that is sought, I think there is a sufficient nexus established in this record [through] the testimony of Dr. Kain and also through other witnesses, including Barbara Roderick, that I think justifies examination of this witness on these items.

The court now reaffirms that ruling and credits Mr. Robinson's testimony.

It is concluded that the expenditure of funds to combat what the City reasonably perceived to be illegal real estate practices, including racial steering and racial solicitation, constitutes a distinct and palpable monetary injury to the City. These expenditures, while voluntary, were necessitated by the City's policy to promote a stable, integrated community and to ward off the resegregation of its various neighborhoods and the City as a whole. The development of this municipal policy was covered in part I.A., of this opinion.

Threatened injuries to the City have also been proved in the evidence. The population trends document in part I.A. show that forces toward resegregation were then occurring in some areas of Cleveland Heights. One example of that is provided by agent Mayfield's showing of a home to a black prospective buyer on a "mostly black" street in Cleveland Heights. Dr. Kain testified that "the increase in black population is a result of many factors in Cleveland Heights." The forces of resegregation if allowed to proceed unchecked, would probably cause diminishment of the City's tax base as recognized in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979). The soundness of the tax base in years 1976 through 1978[107] does not preclude the existing threat of a diminished tax base if tendencies towards resegregation were to accelerate. Threatened injury to the City results from the forces of resegregation, and a continuing violation of the Fair Housing Act, which has been found, is one of those forces which leads to resegregation.

In illustrating that "other harms" may flow "from the realities of a racially segregated community," the Court in *Bellwood* notes that "school segregation is linked closely to housing segregation." *Id.* at 111, n. 24, 99 S.Ct. at 1613, n. 24. Increas-

Program [for prospective new homeowners] and the program that keeps track of … statistics of housing sales in Cleveland Heights."

**107.** Defendants note that the City's application for Community Development Block Grant funds, dated February 5, 1979 and signed by City Manager Robinson, revealed that there was an increase in real estate values from 1976 to 1977 of 14.9 percent in Cleveland Heights. This percentage was compared with the following increases: East Cleveland, 5.6 percent; Euclid, 13.4 percent; Lyndhurst, 13.8 percent; Mayfield Heights, 13.3 percent; Richmond Heights, 14.6

percent; Shaker Heights, 18.6 percent; South Euclid, 11.6 percent; and University Heights, 11.7 percent. In addition, figures for "estimated change in value 1976–1979" showed the following increases: Cleveland Heights, 44.7 percent; East Cleveland, 16.8 percent; Euclid, 40.2 percent; Lyndhurst, 14.4 percent; Mayfield Heights, 39.9 percent; Richmond Heights, 43.8 percent; Shaker Heights, 55.8 percent; South Euclid, 34.8 percent; and University Heights, 35.1 percent. City Manager Robinson testified that this showed that "the values had been undervalued for so long that they were starting to catch up in that period."

es in black enrollment in certain elementary schools in Cleveland Heights, and actions to offset disproportionate increases in certain schools in the Cleveland Heights—University Heights school district, are sufficient to show that school segregation is an injury that threatens the City and which results from the forces of resegregation.[108]

 In the ruling of December 31, 1980, this court declared that "HCC may press a monetary claim to the extent of funds expended as a result of defendants' practices." Now that the evidence has been received, the court first considers HCC's request for "Market Share" damages.

The plaintiff Heights Community Congress seeks what it terms "Market Share" damages. Starting with HCC's "proportional budget" of $79,300 for the period September 1978 through May 1979, it attributes 43 percent of that total, or $34,120, to the costs of real estate monitoring and neighborhood organizing. Since Hilltop's market share during that period was 12 percent of real estate sales in Cleveland Heights, HCC calculates that "Hilltop cost HCC $9,522 for that period." It then states, "If the market share would be calculated against monitoring costs alone, the cost would have been $4,094."

The difficulty with HCC's claim for damages lies not in the above calculations. Rather, the fault lies in HCC's failure to produce evidence that causally connects Hilltop's section 3604 violations to HCC's expenditure of monies for monitoring

($4,094) or the more inclusive costs of ($9,522).

Lana Cowell, Executive Director of HCC, was asked the following question by counsel for Hilltop and Mr. Aveni: "You mean to tell me if Hilltop did not exist you wouldn't still be out there monitoring other real estate brokers and organizing neighborhood organizations and conducting New Homeowner Questionnaires?" She answered, "Yes, we probably would." HCC produced no evidence that monitoring costs would have been reduced "if Hilltop did not exist."

 As a second type of damage, plaintiff HCC seeks "perceptive impairment" damages. The basis for this claim is the language in *Havens Realty Corp. v. Coleman*, 455 U.S. at 365, 102 S.Ct. at 1117:

If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury-in-fact.

Summing up its argument for these damages, plaintiff urges:

In effect, the HCC has been emasculated since 1974 in stopping Hilltop from engaging in housing illegalities. It has been made helpless in its struggle to enjoin this aspect of pressure on the community, despite meetings, audits, surveys, advocacy of stronger local legislation, etc. Hilltop's actions have created the kind of "perceptive impairment" damages which rest within the sound dis-

---

**108.** Oxford Elementary School (census tract 1401, and parts of 1403, 1404 and 1405) had a black enrollment of .37 percent in 1970, 11.6 percent in 1974, 17.61 percent in 1975, 36.27 percent in 1977, and 47.01 percent in 1978.

Milliken school district (census tract 1408 and part of 1409) had a black enrollment of 6.46 percent in 1970, 43.53 percent in 1974, 53.16 percent in 1975, 62.98 percent in 1977 and 69.31 percent in 1978.

Taylor School (parts of census tracts 1406, 1407, 1409, 1415, 1416 and 1417) had a black enrollment of 9.78 percent in 1970, 52.84 percent in 1974, 62.84 percent in 1975, 70.05 percent in 1977, and 74.76 percent in 1978.

Determining that any elementary school that had a racial makeup of plus or minus 15 percent of the average of all elementary schools was racially isolated, the Cleveland Heights—University Heights school district closed Milliken School in 1978 and redistricted the remaining elementary schools. Junior high schools were also redistricted, and a voluntary transfer program was instituted. One magnet school was established in 1978, a second magnet school in 1979, a third was programmed, and a school community relations program was established.

cretion of the court.... The value to be placed on correcting HCC's "perceptive impairment" should far exceed the amount reflected in the "market share" damages it has already incurred because of Hilltop.

The evidence shows that HCC has engaged in activities of the type described above. It shows that Hilltop was among those realty firms monitored both by audits, by new homeowner questionnaires, and in other ways; that this monitoring was part of HCC's ongoing activities to carry out its policy of maintaining Cleveland Heights as an open and integrated community; and that it has been necessary to expend funds to finance these monitoring activities. This shows a type of general injury to HCC which is sufficient to permit HCC to join with Cleveland Heights in seeking injunctive or declaratory relief, if otherwise justified. See also, *supra* note 19.

■■■ A different situation is presented with reference to HCC's claim for monetary damages for either "perceptive impairment" or "market share" damages. No evidence was offered by plaintiff HCC to show that any of the foregoing described activities were targeted only at Hilltop. Instead, the evidence indicates that the activities are directed at the entire real estate industry operating in Cleveland Heights as well as against any other forces operating in the community which HCC believes is antagonistic to its policy of maintaining Cleveland Heights as an open and integrated community. It is concluded that plaintiff HCC's evidence fails to establish that HCC's expenditures in carrying on its various activities to maintain an open and integrated community were directly caused by violations of the Fair Housing Act by either defendant Hilltop or the other defend-

ants. Hence, the claim for monetary damages is not established.[109]

## B. Relief

■■■ In a section of their post-trial brief entitled "Impact and Remedy," the plaintiffs request that this court "fashion a form of relief which would correct the effect of unlawful conduct." Principally, the plaintiffs ask the court for an injunction which would order defendant Hilltop to establish "a record keeping system which would track prospects on the basis of race." The prerequisite for granting an injunction in a Fair Housing Act case is first a determination "that there exists some cognizable danger of recurrent violations." *United States v. Warwick Mobile Homes Estates,* 558 F.2d 194, 197 (4th Cir. 1977). This conforms to the general law on injunctions, 42 Am.Jur.2d, *Injunctions,* ¶ 4, (1969).

The eight incidents which comprise the section 3604(a) continuing violation and the section 3604(e) violation span the years 1976 through February 1978. No evidence covers any incident involving Cleveland Heights that occurred after September 1978. Neither the actual violations nor the incidents which only reflect corporate intent permit any inference that either the agents who were involved in those incidents or the corporation itself are likely to engage in further acts of racial steering.

Notably, John Mayfield, whose conduct was found to constitute racial steering in four of the incidents, left the company in early 1979 before this action was filed. Other agents who were involved in some of the incidents are no longer with the company.

**109.** Plaintiff HCC bases a claim for damages for denial of the "right" of fair housing on *Curtis v. Loether,* 415 U.S. 189, 195, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974), which plaintiff HCC argues established "the 'right' of fair housing." In *Loether,* the Court creates no such right. The Court ruled that "a damages action under § 812 is an action to enforce 'legal rights' within the meaning of our Seventh Amendment decisions."

*Loether* considered the Fair Housing Act only with reference to a section 812 claimant's *right* to a jury trial. Moreover, in *Loether* the damage claims under the Fair Housing Act were asserted by individuals, not by organizations. Whatever claims for damages under the Fair Housing Act an organization may have are governed by *Havens Realty Corp.,* 455 U.S. at 378, 379, 102 S.Ct. at 1124.

In 1980 the corporation closed its Heights office for economic reasons. While Hilltop's market share of Cleveland Heights real estate business was 12 percent in 1978–79, the percentage had dropped to 3½ percent by 1982.

These facts, considered separately and jointly, reveal no foundation for a conclusion that there is now a likelihood of a continuing violation or a threat of a future violation.

Finally, an additional consideration militates against the issuance of an injunction. The section 3604(a) continuing violation and the section 3604(e) violation have been proved and imputed to Hilltop Realty, Inc. At the same time, with reference to 17 other section 3604(a) incidents advanced by the plaintiffs, the court concluded there had been no racial steering into or away from Cleveland Heights. In addition to these 17, with reference to four homeowners called by the defendants as witnesses, the court found no steering. These 21 incidents of no steering involving Cleveland Heights offer an additional ground for concluding there is no likelihood of a threat of a future violation. Hence, there is no basis upon which this court might issue an injunction granting the affirmative relief that plaintiffs request.

However, eight acts of agents making unavailable a dwelling because of race have been established and imputed to Hilltop. Each is declared to violate section 3604(a) of the Fair Housing Act. Further, the eight acts are declared to be "an unlawful practice that continues" through 1976, 1977 and 1978 "into the limitations period." *Havens*, 455 U.S. at 381, 102 S.Ct. at 1125.

There is precedent for granting declaratory relief rather than injunctive relief in this Fair Housing Act case. In *United States v. Hunter*, 459 F.2d 205 (4th Cir. 1972), the court upheld a district court's granting of a declaratory judgment instead of the requested injunctive relief for violations of the Fair Housing Act. The appeals court found no abuse of discretion and agreed that given the nature of defendant's violations, he was "sufficiently unlikely to continue violating the Act as to make injunctive relief not warranted." [Footnote omitted.] [110] *Id.* at 220.

## VII. ORDER

1. Upon the findings of fact and conclusions of law heretofore made and for the reasons which have been stated, it is determined and declared:

a. Defendant Hilltop Realty, Inc. has engaged in violations of 42 U.S.C. § 3604(a) in the eight incidents specified in part II.B., pp. 1251–1278.

b. None of the eight incidents is barred by the 180-day period of limitations of 42 U.S.C. § 3612(a), see part IV., p. 1303.

c. In the one instance specified in part III.A., p. 166, the statement violates 42 U.S.C. § 3604(c).

2. With reference to the count 3 claim against defendant Bruce Johanns and defendant Hilltop Realty, Inc., it is determined and declared that said defendants violated 42 U.S.C. § 3604(e) as specified in part III.B., pp. 1297–1303.

3. With reference to the claims against defendant Vincent T. Aveni, Evelyn Gard-

---

**110.** In *Hunter*, at 219, n. 19, the court acknowledged that "[d]eclaratory relief is among the possible remedies available to the District Court under § 3613." That action was brought under section 3613, which allows enforcement of the Act by the Attorney General. The present action was brought under section 3612, which allows enforcement of the Act by private persons. Section 3612(c) states in part:

The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, *or other order*.... [Emphasis added.]

Rule 54(c) of the Federal Rules of Civil Procedure states in part:

Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

Therefore, by either section 3612(c) or Fed.R. Civ.P. 54(c), this court may enter a declaratory judgment in this matter if it is deemed appropriate.

ner and Shirley Bernstein, see parts V., II.B.(9) and B.(11) respectively, the claims are not sustained and are dismissed.

IT IS SO ORDERED.